1
2
3
4
5
6
7
8

UNITED STATES DISTRICT COURT

9

NORTHERN DISTRICT OF CALIFORNIA

10

SAN JOSE DIVISION

11

12  CONTINENTAL AUTOMOTIVE
    SYSTEMS, INC.,

Case No. 19-CV-02520-LHK

13
                        Plaintiff,

**ORDER GRANTING MOTION TO
TRANSFER VENUE**

14
            v.

Re: Dkt. No. 110

15

16  AVANCI, LLC, et al.,

17                      Defendants.

18          Continental Automotive Systems, Inc., the Plaintiff in this case, seeks licenses for various

19  standard essential patents associated with the 2G, 3G, and 4G cellular standards.  Plaintiff believes

20  the twelve defendants in this case have unlawfully conspired to deny such licenses to Plaintiff on

21  fair, reasonable, and non-discriminatory ("FRAND") terms, wherefore Plaintiff brings this multi-

22  count suit.  A subset of the defendants in this case have now moved to transfer the case to the

23  Northern District of Texas pursuant to 28 U.S.C. § 1404(a).  ECF No. 110.  Having considered the

24  parties' briefing, the relevant law, and the record in the case, the Court GRANTS the Motion to

25  Transfer Venue.

26  **I.      BACKGROUND**

27          **A. Factual Background**

28

Because they are relevant to the Motion to Transfer Venue, the Court briefly summarizes the allegations in Plaintiff's First Amended Complaint ("FAC").

Plaintiff Continental Automotive Systems, Inc. is a Delaware corporation with its principal place of business in Auburn Hills, Michigan. FAC ¶ 16. Plaintiff is in the business of making automotive components, which it sells to car manufacturers. FAC ¶ 103. The car manufacturers, or "OEMs" as Plaintiff calls them, then assemble the components from Plaintiff and their other various suppliers into the finished car. FAC ¶ 103. As relevant here, Plaintiff produces telematics control units ("TCUs"), which offer various "telecommunications, infotainment, and safety features." *Id.* ¶ 18. These TCUs engage in and rely upon cellular communications in order to function, which means they implement cellular communications standards. *Id.* ¶¶ 18, 70. Cellular communications standards are technical standards that facilitate communication and compatibility across different devices, providers, and geographies. *Id.* ¶¶ 70, 71. They are commonly identified by their "generation"—i.e., 1G, 2G, 3G, and 4G. *Id.* ¶¶ 70-76. Importantly, cellular communications standards are not mandated by law, but rather voluntarily adopted by members of the industry. Hence, industry groups called standard-setting organizations, or "SSOs" evolved to develop and manage these standards. *Id.* ¶ 71. Among the SSOs implicated in this case are the European Telecommunications Standards Institute ("ETSI"), the Alliance for Telecommunications Industry Solutions ("ATIS"), and the Telecommunications Industry Association ("TIA"). *Id.*

Although standardization has benefits, it also has the potential for anticompetitive consequences. *Id.* at 77. That is because standards will often incorporate patented technology, known as standard essential patents ("SEPs"). The holders of those SEPs—who are typically members of the SSOs—would then be able to charge exorbitant royalties from or refuse to license to certain users of the standards. *Id.* ¶ 123. In other words, each SEP holder acquires monopoly power when their patented technologies become a standard that others must use in order to participate in the cellular communications industry. *Id.* at 121. To prevent these eventualities, SSOs have intellectual property right ("IPR") policies to which their members must adhere. *Id.* ¶ 79, 122. According to Plaintiff, the IPR policies of the SSOs involved in this case require SSO

Case No. 19-CV-02520-LHK
ORDER GRANTING MOTION TO TRANSFER VENUE

members "to commit to license their asserted SEPs to firms implementing the standard on [fair, reasonable, and non-discriminatory ("FRAND")] terms and conditions." *Id.* ¶ 79. Plaintiff believes these IPR policies also "require a SEP holder to license its alleged SEPs on FRAND terms and conditions to any implementer within a given supply chain that uses the standards." *Id.* ¶ 20.

In the instant case, Plaintiff sues various companies who hold SEPs associated with the 2G, 3G, and 4G standards: Nokia Corporation ("Nokia Corp."); Nokia of America Corporation ("Nokia America"); Nokia Solutions and Networks US LLC ("Nokia Solutions"); Nokia Solutions and Networks Oy ("Nokia Solutions Oy"); Nokia Technologies Oy; Conversant Wireless Licensing SARL ("Conversant SARL"); Optis UP Holdings, LLC ("Optis UP"); Optis Cellular Technology, LLC ("Optis Cellular"); Optis Wireless Technology, LLC ("Optis Wireless"); and Sharp Corporation ("Sharp"). *Id.* ¶¶ 87-97. Plaintiff alleges that these companies— referred to collectively by Plaintiff as "Defendant Licensors"—have committed to grant licenses to their SEPs on FRAND terms and conditions, in accordance with the IPR policies of the various SSOs of which they are members. *Id.* ¶¶ 87, 89, 92.

In addition, Plaintiff sues Avanci, LLC and Avanci Platform International Limited ("Avanci PIL"), referred to collectively by Plaintiff as "Avanci." *Id.* at 1. According to Plaintiff, Avanci is a "licensing platform" that "acts as a licensing agent for a large group of patent owners and traditional patent licensors," including Defendant Licensors. *Id.* ¶ 107. Suppose a company manufactures a product that implements a cellular communications standard. *Id.* ¶¶ 111-12. Instead of separately obtaining licenses from each of the SEP holders, that company could obtain a collective license from Avanci to all of the SEPs held by Avanci's members. *Id.* The customer would pay a "flat" royalty that varied with the type of product implementing the standard, such as a car. *Id.* ¶ 112. Plaintiff acknowledges that pools or platforms like Avanci "may be efficient by reducing the transactional costs of negotiating separate licenses with individual licensors." *Id.* ¶ 115. However, Plaintiff believes Avanci is a "collusive vehicle" formed by SEP holders who "wanted to preserve their ability to continue to extract supra-FRAND licensing revenues." *Id.* at

3

28, ¶ 111.  Plaintiff also alleges that not all of the patents included in Avanci's collective license are in fact "essential" for practicing cellular communications standards.  *Id.* ¶ 116-17.

According to Plaintiff, there are three main components to the scheme.  First, Avanci's members (including Defendant Licensors) allegedly agreed to "collectively license their asserted SEPs on non-FRAND terms."  *Id.* ¶ 11.  Second, Plaintiff believes Avanci's members entered into a "multilateral agreement . . . to offer a collective license to its members' SEPs only to manufacturers at the very end of a supply chain, like car OEMs" and not to upstream suppliers like Plaintiff.  *Id.* ¶ 112.  In Plaintiff's view, the purpose of this second agreement is to facilitate Avanci's ability to charge supra-FRAND royalties.  That is, Avanci's high royalties "could not be sustained if charged directly to suppliers in the supply chain with much smaller prices and margins."  *Id.* ¶¶ 10, 113.  Only manufacturers of expensive end-products with greater margins— such as OEMs—would be willing to pay Avanci's royalties.

Third, to disincentivize individual Avanci members from competing "with each other or with Avanci in offering competitive SEP license terms," Avanci's members are allegedly retrained through an express agreement "from offering a license in competition with an Avanci licensing program in any manner that would hinder Avanci's ability to collect its full stated supra-FRAND royalty" on the collective license.  *Id.* ¶ 129.  The problem, according to Plaintiff, is that a fully "exhaustive" license—i.e., a license under which a supplier may "pass through" rights to its customers—would almost always impair Avanci's ability to collect its ordinary royalty on a collective license.  *Id.* ¶¶ 129, 133.  Thus, although each Avanci member is technically free to sell individual licenses to suppliers outside of the Avanci platform, "it is practically impossible for members to offer individual licenses to suppliers that are fully exhaustive."  *Id.* ¶ 129.

In support of Plaintiff's allegations regarding the workings of the Avanci conspiracy, the FAC describes Plaintiff's attempts to obtain licenses to Defendant Licensors' SEPs.  First, Plaintiff sought to obtain a collective license from Avanci.  Plaintiff alleges that, in keeping with the above-described agreements, Avanci indicated "it would only seek authorization from its members to license to Continental if Continental agreed in advance to pay the same inflated rates

4

Avanci demands from the car OEMs." *Id.* ¶ 114. In other words, Avanci allegedly required Plaintiff to pay the flat royalty for a car, even though Plaintiff only sought to produce one component of a car (i.e., TCUs).

Plaintiff then contacted each of the Defendant Licensors individually in an effort to obtain licenses to their respective SEPs. Plaintiff alleges that they all "refused to offer a direct license on FRAND terms." *Id.* ¶ 139. Thus, Plaintiff has been unable to obtain licenses to the relevant SEPs on FRAND terms.

Moreover, Plaintiff further alleges that it is harmed by Avanci's charging of supra-FRAND royalties to car OEMs, which are Plaintiff's customers. According to Plaintiff, Plaintiff and other upstream suppliers in the automotive supply chain actually "bear the artificially elevated cost of Defendants' non-FRAND royalties because the OEMs typically demand indemnity of such licensing costs as a condition of purchasing" from those suppliers. *Id.* ¶ 11. That is, Plaintiff's purchase agreements with car OEMs contain "indemnification clauses" obliging Plaintiff "to indemnify the respective OEM for any royalties the OEM might pay for using and/or selling" Plaintiff's TCUs as part of a vehicle. *Id.* at 105.

In Plaintiff's view, Defendant Licensors' actions contravene the commitments that Defendant Licensors made pursuant to the IPR policies of the SSOs of which they are members. For instance, Plaintiff believes Defendant Licensors have reneged upon their obligation "to license their SEPs on FRAND terms and conditions." *Id.* ¶ 86. Plaintiff further alleges that the IPR policies of the relevant SSOs "require a SEP holder to license its alleged SEPs on FRAND terms and conditions to any implementer within a given supply chain that uses the standards, and not merely to the manufacturers of "end-products." *Id.* ¶¶ 5, 80. In addition, Plaintiff believes the above-described actions of Avanci and Defendant Licensors amount to unlawful anticompetitive conduct. For instance, Plaintiff alleges that Defendants' collusive activity has permitted them to "illegally maintain[] the monopoly power they initially obtained when their patented technologies became standardized." *Id.* ¶ 126. Plaintiff also believes that the bundling of non-essential patents with true SEPs in Avanci's collective licenses constitutes "price fixing and/or illegal tying." *Id.* ¶

United States District Court
Northern District of California

116.

**B. Procedural History**

Plaintiff initially filed suit on May 10, 2019. ECF No. 1. On July 23, 2019, Plaintiff filed the operative First Amendment Complaint ("FAC"). ECF No. 97. The FAC contains seven causes of action: (1) breach of contract; (2) promissory estoppel; (3) declaratory judgment; (4) violation of 15 U.S.C. § 1, Section 1 of the Sherman Act; (5) unlawful monopolization in violation of 15 U.S.C. § 2, Section 2 of the Sherman Act; (6) conspiracy to monopolize in violation of 15 U.S.C. § 2, Section 2 of the Sherman Act; and (7) violation of the California Unfair Competition Law (the "UCL"), Cal. Bus. & Prof. Code §§ 17200 et seq. There are currently twelve defendants in the case: (1) Avanci, LLC; (2) Avanci PIL; (3) Nokia Corp.; (4) Nokia America; (5) Nokia Solutions; (6) Nokia Solutions Oy; (7) Nokia Technologies Oy; (8) Conversant SARL; (9) Optis UP; (10) Optis Cellular; (11) Optis Wireless; and (12) Sharp (collectively, "Defendants").

On July 31, 2019, a subset of Defendants—specifically, Avanci, LLC; Nokia Corp.; Nokia America; Nokia Solutions; Nokia Solutions Oy; Nokia Technologies Oy; and Conversant SARL (the "Moving Defendants")—moved to transfer the case to the United States District Court for the Northern District of Texas pursuant to 28 U.S.C. § 1404(a). ECF No. 110 ("Mot."). Defendants Optis UP, Optis Cellular, Optis Wireless (the "Optis Entities"), Avanci PIL, and Sharp do not join in the motion because they each have pending motions seeking to be dismissed from the case. ECF No. 174 at 1 n.1. However, the Optis Entities have stated that in the event "the Court determines to transfer the case while the Optis entities are still part of the case, the Optis Entities agree to the requested transfer to the jurisdictions identified in the motion." ECF No. 136 at 12 n.3. Avanci PIL and Sharp Corporation have likewise represented that they do not oppose transfer. ECF No. 174 at 1 n.1.

Plaintiff opposed the motion to transfer on August 28, 2019, ECF No. 157, and the Moving Defendants replied on September 13, 2019, ECF No. 174.

Also pending before the Court is Defendants' consolidated Motion to Dismiss, which was filed on August 30, 2019. ECF No. 162. That motion has been fully briefed. ECF Nos. 182, 193.

## II.    ORDER OF ANALYSIS

At the outset, the Court notes that Defendants' consolidated Motion to Dismiss raises, *inter alia*, several jurisdictional challenges. First, all Defendants move to dismiss for lack of Article III standing. ECF No. 162 at 4. Second, Defendants Nokia Corp., Conversant SARL, Avanci PIL, and the Optis Entities move to dismiss for lack of personal jurisdiction, though Conversant SARL moves without stating any argument. *Id.* at 23-24, 28. Third, Sharp moves to dismiss for insufficient service of process. *Id.* at 26. A motion to dismiss for insufficient service of process is a jurisdictional challenge because a court lacks jurisdiction if there has been insufficient service of process. *United States v. 4268 Los Angeles Ave. Simi Valley California 93063*, 672 F. App'x 770, 770 (9th Cir. 2017). Accordingly, before proceeding to the merits of the motion to transfer, the Court first explains why it need not resolve Defendants' various jurisdictional challenges.

It is well-established that "jurisdiction generally must precede merits in dispositional order." *Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 577 (1999). It is equally clear, however, that "[j]urisdiction is vital only if the court proposes to issue a judgment on the merits." *Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 431 (2007). As the U.S. Supreme Court held in *Sinochem*, a dismissal on the ground of *forum non conveniens* is not a judgment on the merits. *Id.* at 432. Rather, "it is a determination that the merits should be adjudicated elsewhere." *Id.* The same is true of a transfer pursuant to 28 U.S.C. § 1404(a), which "is merely a codification of the doctrine of *forum non conveniens* for the subset of cases in which the transferee forum is within the federal court system." *Atl. Marine Const. Co. v. U.S. Dist. Court for W. Dist. of Texas*, 571 U.S. 49, 60 (2013). "A district court therefore may dispose of an action by a forum non conveniens dismissal,"—or transfer a case pursuant to § 1404(a)—"bypassing questions of subject-matter and personal jurisdiction, when considerations of convenience, fairness, and judicial economy so warrant." *Sinochem*, 549 U.S. at 432; *accord Pub. Employees' Ret. Sys. of Mississippi v. Stanley*, 605 F. Supp. 2d 1073, 1075 (C.D. Cal. 2009) (citing *Sinochem* for the proposition that "[a] decision to transfer for inconvenient forum is not a decision on the merits and therefore does not require a finding of jurisdiction."). After all, the purpose of § 1404(a) is to

7

"prevent the waste of time, energy, and money and to protect litigants, witnesses, and the public against unnecessary inconvenience and expense." *Van Dusen v. Barrack*, 376 U.S. 612, 616 (1964). Therefore, "where subject-matter or personal jurisdiction is difficult to determine, and *forum non conveniens* considerations weigh heavily in favor of dismissal, the court properly takes the less burdensome course." *Sinochem*, 549 U.S. at 436.

Here, the jurisdictional challenges in Defendants' consolidated Motion to Dismiss are complex and may require the Court to look beyond the pleadings. For instance, Defendants' contention that Plaintiff lacks Article III standing is not a straightforward issue of law. Instead, the propriety of standing appears to turn in part on factual disputes, wherefore Defendants have submitted several affidavits in support of their motion. *See Savage v. Glendale Union High Sch., Dist. No. 205, Maricopa Cty.*, 343 F.3d 1036, 1040 n.2 (9th Cir. 2003) ("Once the moving party has converted the motion to dismiss into a factual motion by presenting affidavits or other evidence properly brought before the court, the party opposing the motion must furnish affidavits or other evidence necessary to satisfy its burden of establishing subject matter jurisdiction."). Indeed, considering the complexity of the standing issues, further briefing or jurisdictional discovery may be necessary.

Sharp's motion to dismiss for insufficient service of process is similarly complex, as it appears to turn in part on the factual relationship between Sharp and its U.S. subsidiary. ECF No. 162 at 26-27; ECF No. 182 at 29; ECF No. 193 at 15. Judicial economy and fairness are therefore disserved by continuing litigation in the Northern District of California.

Regarding the challenges to personal jurisdiction, only four of the twelve Defendants argue that this Court lacks personal jurisdiction over them. Deferring transfer of the case in order to resolve these defendants' objections would saddle the other defendants with unnecessary expense and delay. As Plaintiff's FAC alleges a conspiracy amongst all the Defendants, severance of the case would be inappropriate. *See, e.g.*, *Anticancer, Inc. v. Pfizer Inc.*, No. 11CV107 JLS RBB, 2012 WL 1019796, at *1 (S.D. Cal. Mar. 26, 2012) (stating that severance should not be used "to separate an essentially unitary problem").

8

For these reasons—and because, as discussed below, the Court finds the motion to transfer to be meritorious—the Court need not reach Defendants' jurisdictional challenges.

## III. LEGAL STANDARD

A motion to transfer venue from one district to another is governed by 28 U.S.C. § 1404(a). That statute states: "For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." 28 U.S.C. § 1404(a). Generally, the party seeking transfer bears the burden of showing that transfer is appropriate.[1] *Jones v. GNC Franchising, Inc.*, 211 F.3d 495, 499 (9th Cir. 2000). Under the plain text of the statute, the moving party must make two showings in order to justify transfer. First, the transferee forum must be one in which the case "might have been brought." *Hoffman v. Blaski*, 363 U.S. 335, 344 (1960). "In determining whether an action 'might have been brought' in a district, the court looks to whether the action initially could have been commenced in that district." *Hatch v. Reliance Ins. Co.*, 758 F.2d 409, 414 (9th Cir. 1985).

Second, provided the case could have been brought in the proposed transferee forum, the movant must persuade the court that considerations of "convenience of parties and witnesses" and "the interest of justice" weigh in favor of transfer. *Earth Island Inst. v. Quinn*, 56 F. Supp. 3d 1110, 1117 (N.D. Cal. 2014). The Ninth Circuit has identified a number of specific but non-exhaustive factors which "the court may consider" in analyzing those overarching statutory considerations: "(1) the location where the relevant agreements were negotiated and executed, (2) the state that is most familiar with the governing law, (3) the plaintiff's choice of forum, (4) the respective parties' contacts with the forum, (5) the contacts relating to the plaintiff's cause of action in the chosen forum, (6) the differences in the costs of litigation in the two forums, (7) the availability of compulsory process to compel attendance of unwilling non-party witnesses, . . . (8) the ease of access to sources of proof," (9) "the presence of a forum selection clause," if any; and

---

[1] A court may also transfer a case *sua sponte* pursuant to 28 U.S.C. § 1404(a), "so long as the parties are first given the opportunity to present their views on the issue." *Costlow v. Weeks*, 790 F.2d 1486, 1488 (9th Cir. 1986).

Case No. 19-CV-02520-LHK
ORDER GRANTING MOTION TO TRANSFER VENUE

(10) "the relevant public policy of the forum state, if any." *Jones,* 211 F.3d at 498–99.  A district court is not restricted to the pleadings on a motion transfer and may consider, *inter alia,* "undisputed facts supported by affidavits, depositions, stipulations, or other relevant documents." *FastCap, LLC v. Snake River Tool Co., LLC*, No. 15-CV-02764-JSC, 2015 WL 6828196, at *2 (N.D. Cal. Nov. 6, 2015).  At all events, § 1404(a) affords the court significant discretion to transfer the case based on an "individualized, case-by-case consideration of convenience and fairness."  *Stewart Org., Inc. v. Ricoh Corp.*, 487 U.S. 22, 29 (1988) (quoting *Van Dusen*, 376 U.S. at 622).

## IV.   DISCUSSION

In the Motion to Transfer, the Moving Defendants seek to transfer this case to the Northern District of Texas.  As set forth below, the Court finds that the case "might have been brought" in the Northern District of Texas and that convenience and the interest of justice favor transfer.

### A.   The Instant Case "Might Have Been Brought" in the Northern District of Texas

"To find that the action could have been brought in the transferee district, the Court must be satisfied that the transferee district has personal jurisdiction over all of the Defendants and that venue would be proper in that District."  *Ponomarenko v. Shapiro*, 287 F. Supp. 3d 816, 834 (N.D. Cal. 2018); *see Hoffman*, 363 U.S. at 343-44 (agreeing with respondents that if "the courts of [the transferee] district lacked venue over the action and ability to command jurisdiction over the defendants," the transferor court "was without power to transfer it to that district").  Whether a case "might have been brought" is determined based on "the posture of the case at the time of filing in the transferor district."  *A. J. Indus., Inc. v. U.S. Dist. Court for Cent. Dist. of California*, 503 F.2d 384, 386 (9th Cir. 1974).

Plaintiff does not address—and so apparently does not dispute—the Moving Defendants' contention that the instant action could have been brought in the Northern District of Texas.  As set out below, the Court agrees that the Northern District of Texas could exercise personal jurisdiction over all Defendants and that venue would be proper in the Northern District of Texas.

### 1.   The Northern District of Texas Could Exercise Personal Jurisdiction over

10

**Defendants**

There are two types of claims in the FAC: (1) federal antitrust claims, and (2) state law claims, including Plaintiff's claim for declaratory judgment. The Court analyzes each in turn.

### a. Nationwide Personal Jurisdiction over the Federal Antitrust Claims

Plaintiff brings three claims for violations of the Sherman Act. In general, a district court may exercise personal jurisdiction over a defendant "if a rule or statute authorizes it to do so and the exercise of such jurisdiction comports with the constitutional requirement of due process." *Myers v. Bennett Law Offices*, 238 F.3d 1068, 1072 (9th Cir. 2001) (internal quotation marks omitted); *see* Fed. R. Civ. P. 4(k)(1)(C). As for statutory authorization, Section 12 of the Clayton Act provides for personal jurisdiction in antitrust suits against corporate defendants as follows:

> Any suit, or proceeding under the antitrust laws against a corporation may be brought not only in the judicial district whereof it is an inhabitant, but also in any district wherein it may be found or transacts business; and *all process in such cases may be served in the district of which it is an inhabitant, or wherever it may be found.*

15 U.S.C. § 22 (emphasis added); *see also BNSF Ry. Co. v. Tyrrell*, 137 S. Ct. 1549, 1555 (2017) (explaining that "Congress' typical mode of providing for the exercise of personal jurisdiction has been to authorize service of process" and giving 15 U.S.C. § 22 as an example). As the Ninth Circuit has held, this provision provides for nationwide personal jurisdiction—i.e., personal jurisdiction in any federal district court. *Go-Video, Inc. v. Akai Elec. Co.*, 885 F.2d 1406, 1413 (9th Cir. 1989) (affirming that "since process, under § 12, could be served anywhere in the country (indeed anywhere in the world)," personal jurisdiction "could be obtained in any judicial district in the United States") Section 12 thus provides statutory authorization for personal jurisdiction in the Northern District of Texas.

Turning to the due process component of personal jurisdiction, a defendant must have "minimum contacts" with the territorial jurisdiction of a court "such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Walden v. Fiore*, 571 U.S. 277, 283 (2014) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)). The Ninth Circuit has "held that the relevant forum with which a defendant must have 'minimum

11

1   contacts' in a suit brought under Section 12 of the Clayton Act is the United States," rather than a

2   particular state. *Action Embroidery Corp.*, 368 F.3d at 1180; *accord FTC v. Americans for Fin.*

3   *Reform*, 720 F. App'x 380, 383 (9th Cir. 2017) (applying national contacts analysis). The

4   question at hand is therefore whether the Defendants have sufficient minimum contacts with the

5   United States as whole to establish either specific or general jurisdiction.

6       At the outset, the Court notes that several of the Defendants (Avanci, LLC; Nokia

7   America; Nokia Solutions; Optis Wireless; Optis Cellular; and Optis UP) are incorporated in the

8   United States and have their principal places of business in the United States. FAC ¶¶ 20, 28-29,

9   44-46. These defendants are indisputably "at home" in the United States, such that general

10  jurisdiction is proper. *See Daimler AG v. Bauman*, 571 U.S. 117, 137 (2014) ("With respect to a

11  corporation, the place of incorporation and principal place of business are paradigm bases for

12  general jurisdiction."); *see Action Embroidery Corp.*, 368 F.3d at 1180 (finding nationwide

13  minimum contacts for "a Virginia professional corporation operating in the United States").

14      Without addressing whether the remaining Defendants' contacts with the United States

15  justify general jurisdiction, the Court finds that, at the very least, specific jurisdiction is proper

16  over all Defendants. "Under specific jurisdiction, a court may assert jurisdiction for a cause of

17  action that arises out of the defendant's forum-related activities." *Yahoo! Inc. v. La Ligue Contre*

18  *Le Racisme Et L'Antisemitisme*, 433 F.3d 1199, 1205 (9th Cir. 2006). The Ninth Circuit has set

19  forth the following "three-part test to analyze whether a party's 'minimum contacts' meet the due

20  process standard for the exercise of specific personal jurisdiction":

21              (1) The non-resident defendant must purposefully direct his activities
                or consummate some transaction with the forum or resident thereof;
22              or perform some act by which he purposefully avails himself of the
                privilege of conducting activities in the forum, thereby invoking the
23              benefits and protections of its laws; (2) the claim must be one which
                arises out of or relates to the defendant's forum-related activities; and
24              (3) the exercise of jurisdiction must comport with fair play and
                substantial justice, i.e. it must be reasonable.
25
    *In re W. States Wholesale Nat. Gas Antitrust Litig.*, 715 F.3d 716, 741–42 (9th Cir. 2013) (internal
26
    quotation marks omitted), *aff'd sub nom. Oneok, Inc. v. Learjet, Inc.*, 135 S. Ct. 1591 (2015). In
27

28                                                      12
    Case No. 19-CV-02520-LHK
    ORDER GRANTING MOTION TO TRANSFER VENUE

other words, the Ninth Circuit has specifically said that "[a] foreign act having an effect in the forum may satisfy the minimum contact [sic] requirement." *Kramer Motors, Inc. v. British Leyland, Ltd.*, 628 F.2d 1175, 1178 (9th Cir. 1980). For instance, "[i]t is sufficient for purposes of due process that the suit was based on a contract which had substantial connection with that State." *McGee v. Int'l Life Ins. Co.*, 355 U.S. 220, 223 (1957).

The Court finds that all three requirements for specific jurisdiction are met here as to all Defendants. Starting with the first requirement, an antitrust defendant "purposefully directs" its activities at a forum "when its allegedly anticompetitive behavior is targeted at a resident of the forum, or at the forum itself." *In re Cathode Ray Tube (CRT) Antitrust Litig.*, 27 F. Supp. 3d 1002, 1011 (N.D. Cal. 2014) (citing *In re W. States Wholesale Nat. Gas Antitrust Litig.*, 715 F.3d at 743). The allegedly anticompetitive behavior in the instant case is the conspiracy amongst the Defendants to charge supra-FRAND royalties for their SEPs. The FAC plainly alleges that Defendants targeted their conspiracy at U.S. markets and companies, including Plaintiff (a Delaware corporation) and Plaintiff's customers ("car OEMs throughout the United States," FAC ¶ 173). Specifically, as described above, Plaintiff alleges that (1) Avanci charges supra-FRAND royalties to car OEMs in the United States; (2) Avanci refused to grant Plaintiff a collective license on FRAND terms and conditions; and (3) Defendant Licensors refused to grant Plaintiff individual licenses to their respective SEPs. Moreover, the cellular communications standards and SEPs at issue in this case "are implemented throughout the United States." FAC ¶ 173. Defendants' activity thus causes harm to U.S. entities in the United States. For instance, Defendants' alleged refusal to grant Plaintiff licenses to the SEPs impedes Plaintiff's ability to make products using cellular technology in the United States. Finally, Defendants allegedly carried out their conspiracy in part through a U.S. entity—Avanci, LLC (a Delaware corporation). The Court therefore concludes the first requirement for specific jurisdiction is satisfied.

As for the second requirement of the specific jurisdiction test, there is no question that Plaintiffs' antitrust claims arise out of Defendants' alleged conspiracy to charge supra-FRAND royalties for their SEPs. The Court therefore turns to the third requirement: that specific

jurisdiction be reasonable.  Specific jurisdiction is presumptively reasonable if the first two requirements are satisfied.  *Ballard v. Savage*, 65 F.3d 1495, 1500 (9th Cir. 1995) ("We presume that an otherwise valid exercise of specific jurisdiction is reasonable.").  None of the parties contend that litigating in the Northern District of Texas would offend "traditional notions of fair play and substantial justice."  Indeed, though some Defendants did not join the instant motion to transfer, none of the Defendants object to transfer.  Under these circumstances, the exercise of personal jurisdiction over Plaintiff's federal antitrust claims by the Northern District of Texas is reasonable.

### b.  Pendent Personal Jurisdiction over the State Law Claims

The FAC also contains four state law claims: a breach of contract claim (Count 1); a promissory estoppel claim (Count 2), a claim for declaratory judgment in connection with the common law claims for breach of contract and promissory estoppel (Count 3), and a UCL claim (Count 7).  "Personal jurisdiction must exist for each claim asserted against a defendant."  *Action Embroidery Corp.*, 368 F.3d at 1180.  Hence, having concluded that the Court has personal jurisdiction over Plaintiff's antitrust claims against all Defendants, the Court turns to whether it may exercise personal jurisdiction over the remaining four state law claims.

One possible basis for personal jurisdiction over these claims could be Texas's long-arm statute.  *See* Fed. R. Civ. P. 4(k)(1)(A) ("Serving a summons or filing a waiver of service established personal jurisdiction over a defendant who is subject to the jurisdiction of a court of general jurisdiction in the state where the district court is located.").  Personal jurisdiction pursuant to Texas's long-arm statute would require analysis of each Defendant's contacts with Texas.  The Court need not engage in such analysis, however, because the doctrine of pendant personal jurisdiction authorizes personal jurisdiction over Plaintiff's state law claims.  Pendent personal jurisdiction is commonly applied where, as here, "one or more federal claims for which there is nationwide personal jurisdiction are combined in the same suit with one or more state or federal claims for which there is not nationwide personal jurisdiction."  *Action Embroidery Corp.*, 368 F.3d at 1180–81.  The doctrine affords a court the discretion to exercise jurisdiction over "a

14

claim for which there is no independent basis of personal jurisdiction so long as it arises out of a common nucleus of operative facts with a claim in the same suit over which the court does have personal jurisdiction." *CE Distribution, LLC v. New Sensor Corp.*, 380 F.3d 1107, 1113 (9th Cir. 2004); *see Rolls-Royce Corp. v. Heros, Inc.*, 576 F. Supp. 2d 765, 784 (N.D. Tex. 2008) (concluding that, "if [Plaintiff's] remaining claims arise out of the same nucleus of operative fact as its RICO claims, it is within the court's discretion to exercise pendent personal jurisdiction over them").

Here, all four state law claims arise out of a common nucleus of operative facts with the federal antitrust claims. The Court starts with Counts 1 and 2. The allegedly anticompetitive actions giving rise to Plaintiff's federal antitrust claims also form the basis for Plaintiff's claims for breach of contract (Count 1) and promissory estoppel (Count 2). The anticompetitive actions include, for instance, Defendants' "agreements or understandings to . . . collectively boycott intermediate suppliers of components and subsystems within the automotive chain," which Plaintiff claims are unreasonable restraints on trade in violation of Section 1 of the Sherman Act. FAC ¶¶ 171-72. Likewise, the FAC alleges unlawful monopolization and conspiracy to monopolize under Section 2 of the Sherman Act on the theory that Defendants' "multilateral agreement between/among Defendants . . . to pool or otherwise combine and collectively license their patents through Avanci on non-FRAND terms was a mechanism to maintain and further enhance their ability to exploit the monopoly power that each co-conspirator SEP holder initially obtained from standardization of its proprietary technologies." *Id.* ¶ 192. These same acts— refusing to license to upstream suppliers and licensing patents on non-FRAND terms—constitute Defendants' alleged violations of contracts with and promises made to SSOs, per Defendants' breach of contract and promissory estoppel claims.

Count 3 simply seeks declaratory judgment as to Plaintiff's rights under the contracts and promises at issue in Counts 1 and 2, which means it arises from the same underlying facts.

The last state law claim is Count 7, a claim brought under the UCL. Under California law, "conduct that threatens an incipient violation of an antitrust law" can serve as a basis for a UCL

claim. *Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal. 4th 163, 187 (1999). Here, the FAC alleges that "the anticompetitive business acts or practices that are alleged herein and above violate, *inter alia*, Sections 1 and 2 of the Sherman Act, Section 5 of the Federal Trade Commission Act and common law, and as such also constitute unlawful conduct within the meaning of the UCL." FAC ¶ 200. In other words, Plaintiff's claim under the UCL is predicated upon its federal antitrust and common law claims. It follows, then, that the UCL claim concerns the same facts as those claims.

Thus, all of Plaintiffs' claims arise out of a common nucleus of facts: Defendants' conspiracy to charge supra-FRAND royalties for various SEPs in the cellular communications industry. A district court could therefore exercise pendent personal jurisdiction over the state law claims. That pendent personal jurisdiction is a discretionary doctrine is of no moment. Whether the Northern District of Texas actually declines to exercise pendent personal jurisdiction over the state law claims has no bearing on whether Plaintiff *might have* brought suit in that district. *See High River Ltd. P'ship v. Mylan Labs., Inc.*, 353 F. Supp. 2d 487, 496 (M.D. Pa. 2005). It is enough that pendent personal jurisdiction over the state law claims would be permissible.

With that, the Court concludes that the Northern District of Texas could exercise personal jurisdiction over both Plaintiff's federal antitrust claims and state law claims.

### 2. Venue Would Be Proper in the Northern District of Texas

Turning briefly to venue, the Moving Defendants assert and Plaintiff does not appear to dispute that venue would be proper in the Northern District of Texas. The Moving Defendants assert that 28 U.S.C. § 1391(b)(2) authorizes venue in the Northern District of Texas. Mot. at 9. The Court agrees.

"[V]enue is proper in a federal antitrust suit if the venue requirements of either Section 12 or 28 U.S.C. § 1391 are satisfied." *Action Embroidery Corp.*, 368 F.3d at 1178. Section 1391(b)(2) provides, in pertinent part, that venue is proper in "a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred." "Substantiality is intended to preserve the element of fairness so that a defendant is not haled into a remote district

16

having no real relationship to the dispute." *California Closet Co. v. Ebben*, No. C 08-0625, 2008 WL 1766767, at *7 (N.D. Cal. Apr. 15, 2008) (quoting *Cottman Transmission Sys., Inc. v. Martino*, 36 F.3d 291, 294 (3d Cir. 1994)). However, "§ 1391(b)(2) does not require that a majority of the events have occurred in the district where suit is filed, nor does it require that the events in that district predominate." *Rodriguez v. California Highway Patrol*, 89 F. Supp. 2d 1131, 1136 (N.D. Cal. 2000); *accord Daniel v. Am. Bd. of Emergency Med.*, 428 F.3d 408, 432 (2d Cir. 2005) ("Section 1391(b)(2) does not restrict venue to the district in which the 'most substantial' events or omissions giving rise to a claim occurred."). "Rather, it is sufficient that a substantial part of the events occurred in the challenged venue, even if a greater part of the events occurred elsewhere." *California Closet Co.*, 2008 WL 1766767, at *7.

As discussed further below, the Court finds that "a substantial part of the events or omissions" giving rise to Plaintiff's claims occurred in the Northern District of Texas. Plaintiff alleges that Defendants engaged in an anticompetitive scheme to charge supra-FRAND royalties on their respective SEPs. At the heart of this scheme is the Avanci platform. According to Plaintiff, Defendant Licensors appointed Avanci as their licensing agent. Avanci is the "collusive vehicle" through which Defendant Licensors sell collective licenses at supra-FRAND rates. As relevant to venue, the Moving Defendants aver that Avanci, LLC "conducts its licensing business operations through personnel working in Dallas." Mot. at 4 (citing ECF No. 110-2 ("McLeroy Decl.") ¶ 2). Dallas is located in the Northern District of Texas. Plaintiff's claims are thus "based on conduct of Avanci employees working out of Avanci's principal executive office in Dallas." Mot. at 12. For instance, Avanci's Dallas employees were "responsible for the negotiation and execution of agreements" entered into by Avanci, LLC, Avanci PIL, and Avanci members— including Defendant Licensors. McLeroy Decl. ¶ 2. These agreements include the "express multilateral agreement" through which Defendant Licensors bound themselves not to compete with Avanci by offering individual licenses. In other words, much of the allegedly unlawful conduct occurred in the Northern District of Texas. Plaintiff, meanwhile, does not contend otherwise. The Court is therefore satisfied that venue may lie in the Northern District of Texas

17

1    under § 1391(b)(2).

2         In sum, having determined that both personal jurisdiction and venue are proper in the

3    Northern District of Texas, the Court concludes that the instant case "might have been brought"

4    there.

5    **B. Convenience and the Interest of Justice Favor Transfer**

6         The Court now turns to the second requirement for transfer: that considerations of

7    "convenience of parties and witnesses" and "the interest of justice" weigh in favor of transfer.

8    Below, the Court analyzes these statutory factors as well as other considerations that the parties

9    have raised.  The Court ultimately finds that the Moving Defendants have met their burden of

10   justifying transfer from this court to the Northern District of Texas.

11   **1.  The Plaintiff's Choice of Forum**

12        First and foremost, Plaintiff argues strenuously that the Court should defer to Plaintiff's

13   choice of forum.  ECF No. 157 ("Opp.") at 10-11.  Although the district court has significant

14   discretion to transfer a case, it is true that "great weight is generally accorded plaintiff's choice of

15   forum." *Lou v. Belzberg*, 834 F.2d 730, 739 (9th Cir. 1987); *accord Carolina Cas. Co. v. Data

16   Broad. Corp.*, 158 F. Supp. 2d 1044, 1048 (N.D. Cal. 2001).

17        Some courts in this District have also suggested that a plaintiff's choice of forum is entitled

18   to greater deference in cases involving permissive venue statutes, which express Congress's intent

19   "to grant plaintiffs liberal choice in their selection of a forum." *Ellis v. Costco Wholesale Corp.*,

20   372 F. Supp. 2d 530, 537 (N.D. Cal. 2005) (discussing the Title VII venue provision) (internal

21   quotation marks omitted).  Plaintiff believes 15 U.S.C. § 22 is one such statute.  Opp. at 11.

22   However, at least one district court has rejected the notion that plaintiffs are entitled to special

23   deference under 15 U.S.C. § 22.  *In re Funeral Consumers Antitrust Litig.*, No. C 05-01804 WHA,

24   2005 WL 2334362, at *7 (N.D. Cal. Sept. 23, 2005) ("Plaintiffs also argue that 15 U.S.C. 22 . . .

25   entitles their choice to special deference upon a motion for transfer. This is not the law.").

26        Over the years, moreover, Congress has greatly expanded venue options in all types of

27   federal cases, most recently in the Federal Courts Jurisdiction and Venue Clarification Act of

28

18

2011.  *See* 14D Wright & Miller, *Fed. Prac. & Proc.*, § 3802 (4th ed. 2019).  The now-broad availability of federal venue generally weakens the proposition that Plaintiff's choice deserves greater deference by virtue of § 22.  *See id.* § 3818 ("The general venue statute today is far broader than it was when the Clayton Act was passed in 1914.").

In any event, there are two significant factors counseling against deference to Plaintiff's initial choice of venue in the present case.  First, "[w]hen the plaintiff's choice is not its home forum, . . . the presumption in the plaintiff's favor applies with less force, for the assumption that the chosen forum is appropriate is in such cases less reasonable."  *Sinochem*, 549 U.S. at 430 (internal quotation marks omitted).  Plaintiff Continental has filed this case in the Northern District of California and wishes that the case remain here.  However, Plaintiff is not a resident of this District.  It is a Delaware corporation with its principal place of business in Michigan.

Second, the degree to which courts defer to the plaintiff's chosen venue is also "substantially reduced" "where the forum lacks a significant connection to the activities alleged in the complaint."  *Getz v. Boeing Co.*, 547 F. Supp. 2d 1080, 1083 (N.D. Cal. 2008); *see also Cung Le v. Zuffa, LLC*, 108 F. Supp. 3d 768, 779 (N.D. Cal. 2015) (plaintiff's choice of forum was "afforded less deference" in part because plaintiff filed the actions "in a district where very few of the operative facts occurred").  As laid out in greater detail below, the Court sees few meaningful ties between the Northern District of California and this case.  Plaintiffs have not alleged that a substantial part of the events underlying Plaintiff's claims took place in California, or that the Northern District of California has a special local interest in the issues raised in the FAC.  Indeed, Plaintiff emphasizes that the anticompetitive harms caused by Defendants' actions will be felt by "the whole [Internet of Things] IoT industry . . . nationally, and around the world."  Opp. at 1.  There is thus no indication that the Northern District of California has any "significant connection," *Getz*, 547 F. Supp. 2d at 1083, to the instant suit.

Accordingly, although the Court takes account of Plaintiff's initial choice of forum, that choice is not entitled to the same "great weight" that might normally attach.

### 2.  Convenience of the Parties

Next, the Court considers the convenience of the parties. The Moving Defendants assert that "[t]ransfer would unquestionably be more convenient for Defendants, many of whom are headquartered in or very near to" the Northern District of Texas. Mot. at 12. To briefly review, there are twelve defendants in the case: (1) Avanci, LLC; (2) Avanci PIL; (3) Nokia Corp.; (4) Nokia America; (5) Nokia Solutions; (6) Nokia Solutions Oy; (7) Nokia Technologies Oy; (8) Conversant SARL; (9) Optis UP; (10) Optis Cellular; (11) Optis Wireless; and (12) Sharp. Of those, the following four Defendants are headquartered in Texas: Avanci, LLC (Dallas, Texas) and the three Optis Entities (Plano, Texas). FAC ¶¶ 20, 44-46.

In addition, though they are not headquartered in Texas, it is fair to say that the transferee district would be more convenient for two more Defendants: Nokia Solutions and Nokia America. The Moving Defendants have submitted a declaration indicating that Defendant Nokia Solutions no longer exists, but had been headquartered in Irving, Texas. ECF No. 110-3 ¶ 4. Nokia Solutions was merged into Nokia America, effective January 1, 2018. *Id.* Nokia America, in turn, has its principal place of business New Jersey. Relevant here, Nokia America avers that "its most significant corporate places of business" are in New Jersey and Texas, including Texas offices in Dallas, Irving, and Plano. *Id.* ¶ 3. "[O]ver 2,000 Nokia of America Corporation employees are or will soon be based in Dallas" alone. *Id.* ¶¶ 3,7.

In response, Plaintiff claims that Nokia America "operates four separate facilities in this District." Opp. at 6. Even by Plaintiff's own account, however, Nokia America's Sunnyvale office—which Plaintiff alleges is Nokia America's "West Coast home"—employs only 40 researchers. Nokia America's presence in Texas is orders of magnitude greater. Under these circumstances, the Court accepts the Moving Defendants' representation that the Northern District of Texas is more convenient for Nokia America and the apparently defunct Nokia Solutions.

The FAC alleges that the remaining six defendants (Avanci PIL, Conversant SARL, Nokia Corp., Nokia Solutions Oy, Nokia Technologies Oy, and Sharp) are foreign entities,[2] so they are

---

[2] Avanci PIL is organized under the laws of Ireland and has its principal place of business in Ireland. FAC ¶ 21. Conversant SARL is organized under the laws of Luxembourg and has its

20

equally inconvenienced by California and Texas forums.  In sum, then, the convenience factor for all domestic Defendants weighs in favor of transfer.

For its part, Plaintiff has not convincingly shown that the Northern District of Texas is any less convenient for it.  Again, Plaintiff is a Delaware corporation with its principal place business in Michigan.  Plaintiff nevertheless argues that the Northern District of California is more convenient because it "has a major facility in San Jose, spanning 65,000 square feet."  Opp. at 1.  According to Plaintiff, its Intelligent Transportation Systems ("ITS") segment is managed out of the San Jose facility.  *Id.* at 2.  ITS apparently "develops services and products that utilize and rely on cellular connectivity technologies that are the subject of this dispute."  *Id.*  As the Moving Defendants point out, however, Plaintiff's own declaration seems to indicate that ITS is a separate corporate entity: Continental Intelligent Transportation Systems, LLC.  ECF No. 157-2 ("Wahnschaff Decl.") ¶ 3.  ITS is not a party to this lawsuit, so its convenience is not relevant to the "convenience of the parties."

Moreover, conspicuously absent from Plaintiff's averments is any nexus between ITS's business activities in San Jose and the allegations in the FAC.  Plaintiff does not assert that any of the fewer than 100 personnel working in San Jose are involved in licensing—the subject of this suit.  Instead, Plaintiff states that its San Jose employees include "sales people" "responsible for negotiating and finalizing the purchase" of its flagship product with customers.  Opp. at 3 (citing Wahnschaff Decl. ¶ 3).  The San Jose facility also houses a research and development ("R&D") center.  *Id.* ¶ 5.  Plaintiff fails to specify that any of its San Jose R&D and sales personnel are connected to the instant case.  The Court therefore rejects Plaintiff's contention that the Northern District of California is more convenient than the Northern District of Texas.

Because the Northern District of Texas would be more convenient for Defendants and not

_____

principal place of business in Luxembourg.  *Id.* ¶ 35.  Nokia Corp. is organized under the laws of Finland and has its principal place of business in Finland.  *Id.* ¶ 27.  Nokia Solutions Oy is organized under the laws of Finland and has its principal place of business in Finland.  *Id.* ¶ 30.  Nokia Technologies Oy is organized under the laws of Finland and has its principal place of business in Finland.  *Id.* ¶ 31.  Sharp is organized under the laws of Japan and has its principal place of business in Japan.  *Id.* ¶ 52.

Case No. 19-CV-02520-LHK
ORDER GRANTING MOTION TO TRANSFER VENUE

less convenient for Plaintiff, the convenience of the parties weighs in favor of transfer.

### 3. Convenience of the Witnesses

The Court now turns to which district betters serves the convenience of witnesses that may be called in this litigation. It has been said that the convenience of the witnesses—especially non-party witnesses—is "the most important factor in determining whether a transfer pursuant to § 1404 is appropriate." *Amini Innovation Corp. v. JS Imports, Inc.*, 497 F. Supp. 2d 1093, 1111 (C.D. Cal. 2007); *accord Cung Le*, 108 F. Supp. 3d at 778 (convenience of the witnesses is "the most important consideration of them all"). Courts look to "who the witnesses are, where they are located, what their testimony will be, and why such testimony is relevant." *Florens Container v. Cho Yang Shipping*, 245 F. Supp. 2d 1086, 1092-93 (N.D. Cal. 2002) (citing *A.J. Industries, Inc. v. United States Dist. Ct.*, 503 F.2d 384, 389 (9th Cir. 1974)). The convenience of party witnesses and non-party witnesses are both relevant to the Court's inquiry, though the Court "accords less weight to the inconvenience of party witnesses, . . . as they can be compelled to testify regardless of the forum in which the lawsuit is ultimately litigated." *Amini Innovation Corp.*, 497 F. Supp. 2d at 1111; *accord Lax v. Toyota Motor Corp.*, 65 F. Supp. 3d 772, 779 (N.D. Cal. 2014).

Here, it is evident to the Court that this case will involve witnesses from many different entities located all over the world, and that travel and inconvenience will be unavoidable. The Court is also mindful that litigation is yet at an early stage, before it is clear precisely which witnesses will be relevant. Nevertheless, based on the current record, the Court believes the Northern District of Texas is the more convenient venue for both party and non-party witnesses.

### a. Party Witnesses

Starting with party witnesses, the Moving Defendants contend that venue in the Northern District of Texas is more convenient because "many of the relevant potential witnesses from Defendants are located in or near Dallas." Mot. at 13. The Court agrees.

The Moving Defendants point specifically to employees of the six domestic Defendants: Avanci, LLC, the three Optis Entities, Nokia Solutions, and Nokia America. As previously noted, Avanci, LLC and the Optis Entities are headquartered in Texas. Witnesses from Avanci, LLC are

likely to be of particular relevance, as the Avanci platform is allegedly the "collusive vehicle" carrying out many of Defendants' allegedly anticompetitive acts. For instance, when Plaintiff allegedly sought to obtain a collective license from Avanci, Avanci, LLC acted through its Dallas employees. It is therefore unsurprising that the two Avanci employees (Kasim Alfalahi and Luke McElroy) named by Plaintiff as potential witnesses in its Rule 26 initial disclosures are located in Dallas. ECF No. 174-1 ("Papendick Decl.") ¶ 4, Ex. A. at 3. The parties have also named three employees of the Optis entities (Brian Blasius, Ray Warren, and James Warden) as potential witnesses, and these witnesses are likewise based in Texas. *Id.* ¶ 4.

As for Nokia Solutions and Nokia America, Nokia America—which has apparently subsumed Nokia Solutions—attests that all its automotive licensing personnel are based in Finland, where its parent company Nokia Corp. is headquartered. Mot. at 5-6; Reply at 7. These employees are likely witnesses, and neither forum is particularly convenient. In response, Plaintiff merely emphasizes that Nokia America has a handful of offices in the Northern District of California. As discussed above, though, those offices do not appear to have any connections to the instant litigation. Nor has Plaintiff identified a single relevant party witness at those offices.[3] Rather, Nokia America's domestic personnel are concentrated in Texas and New Jersey. To the extent any of these domestic personnel are relevant witnesses, the Northern District of Texas would be more convenient.

The remaining Defendants are foreign entities. In general, any witnesses from the foreign Defendants will be located abroad, making both forums equally inconvenient. Mot. at 13.

So far, then, the Northern District of Texas is likely be more convenient for witnesses from the domestic Defendants. Against this backdrop, Plaintiff showcases a single defense party

---

[3] Plaintiff makes a passing reference to Michael Schmidt, an employee of an unspecified Nokia entity who allegedly engaged in licensing discussions with one of Plaintiff's affiliates, Zonar Systems, Inc. Opp. at 6-7. However, Zonar Systems, Inc. is not a party to this litigation, and Plaintiff failed to contradict the Moving Defendants' contention that the licensing discussions with Zonar Systems, Inc. do not relate to the allegations in the FAC. Mot. at 6. As a consequence, Plaintiff has not established the relevance of Mr. Schmidt's testimony. Besides, Mr. Schmidt appears to be located in Seattle, Washington. Opp. at 6; Mot. at 6. Accordingly, the Court finds that Mr. Schmidt has no bearing on the convenience of the party witnesses.

Case No. 19-CV-02520-LHK
ORDER GRANTING MOTION TO TRANSFER VENUE

1    witness located in this District: Boris Teksler, one of Defendant Conversant SARL's officers.

2    Opp. at 5, 6.  It is undisputed that Mr. Teksler lives and works in the Northern District of

3    California, and that he was involved in Conversant SARL's negotiations with Avanci in

4    connection with joining Avanci.  Mot. at 1; ECF No. 110-1 ("Burt Decl.") ¶ 3; Opp. at 5.

5         But Mr. Teksler is only one of multiple personnel involved in Conversant SARL's

6    negotiations with Avanci.  Burt Decl. ¶ 6(b).  The Court first notes that Conversant SARL itself

7    has no offices in the United States, but is instead managed by employees of other Conversant

8    entities based in Ottawa and Plano: Conversant Intellectual Property Management, Inc.

9    ("Conversant IP"), which is based in Ottawa, Canada; Conversant Intellectual Property

10   Management Corp. ("Conversant IP Texas"), which is based in Plano, Texas; and Conversant

11   Wireless Licensing Ltd. ("Conversant Wireless Texas"), which is based in Plano, Texas.  Burt

12   Decl. ¶ 1; Mot. at 13 n.18.

13        Other than Mr. Teksler, the Conversant SARL personnel involved in the Avanci

14   negotiations are primarily located in Ottawa, Canada and Plano, Texas.  *Id.*; Mot. at 5.  The same

15   is true of the employees who negotiated with Plaintiff on behalf of Conversant SARL when

16   Plaintiff sought a license from Conversant SARL directly.  That is so, according to the Moving

17   Defendants, because the employees responsible for managing and licensing Conversant SARL's

18   patent portfolio are primarily located in Ottawa and Plano.  Burt Decl. ¶ 4; Mot. at 13 n.18.  One

19   such witness is Scott Burt of Plano, Texas, which Plaintiff has included in its initial disclosures.[4]

20   Papendick Decl. ¶ 4, Ex. A at 5.  In fact, Mr. Teksler appears be the only Conversant SARL

21   witness for whom the Northern District of California is more convenient.  Considering the other

22   Conversant SARL witnesses—particularly those based in Plano, Texas—Mr. Teksler is hardly

23   enough to shift the balance in favor of the Northern District of California.  *See In re Funeral*

24   *Consumers Antitrust Litig.*, No. C 05-01804 WHA, 2005 WL 2334362, at *5 (N.D. Cal. Sept. 23,

25

26   _____

27   [4] Mr. Burt is, among other things, the Chief Intellectual Property Officer and General Counsel of
     Conversant IP—of which Defendant Conversant SARL is a wholly owned subsidiary.  Burt Decl.
     ¶ 1-2.

28
     Case No. 19-CV-02520-LHK
     ORDER GRANTING MOTION TO TRANSFER VENUE

1   2005) ("Against the larger picture of the far greater number of witnesses in Texas, as shown by the

2   Rule 26 disclosures, the California witnesses shrink into insignificance.").

3       The Court therefore concludes that, notwithstanding Mr. Teksler, the Northern District of

4   Texas is likely to be more convenient to the Defendants' party witnesses.

5       As for Plaintiff's witnesses, Plaintiff is headquartered in Auburn Hills, Michigan. Plaintiff

6   makes much of the fact that it has a "major facility" in San Jose, California. Opp. at 1. Yet, as

7   discussed above, Plaintiff has failed to show that this facility bears any connection to the instant

8   litigation. Plaintiff does not allege that any employees at this facility were involved in or have

9   firsthand knowledge of the conduct alleged in the FAC. Rather, the facility is home to Continental

10  Intelligent Transportation Systems, LLC, a separate corporate entity that is not a party to this suit.

11  If anything, the Northern District of Texas is closer to Plaintiff's headquarters in Auburn Hills,

12  Michigan.

13      Thus, although many potential party witnesses reside in neither district, the Court agrees

14  with the Moving Defendants that the Northern District of Texas is likely to be the more

15  convenient forum for party witnesses.

16                              **b. Non-party Witnesses**

17      Turning to the more important factor—the convenience of non-party witnesses—the

18  parties highlight four different groups of witnesses.

19      First, the Moving Defendants point to "the non-party patent experts whom Avanci engaged

20  to evaluate the essentiality of the SEPs included in the Avanci license." Mot. at 14. The Moving

21  Defendants assert and Plaintiff does not deny that these patent experts are relevant to rebut

22  Plaintiff's allegations in the FAC that not all of the patents included in the Avanci patent pool are

23  actually "essential" to cellular communications standards. Mot. at 7; *see* FAC ¶¶ 116-17. There

24  were apparently 15 such experts: two in Texas, six in Virginia, three in North Carolina, four in

25  Colorado, one in Utah, and one in Washington. McLeroy Decl. ¶ 5. The Northern District of

26  Texas is substantially closer to the 11 experts located in Texas and the East Coast, whereas this

27  District is only closer to the two experts in Utah and Washington. *Cf. Jarvis v. Marietta Corp.*,

28
Case No. 19-CV-02520-LHK
ORDER GRANTING MOTION TO TRANSFER VENUE

No. C 98-4951 MJJ, 1999 WL 638231, at *5 (N.D. Cal. Aug. 12, 1999) (finding that the Northern District of New York is more convenient for witnesses residing in the eastern United States and Canada).

The second key group of potential witnesses are employees of non-party Avanci members. These are SEP holders who have not been separately named as Defendants in this suit. The parties dispute which forum is more convenient for witnesses from these entities. Plaintiff calls attention to Qualcomm, Ericsson, and BlackBerry. Opp. at 7.

Starting with Qualcomm, Plaintiff asserts that Qualcomm is headquartered in San Diego, California and that the former Qualcomm employee (Derek Aberle) who executed Qualcomm's multilateral agreements with Avanci is located in San Diego. *Id.* Oddly, however, Plaintiff did not name Mr. Aberle in its Rule 26 initial disclosures. *See* Papendick Decl., Ex. A. Pursuant to Rule 26, those initial disclosures include a list of "each individual likely to have discoverable information . . . that the disclosing party may use to support its claims or defenses." Fed. R. Civ. P. 26(a)(1)(A)(1). Although Plaintiff reserved its right to supplement the list of witnesses, Plaintiff served its Rule 26 initial disclosures on Defendants after filing its opposition to the instant motion. Hence, the omission of Mr. Aberle suggests that Plaintiff no longer considers him a relevant witness. The Court is therefore unable to conclude that Mr. Aberle is a likely, relevant witness.

The same is true of Plaintiff's proffered witnesses from BlackBerry, which Plaintiff says is headquartered in Canada. Plaintiff suggests that two former BlackBerry employees (Jerald Gnuschke and Roland Williams) may be witnesses because they "corresponded directly with Continental regarding a license to BlackBerry's SEPs." Opp. at 8. Plaintiff claims these employees are located in this District, but Plaintiff's own exhibit contradicts that claim. *Id.* (citing ECF No. 158-2, Ex. 60). Plaintiff's exhibit indicates that Mr. Williams works in Davis, California (in the Eastern District of California) and Mr. Gnuschke works in Seattle, Washington. In any event, neither Mr. Williams nor Mr. Gnuschke appear in Plaintiff's Rule 26 initial disclosures. Indeed, Plaintiff's Rule 26 initial disclosures are devoid of any witnesses from BlackBerry. *See*

Papendick Decl., Ex. A. Plaintiff's Rule 26 initial disclosures do not even include a placeholder for an unnamed BlackBerry employee.

As for Ericsson, Plaintiff points to three former Ericsson executives. Plaintiff acknowledges, though, that two of these three employees are based in Sweden, where Ericsson is headquartered. The Court rejects the notion that the Northern District of California is more convenient for these or any other Ericsson employees based in Sweden. The third executive, John Han, now works for Qualcomm in San Diego, California. But again, Plaintiff omitted Mr. Han from its Rule 26 initial disclosures. *See* Papendick Decl., Ex. A.

For these reasons, the Court is not persuaded that the individuals from Qualcomm, Ericsson, and BlackBerry upon which Plaintiff rests its convenience argument are likely to be relevant witnesses.[5]

Meanwhile, the Moving Defendants contend that several "key employees" of non-party Avanci members who were responsible for managing the Avanci relationship are located in Dallas, Texas and the surrounding areas. Mot. at 5 (citing McLeroy Decl. ¶ 3). The Moving Defendants fail to identify these "key employees" with any specificity, however. The Moving Defendants have not provided their names, their employers, their roles at those employers, or their precise locations. Because the Court cannot assess the relevance of these unidentified employees, the Court accords no weight to the Moving Defendants' "vague generalizations" regarding the convenience of these witnesses. *Cochran v. NYP Holdings, Inc.*, 58 F. Supp. 2d 1113, 1119 (C.D. Cal. 1998), *aff'd*, 210 F.3d 1036 (9th Cir. 2000).

In sum, neither side has demonstrated that its preferred forum is more convenient for witnesses from non-party Avanci members.

The third group of non-party witnesses comprise two potential licensors who did not join the Avanci platform: Tesla and Apple, Inc. ("Apple"). Plaintiff asserts that Avanci met and

---

[5] Plaintiff worries that witnesses from BlackBerry and Qualcomm "would be immune from compulsory process if this case is transferred to Texas." Opp. at 22. Because Plaintiff has failed to identify any relevant witnesses at those entities, the Court does not reach the issue of whether a subpoena could reach them.

Case No. 19-CV-02520-LHK
ORDER GRANTING MOTION TO TRANSFER VENUE

negotiated with these companies in this District regarding the possibility of joining the Avanci platform. Opp. at 11 (citing ECF No. 157-1 ("Risher Decl.") ¶¶ 3-5). As the Moving Defendants point out, however, Plaintiff provides no information regarding the nature or relevance of the possible testimony from Tesla or Apple employees. It is perhaps unsurprising, then, that Plaintiff's Rule 26 initial disclosures include neither named employees nor placeholders for unnamed employees from Tesla or Apple. Accordingly, the convenience of potential Apple and Tesla witnesses does not counsel against transfer.

Finally, the fourth group of non-party witnesses are individuals from the SSOs. To briefly review, the FAC alleges that Defendants made and breached commitments to various SSOs to license their respective SEPs on FRAND terms and conditions. Those commitments were made pursuant to the IPR policies of each SSOs. None of the relevant SSOs appear to be located particularly close in proximity to this District or the Northern District of Texas. *See* Mot. at 6-7. Their convenience therefore does not cut in either direction.

All told, the Court finds that only the first group of non-party witnesses—the patent experts who made essentiality determinations as to the SEPs offered in the Avanci license—bears on the convenience of non-party witnesses. The Northern District of Texas is more convenient for this first group of witnesses, which means that the convenience of non-party witnesses weighs in favor of transfer.

### 4. Other Convenience Factors

The parties raise two other factors in support of their respective positions as to convenience: the location of counsel and the ease of access to evidence. The Court finds that neither weighs heavily toward one forum over another.

#### a. Location of Counsel

Regarding the location of counsel, Plaintiff asks the Court to take account of the fact that 19 of the 28 counsel of record in this case are officed in California, "and thus litigation would be less costly" here. As Plaintiff acknowledges, however, "[t]he convenience of counsel is not considered for purposes of deciding whether a venue is convenient for the purposes of § 1404(a)."

28

*Vasquez v. Wells Fargo Bank, Nat'l Ass'n*, 77 F. Supp. 3d 911, 925 (N.D. Cal. 2015) (citing *In re Horseshoe Entertainment*, 337 F.3d 429, 434 (5th Cir. 2003) ("The factor of 'location of counsel' is irrelevant and improper for consideration in determining the question of the transfer of venue.")). After all, "many lawyers today practice on a national basis," "local counsel usually is available to be present in court," and "it would be easy to manipulate venue simply by obtaining counsel in the venue of choice." *Wilson v. Walgreen Co.*, No. C-11-2930 EMC, 2011 WL 4345079, at *5 (N.D. Cal. Sept. 14, 2011) (internal quotation marks omitted). The Court therefore declines to give any significant weight to where the attorneys' offices are located.

### b. Ease of Access to Evidence

Both parties acknowledge that, in the current age of electronic discovery, the location of documentary evidence is increasingly irrelevant. *See Lax*, 65 F. Supp. 3d at 780 ("[W]here electronic discovery is the norm (both for electronic information and digitized paper documents), ease of access is neutral given the portability of the information."). The ability to digitize documents for storage and transport means that evidence can easily and cheaply be produced to any appropriate forum.

The Moving Defendants nonetheless argue that the "ease of access to evidence" factor counsels in favor of transfer because "documents maintained by Avanci in Dallas are likely to be among the most relevant to this action." Mot. at 15. The Court is not persuaded. Even if critical evidence may be stored in Dallas, the Moving Defendants have not demonstrated that transporting such evidence will be burdensome in any way. The parties "do not allege discovery here will implicate any unique types of information that cannot easily be digitized." *Lax*, 65 F. Supp. 3d. at 780. On the contrary, Plaintiff's allegations primarily involve negotiations and agreements. The Court therefore finds this factor to be neutral.

### 5. The Interest of Justice

The Court next considers to the "interest of justice." Courts have interpreted the "interest of justice" to encompass various "public factors." *See Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 241 (1981). In the instant case, the parties have raised five such factors: the local interest in the

29

1  controversy, familiarity with governing law, judicial economy, ability to enforce an injunction,

2  and court congestion.  The Court takes each in turn.

3            a.   **Local Interest in the Controversy**

4         Plaintiff's principal argument against transfer is that this District "has great local interest in

5  this dispute."  Opp. at 11.  The U.S. Supreme Court and the Ninth Circuit have both recognized

6  "the local interest in having localized controversies decided at home."  *Decker Coal Co. v.*

7  *Commonwealth Edison Co.*, 805 F.2d 834, 843 (9th Cir. 1986) (quoting *Piper Aircraft Co. v.*

8  *Reyno*, 454 U.S. 235, 241 n.6 (1981)).  However, the present dispute is not the kind of "localized

9  controversy" that either district has an interest in having decided locally.  A controversy is

10  properly considered "localized" if it directly and especially affects the rights and interests of

11  citizens of a particular state or locality.  *Nat'l Ass'n of Home Builders v. E.P.A.*, 675 F. Supp. 2d

12  173, 177 (D.D.C. 2009).  In such cases, resolving the matter in a local forum allows local citizens

13  to participate in and observe the case.  *S. Utah Wilderness All. v. Lewis*, 845 F. Supp. 2d 231, 237

14  (D.D.C. 2012).  By contrast, a case with national or international significance "cannot be

15  considered the type of purely 'localized controversy' that would warrant transfer to the local

16  district court."  *Forest Cty. Potawatomi Cmty. v. United States*, 169 F. Supp. 3d 114, 118 (D.D.C.

17  2016).  Patent cases, for instance, "do not give rise to a local controversy or implicate local

18  interests" because the rights determined in such cases are national in scope.  *Intellectual Ventures I*

19  *LLC v. Checkpoint Software Techs. Ltd.*, 797 F. Supp. 2d 472, 486 (D. Del. 2011) (recognizing

20  that local interest is usually a neutral factor in patent cases); *see also Westside Winery, Inc. v.*

21  *Palm Bay Int'l, Inc.*, No. C 18-2765 SBA, 2018 WL 4278665, at *4 (N.D. Cal. Aug. 3, 2018)

22  ("[I]n contract disputes arising from obligations that are national in scope, the action is generally

23  not considered to be a localized controversy."); *Allegiance Healthcare Corp. v. London Int'l Grp.,*

24  *PLC*, No. C 97-4619 SC, 1998 WL 328624, at *4 (N.D. Cal. June 17, 1998) ("Plaintiff's claims

25  are based on Defendants; national advertising and promotion of their gloves. This case is not a

26  localized controversy.").

27         The instant case is undoubtedly national—indeed, international—in scope.  Plaintiff

28                                            30

Continental claims that it is "one of the leading suppliers to automotive OEMs worldwide." FAC ¶ 17. The Defendants are likewise multinational corporations that conduct business all over the world. Many of them are foreign entities. Furthermore, Defendants are alleged to have engaged in anticompetitive behavior with global effects. The FAC specifically states that "[t]he geographic scope of the relevant technology markets, the market for the licensing of 2G, 3G, and 4G cellular SEPs, and the baseband processor markets alleged herein *is worldwide*." FAC ¶ 134. The FAC goes on to explain that "[t]he 2G, 3G, and 4G standards at issue have been adopted globally and are subject to common FRAND obligations" and that "SEP licenses are typically granted on a worldwide basis." *Id.* Just as "patent infringement is a national issue, not a local one," *Viva Healthcare Packaging, Ltd. v. CTL Packaging USA, Inc.*, No. LACV1303372JAKMRWX, 2013 WL 12142564, at *5 (C.D. Cal. Oct. 8, 2013), "no single jurisdiction can truly claim a uniquely particularized interest" "in the enforcement of federal antitrust laws." *Bartolucci v. 1-800 Contacts, Inc.*, 245 F. Supp. 3d 38, 50 (D.D.C. 2017).

Plaintiff nevertheless contends that this District has a greater local interest in the instant case "because of the disproportionately significant impact" of the case on "the IoT and automotive technology industry here." Opp. at 23. Specifically, Plaintiff points to "electric vehicle companies such as Tesla, Lucid, Rivian, and Faraday," "automotive technology companies like Uber, Lyft, and Cruise," and "traditional carmakers Ford, BMW, General Motors, Honda, Mercedes-Benz and Nissan-Renault," all of which have a presence in this District. Opp. at 13. In Plaintiff's own words, however, this dispute "will profoundly impact an entire global industry." Opp. at 1. Beyond asserting that these various companies have a presence in this District, Plaintiff has not provided any evidence that this District has a particularized interest in the instant case. Without such evidence, the Court is not persuaded that what appears to be an essentially international controversy is actually a local one.

If anything, the Northern District of Texas's local interest is the greater one because of Avanci, LLC's presence there. Courts have found that a district where the allegedly unlawful activity was concentrated may have a local interest. *See Desert Survivors v. U.S. Dep't of the*

*Interior*, No. 16-CV-01165-JCS, 2016 WL 3844332, at \*11 (N.D. Cal. July 15, 2016) ("[T]he Eastern District has a slightly stronger local interest in this controversy because the operative facts that occurred in the Eastern District.").  As discussed above, the Avanci platform is the "collusive vehicle" through which Defendants are alleged to have accomplished much of their anticompetitive behavior.  Avanci, LLC is headquartered in Dallas, Texas and its Dallas employees were responsible for the allegedly unlawful behavior.  Any local interest in adjudicating the controversy would therefore belong to the Northern District of Texas.

In sum, the Court therefore concludes that the instant dispute is one of international significance such that neither district has a substantially more compelling local interest.  To the extent there is any local interest in the case, it lies with the Northern District of Texas and thus weighs in favor of transfer.

### b.  Familiarity with Governing Law

The Court turns to another interest-of-justice consideration, each court's familiarity with the applicable law.  As noted, the FAC contains federal antitrust claims and state law claims.  As to the federal claims under the Sherman Act, federal district courts are "presumed to be equally familiar with the applicable statutes." *Desert Survivors v. US Dep't of the Interior*, No. 16-CV-01165-JCS, 2016 WL 3844332, at \*4 (N.D. Cal. July 15, 2016); *see also Miller v. Insulation Contractors, Inc.*, 608 F. Supp. 2d 97, 103 (D.D.C. 2009) ("[A]ll federal courts are presumed to be equally familiar with the law governing federal statutory claims.").

As for Plaintiff's common law claims for breach of contract and promissory estoppel, it is not yet clear which state's law governs. *See* Mot. at 16, 16 n. 25.  The breach of contract and promissory estoppel claims are based upon Defendant Licensors' alleged commitments to various SSOs.  These commitments, in turn, were purportedly made in connection with the SSOs' respective IPR policies.  Accordingly, the applicable state law will likely turn on facts not currently before the Court, including whether the IPR policy contains a choice-of-law provision.  In fact, multiple different states' laws may apply depending on the underlying agreement.  There is therefore no reason to think that either district has greater familiarity with the law applicable to the

32

common law claims.

That leaves the UCL claim, which is a statutory claim under California law. Continental asserts that judges in this District are more familiar with the UCL than judges in the Northern District of Texas, which is likely true. Nonetheless, the existence of the UCL claim is not an obstacle to transfer. Courts in this District have repeatedly found that "where a federal court's jurisdiction is based on the existence of a federal question, as it is here, one forum's familiarity with supplemental state law claims should not override other factors favoring a different forum." *Johns v. Panera Bread Co.*, No. 08-1071 SC, 2008 WL 2811827, at *5 (N.D. Cal. July 21, 2008); *accord Foster v. Nationwide Mut. Ins. Co.*, No. C 07-04928 SI, 2007 WL 4410408, at *6 (N.D. Cal. Dec. 14, 2007). That is because, as United States District Judge William Alsup aptly put it, "the tail should not wag the dog." *In re Funeral Consumers Antitrust Litig.*, No. C 05-01804 WHA, 2005 WL 2334362, at *6 (N.D. Cal. Sept. 23, 2005). Where, as here, the basis for federal subject matter jurisdiction is federal question jurisdiction, Plaintiff's suit is "first and foremost a purported nationwide antitrust class action under the Sherman Act." *Id.* If "the main federal event" is better served in a particular venue, "the pendency of a supplemental state-law claim should not override the indicated result." *Id.* After all, "courts outside of California are fully capable of applying California law." *Roling v. E*Trade Sec., LLC*, 756 F. Supp. 2d 1179, 1186 (N.D. Cal. 2010).

Moreover, as discussed above, Plaintiff's UCL claim is predicated on the same violations of the Sherman Act and common law that form the basis for Plaintiff's antitrust and common law claims. FAC ¶ 200 ("[T]he anticompetitive business acts or practices that are alleged herein and above violate, *inter alia*, Sections 1 and 2 of the Sherman Act, Section 5 of the Federal Trade Commission Act and common law, and as such also constitute unlawful conduct within the meaning of the UCL."). As a result, the Northern District of Texas would have little additional analysis to conduct, beyond adjudicating the federal antitrust and state common law claims.

For these reasons, Plaintiff's UCL claim—and thus, familiarity with governing law—is "a very small factor" in the overall balance. *In re Funeral Consumers Antitrust Litig.*, 2005 WL

33

2334362, at *6.

### c. Judicial Economy

Relatedly, Plaintiff argues that judicial economy favors retaining the case because this Court is already "extremely familiar with the legal issues in this lawsuit because it recently decided *FTC v. Qualcomm, Inc.*, No. 17-cv-00220-LHK, another case involving FRAND, SEP, and related antitrust issues." Opp. at 13. However, Plaintiffs have not sought to relate or consolidate the present case to *FTC v. Qualcomm* or any other preexisting litigation in this District. Again, federal district courts are "presumed to be equally familiar with the applicable statutes." *Desert Survivors*, No. 16-CV-01165-JCS, 2016 WL 3844332, at *4. The factor of judicial economy is therefore neutral.

### d. Ability to Enforce an Injunction

Plaintiff also opposes transfer on the ground that "[t]his District is better able to monitor compliance with an injunction than the Northern District of Texas." Opp. at 14. Specifically, Plaintiff believes that Plaintiff and other "current or potential licensing targets of Defendants" "would be subject to the protections of any injunction" and that they "could more readily seek relief here than in Texas" because they "are located in this District." *Id.*

To begin with, Plaintiff does not provide any authority for the proposition that an injunction might be more effectively enforced by a particular federal district court. Plaintiff cites only *Ergos Software, Inc. v. Benflah*, in which the district court rejected that very proposition. No. SACV080908AGRNBX, 2009 WL 10674043, at *4 (C.D. Cal. Sept. 15, 2009) ("The Court has jurisdiction over Defendants and can enforce any injunction it grants in this case."). Indeed, Plaintiff has raised no question as to the Northern District of Texas's authority to enforce any injunction that it may issue. Nor could it, as "district courts do, and must, have the authority to punish contemptuous violations of their orders." *Reebok Int'l Ltd. v. McLaughlin*, 49 F.3d 1387, 1390 (9th Cir. 1995) (citing 18 U.S.C. § 401; *International Union, UMW v. Bagwell*, 512 U.S. 821, 831 (1994)).

Instead, Plaintiff's argument simply boils down to the same arguments the Court has

34

already considered as to the geographical convenience of the Northern District of California for Plaintiff and other potential licensees. The Court declines to revisit its conclusion that the Northern District of Texas is equally convenient for Plaintiff, which is headquartered in Michigan. Insofar as Plaintiff is concerned about the convenience of a different potential licensee, these concerns are too speculative to have any force. That is, Plaintiff worries that, should Plaintiff prevail in obtaining an injunction, Defendants might fail to comply with that injunction and some unspecified potential licensee might then ask the district court to intervene. Considering the chain of contingencies at play, the Court is unable to assess the geographical convenience of this hypothetical litigant.

Accordingly, the Court concludes that any potential injunction can readily be enforced in the Northern District of Texas.

### e. Court Congestion

Finally, the Moving Defendants claim that transfer is in the interest of efficiency because "[t]he Northern District of Texas offers a more streamlined docket." Mot. at 17. According to the Moving Defendants, the average time to disposition in the Northern District of California is 7.6 months compared to 7 months in the Northern District of Texas. *Id.* The Moving Defendants are correct that courts may consider the relative congestion of the fora in evaluating the interest of justice. *Park*, 964 F. Supp. 2d at 1095-96 (quoting *Decker Coal*, 805 F.2d at 843). However, the difference in congestion between this District and the Northern District of Texas is marginal. *Roling v. E\*Trade Sec., LLC*, 756 F. Supp. 2d 1179, 1187 (N.D. Cal. 2010) (holding that the difference between 6.4 months and 9.4 months was too marginal "to accurately predict the outcome in this specific action"). Moreover, as Plaintiff points out, "the median time to trial is actually faster in this District (25.9 months) than in the Northern District of Texas (26.3 months)." Opp. at 15. The Court is therefore unable to draw any meaningful conclusions about expediency based on the foregoing data. The factor of court congestion is neutral.

### 6. Balancing of Factors

On balance, the convenience and fairness considerations under § 1404(a) demonstrate that

35

the Northern District of Texas is the more appropriate venue for the instant case. The Court acknowledges that it owes Plaintiff's choice of forum some deference. But as discussed above, that deference is diminished here and weighs only slightly against granting the motion to transfer. On the other side of the ledger, the Moving Defendants have shown that convenience to the parties and convenience to the witnesses would be better served in the Northern District of Texas. These convenience factors are entitled to the greatest weight, for the "central purpose" of the court's inquiry "is to ensure that the trial is convenient." *Piper Aircraft Co.*, 454 U.S. at 256. Though many factors (location of counsel, ease of access to evidence, ability to enforce an injunction, local interest in the controversy, familiarity with governing law, judicial economy, and court congestion) are neutral, Plaintiff has not shown that a single factor affirmatively favors retention of the case in this District.

Finally, the Court emphasizes that "this is not one of the situations where a contemplated transfer simply shifts inconvenience between parties." *Cung Le*, 108 F. Supp. 3d at 779. Here, as in *Cung Le*, transfer simply shifts the case away from a forum "that is not especially convenient for either side and sends [it] to the one that is especially suited to Plaintiffs' claims." *Id.*

Considering all of the factors, then, the Court concludes the Moving Defendants have met their burden of justifying transfer.

## V. CONCLUSION

For the foregoing reasons, the Motion to Transfer is GRANTED. The Clerk shall TRANSFER the above-captioned case to the United States District Court for the Northern District of Texas.

**IT IS SO ORDERED.**

Dated: December 11, 2019

*Lucy H. Koh*

LUCY H. KOH
United States District Judge

Case No. 19-CV-02520-LHK
ORDER GRANTING MOTION TO TRANSFER VENUE