UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF TEXAS

DALLAS DIVISION

| | |
|---|---|
| CONTINENTAL AUTOMOTIVE SYSTEMS, INC., <br>       Plaintiff, <br><br> v. <br><br> AVANCI, LLC, et al. <br>       Defendants. | No. 3:19-CV-02933-M |

## MOTION FOR LEAVE TO FILE STATEMENT OF INTEREST

The United States respectfully moves for leave to file the Statement of Interest attached hereto as Exhibit A pursuant to 28 U.S.C. § 517, which permits the Attorney General to send "any officer of the Department of Justice" to "any State or district in the United States to attend to the interests of the United States in a suit pending in a court of the United States[.]"

The Antitrust Division of the Department of Justice enforces the federal antitrust laws and has a strong interest in their correct application. The United States has an interest in this pending case because of the application of Section 2 of the Sherman Act (15 U.S.C. § 2) in the matter as described below. Notwithstanding the United States' statutory authorization to file a Statement of Interest, in the interest of avoiding any conflict with Local Rules, the United States respectfully moves the Court for an order permitting it to file its Statement of Interest attached hereto.

### I.      Procedural Background

On July 23, 2019, Plaintiff Continental Automotive Systems, Inc. ("Continental" or "Plaintiff") brought suit in the Northern District of California against Avanci LLC and Avanci

Platform International Limited (collectively "Avanci") along with other entities (collectively, with Avanci, "Defendants") based on Defendants' patent licensing practices. With a motion to dismiss pending, venue for this matter was transferred to the Northern District of Texas. On January 27, 2020, this Court ordered both sides to re-brief the motion to dismiss, limited to the change in Circuit law and any other change in status since the motion was originally briefed. (Dkt. 264.) The United States consulted with counsel for each side and informed them that it was considering filing a Statement of Interest regarding Continental's Section 2 claims. The United States further conferred with counsel for both parties on February 25-26, 2020, regarding the Statement of Interest and this Motion for Leave. At this time, counsel for each of the Defendants informed the United States that each consented to the filing. Counsel for Continental informed the United States that it would oppose the filing. Continental will submit its opposition to Defendants' Motion to Dismiss on or before February 28, 2020.

## II.  Argument

The Antitrust Division of the Department of Justice enforces the federal antitrust laws and has a strong interest in their correct application. The United States has a particular interest in this case because it involves the intersection of antitrust law and intellectual property rights, a topic which the United States has long studied and with which it has considerable enforcement experience.[1] The United States seeks to ensure that the antitrust laws are correctly applied to promote innovation and enhance consumer welfare, and are not misinterpreted in ways that could

---

[1] *See* U.S. Dep't Of Justice & Fed. Trade Comm'n, Antitrust Guidelines For The Licensing Of Intellectual Property (2017), https://www.ftc.gov/system/files/documents/public_statements/1049793/ip_guidelines_2017.pdf; U.S. Dep't of Justice & Fed. Trade Comm'n, Antitrust Enforcement and Intellectual Property Rights: Promoting Innovation and Competition (2007), https://www.justice.gov/sites/default/files/atr/legacy/2007/07/11/222655.pdf.

undermine these critical goals.  This Statement explains that Continental's attempts to base

Section 2 antitrust violations upon alleged breaches of "fair, reasonable, and nondiscriminatory"

("FRAND") licensing commitments made during standard-setting processes, including claims of

purported "deception" regarding FRAND rates, do not articulate cognizable antitrust claims.  In

particular, the Statement argues that courts in the Fifth Circuit should not follow the Third

Circuit's decision in *Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297 (3d Cir. 2007), in the

standard-setting context.  The United States takes no position on the merits of the remaining

claims or the motion to dismiss them.

## III.      Conclusion

Accordingly, the United States respectfully requests leave to file its attached Statement of

Interest regarding the proposed application of Section 2 of the Sherman Act (15 U.S.C. § 2).

Respectfully submitted,

/s/ *Andrew DeLaney*

ANDREW N. DeLANEY (NYBN 4713947)
DANIEL E. HAAR
Attorneys, Antitrust Division
U.S. Department of Justice
950 Pennsylvania Ave. NW
Washington, DC 20530
Telephone: (202) 598-2846
Facsimile: (202) 514-0536
E-mail: andrew.delaney@usdoj.gov
Attorneys for the United States of America

<u>Certificate of Conference</u>

I certify that counsel for the United States conferred with counsel for each of parties on February 25-26, 2020.  Counsel for each of the Defendants informed the United States that each consented to the filing.  Counsel for Plaintiff informed the United States that it would oppose the filing.

/s/ <i>Andrew DeLaney</i>
Andrew DeLaney
Attorney, Antitrust Division
U.S. Department of Justice

<u>Certificate of Service</u>

On February 27, 2020, I electronically submitted the foregoing document with the clerk of court for the U.S. District Court, Northern District of Texas, using the electronic case filing system of the court.  I hereby certify that I have served all parties electronically or by another manner authorized by Federal Rule of Civil Procedure 5(b)(2).

/s/ <i>Andrew DeLaney</i>
Andrew DeLaney
Attorney, Antitrust Division
U.S. Department of Justice

# EXHIBIT A

MAKAN DELRAHIM
Assistant Attorney General, Antitrust Division

MICHAEL F. MURRAY
Deputy Assistant Attorney General, Antitrust Division

WILLIAM J. RINNER
Senior Counsel and Chief of Staff to the Assistant Attorney General, Antitrust Division

ELYSE DORSEY,
TAYLOR M. OWINGS
Counsel to the Assistant Attorney General, Antitrust Division

DANIEL E. HAAR
ANDREW N. DeLANEY (NYBN 4713947)
JENNIFER DIXTON
Attorneys, Antitrust Division
U.S. Department of Justice
950 Pennsylvania Ave. NW
Washington, DC 20530
Telephone: (202) 598-2846
Facsimile: (202) 514-0536
E-mail: andrew.delaney@usdoj.gov

Attorneys for the United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF TEXAS

DALLAS DIVISION

| | |
|---|---|
| CONTINENTAL AUTOMOTIVE SYSTEMS, INC.,<br><br>              Plaintiff,<br><br>v.<br><br>   AVANCI, LLC, et al.<br><br>         Defendants. | No. 3:19-CV-02933-M<br><br>**STATEMENT OF INTEREST OF THE UNITED STATES** |

## TABLE OF CONTENTS

I. INTRODUCTION ....................................................................................................... 1

II. BACKGROUND ....................................................................................................... 2

    A. Patent Law and Antitrust Law Serve the Same Goal of Promoting Dynamic
       Competition ........................................................................................................ 2

    B. Standard Setting and Development Activity Creates Economic Efficiency Through the
       Selection of a Superior Technology .................................................................. 4

    C. Relevant Factual Allegations ........................................................................... 6

III. ARGUMENT ........................................................................................................... 8

    A. Continental's Breach of FRAND Claims Do Not Allege that Defendants Engaged in
       Any Unlawful Exclusionary Conduct ............................................................... 9

        1. A Patent Holder's Effort to Maximize Its Licensing Rates after Agreeing to Abide
           by FRAND Terms Does Not Constitute Unlawful Exclusionary Conduct .......... 11

        2. A Patent Holder's Alleged "Deception" Regarding the Rates It Intends to Charge
           After Making a FRAND Commitment Does Not Constitute Unlawful Exclusionary
           Conduct .......................................................................................................... 15

        3. There Is No Antitrust Duty to License on FRAND Terms .................................... 20

    B. Imposing Antitrust Liability for Violations of FRAND Commitments in the Standard
       Setting Context Risks Over-Deterring Conduct That Is Already Adequately Policed by
       Contract and Patent Law ................................................................................... 20

    C. A Section 2 Cause of Action Premised on Alleged Violations of a FRAND
       Commitment Is Not Administrable Because It Would Require Courts to Act as
       Central Planners ............................................................................................... 21

IV. CONCLUSION ....................................................................................................... 25

# TABLE OF AUTHORITIES

**Cases**

*Abraham & Veneklasen Joint Venture v. Am. Quarter Horse Ass'n,*
  776 F.3d 321 (5th Cir. 2015) ................................................................. 9

*Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.,*
  836 F.3d 1171 (9th Cir. 2016) .............................................................. 13

*Allied Tube & Conduit Corp. v. Indian Head, Inc.,*
  486 U.S. 492 (1988) .............................................................................. 12

*Am. Soc'y of Mech. Eng'rs, Inc. v. Hydrolevel Corp.,*
  456 U.S. 556 (1982) .............................................................................. 12

*Apple, Inc. v. Motorola Mobility, Inc.,*
  886 F. Supp. 2d 1061 (W.D. Wis. 2012) .............................................. 4

*Aspen Skiing v. Aspen Highlands Skiing Corp.,*
  472 U.S. 585 (1985) .............................................................................. 14

*Atari Games Corp. v. Nintendo of Am., Inc.,*
  897 F.2d 1572 (Fed. Cir. 1990) ............................................................. 4

*Bell Atl. Corp. v. Twombly,*
  550 U.S. 554 ......................................................................................... 16

*Berkey Photo, Inc. v. Eastman Kodak Co.,*
  603 F.2d 263 (2d Cir. 1979) ................................................................. 17

*Broadcom Corp. v. Qualcomm Inc.,*
  501 F.3d 297 (3d Cir. 2007) ..................................................... 8, 18, 19

*Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.,*
  509 U.S. 209 (1993) ........................................................................ 21, 24

*Concord v. Boston Edison Co.,*
  915 F.2d 17 (1st Cir. 1990) .................................................................. 21

*Ericsson, Inc. v. D-Link Sys., Inc.,*
  773 F.3d 1201 (Fed. Cir. 2014) ........................................................... 19

*Ex parte Michelin N. Am., Inc.,*
  795 So. 2d 674 (Ala. 2001) .................................................................. 16

*Georgia–Pacific Corp. v. United States Plywood Corp.*,
   318 F. Supp. 1116 (S.D.N.Y. 1970) ........................................................ 19

*Harrison Aire, Inc. v. Aerostar Int'l, Inc.*,
   423 F.3d 374 (3d Cir. 2005) ...................................................................... 3

*HTC Corp. v. Telefonaktiebolaget LM Ericsson*,
   407 F. Supp. 3d 631 (E.D. Tex. 2019) .................................................... 17

*In re Adderall XR Antitrust Lit.*,
   754 F.3d 128 (2d Cir. 2014) .................................................................... 13

*LaScola v. U.S. Sprint Communications*,
   946 F.2d 559 (7th Cir. 1991) .................................................................. 17

*Lum v. Bank of Am.*,
   361 F.3d 217 (3d Cir. 2004) .................................................................... 16

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
   475 U.S. 574 (1986) ................................................................................ 22

*McHugh v. Westpac Banking Corp.*,
   Civ No. 93-3058, 1995 WL 476590 (N.D. Ill. Aug. 8, 1995) ........... 16, 17

*Microsoft Corp. v. Motorola, Inc.*,
   696 F.3d 872 (9th Cir. 2012) .................................................................... 4

*Microsoft Corp. v. Motorola, Inc.*,
   795 F.3d 1024 (9th Cir. 2015) ............................................................. 9, 22

*Nat'l Soc'y of Prof'l Eng'rs v. United States*,
   435 U.S. 679 (1978) ................................................................................ 11

*Novell, Inc. v. Microsoft Corp.*,
   731 F.3d 1064 (10th Cir. 2013) ...................................................... 13, 14, 25

*N. Pac. Ry. Co. v. United States*,
   356 U.S. 1 (1958) ...................................................................................... 3

*Nw. Power Prods., Inc. v. Omark Indus., Inc.*,
   576 F.2d 83 (5th Cir. 1978) .................................................................... 10

*NYNEX v. Discon*, Inc.,
   525 U.S. 128 .................................................................................... passim

*Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*,
   555 U.S. 438 .................................................................................... passim

*Rambus Inc. v. FTC*,
    522 F.3d 456 (D.C. Cir. 2008) ........................................................................ passim

*Research in Motion Ltd. v. Motorola, Inc.*,
    644 F. Supp. 2d 788 (N.D. Tex. 2008) ................................................................. 8

*Retractable Techs., Inc. v. Becton Dickinson & Co.*,
    842 F.3d 883 (5th Cir. 2016) ......................................................................... 9, 16

*Surgical Care Ctr. of Hammond, L.C. v. Hosp. Serv. Dist. No. 1*,
    309 F.3d 836 (5th Cir. 2002) ................................................................................ 9

*United States v. Aluminum Co. of Am.*,
    148 F.2d 416 (2d Cir. 1945) ............................................................................... 11

*United States v. Grinnell Corp.*,
    384 U.S. 563 (1966) .............................................................................................. 9

*United States v. Microsoft Corp.*,
    253 F.3d 34 (D.C. Cir. 2001) ......................................................................... passim

*United States v. Trenton Potteries Co.*,
    273 U.S. 392 (1927) ............................................................................................ 21

*USM Corp. v. SPS Techs., Inc.*,
    694 F.2d 505 (7th Cir. 1982) ............................................................................. 21

*Verizon Comm'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*,
    540 U.S. 398 (2004) ..................................................................................... passim

**Statutes**

28 U.S.C. § 517 ....................................................................................................... 1

U.S. Const. art. I §8 ............................................................................................... 24

**Other Authorities**

Alden Abbott, *Standard Setting, Patents, and Competition Law Enforcement—The Need for U.S. Policy Reform*, CPI Antitrust Chron. (Mar. 2015) ...................................... 19, 20 , 23

Anup Malani & Jonathan S. Masur, *Raising the Stakes in Patent Cases*,
    101 Geo. L.J. 637, 638 (2013) ............................................................................ 21

Benjamin Klein, *Market Power in Antitrust: Economic Analysis After Kodak*,
    3 Sup. Ct. Econ. Rev. 43 (1993) ......................................................................... 22

Bernhard Ganglmair, Luke M. Froeb & Gregory J. Werden, *Patent Hold-Up and Antitrust: How a Well-Intentioned Rule of Reason Could Retard Innovation*, 60 J. Indus. Econ. 249 (2012) .. 23

Bruce H. Kobayashi & Joshua D. Wright, *Federalism, Substantive Preemption, and Limits on Antitrust: An Application to Patent Holdup*, 5 J. Comp. L. & Econ. 469 (2009) ..................... 22

Ian Ayres & Gregory Klass, *Promissory Fraud*, 78 N.Y. St. B.A. J. 26, 30 (2006) ................... 16

Jorge Padilla, Douglas H. Ginsburg & Koren W. Wong-Ervin, *Antitrust Analysis Involving Intellectual Property and Standards: Implications from Economics*, forthcoming Harv. J.L. & Tech. (2019) ........................................................................ 3

Joshua D. Wright & Douglas H. Ginsburg, *Whither Symmetry? Antitrust Analysis of Intellectual Property Rights at the FTC and DOJ*, 9(2) Comp. Policy Int'l, 41 (2013) ................................ 3

Douglas H. Ginsburg, Koren W. Wong-Ervin & Joshua D. Wright, *The Troubling Use of Antitrust to Regulate FRAND Licensing*, Comp. Policy Int'l (Oct. 2015) ............................... 22

Kristen Osenga, *Ignorance Over Innovation: Why Misunderstanding Standard Setting Operations Will Hinder Technological Progress*, 56 U. Louisville L. Rev. 159 (2018) .................................................................... 5, 23

Mark A. Lemley, *Intellectual Property Rights and Standard-Setting Organizations*, 90 Cal. L. Rev. 1889 (2002) ..................................................................................... 3, 4

Hon. Maureen K. Ohlhausen, *The Elusive Role of Competition in the Standard-Setting Antitrust Debate*, 20 Stan. Tech. L. Rev. 93 (2017) ................................................................ 24

3A Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* (4th ed. 2016) ............................... 21

Richard A. Posner, *Economic Analysis of Law* (9th ed. 2014) .................................................... 23

Richard J. Gilbert & Hillary Greene, *Merging Innovation into Antitrust Agency Enforcement of the Clayton Act*, 83 Geo. Wash. L. Rev. 1919 (2015) ................................................. 3

Thomas O. Barnett, *Maximizing Welfare Through Technological Innovation*, 15 Geo. Mason L. Rev. 1191 (2008) .......................................................................... 2, 3

U.S. Dep't of Justice & Fed. Trade Comm'n, Antitrust Enforcement and Intellectual Property Rights: Promoting Innovation and Competition (2007), ................................. 1, 4, 6, 12

U.S. Dep't Of Justice & Fed. Trade Comm'n, Antitrust Guidelines For The Licensing Of Intellectual Property (2017) ................................................................................ 1, 4, 14

# I. INTRODUCTION

The United States respectfully submits this statement pursuant to 28 U.S.C. § 517, which permits the Attorney General to direct any officer of the Department of Justice to attend to the interests of the United States in any case pending in a federal court.  The Antitrust Division of the Department of Justice enforces the federal antitrust laws and has a strong interest in their correct application.  The United States has a particular interest in this case because it involves the intersection of antitrust law and intellectual property rights, a topic which the United States has long studied and with which it has considerable enforcement experience.[1]  The United States seeks to ensure that the antitrust laws are correctly applied to promote innovation and enhance consumer welfare, and are not misinterpreted in ways that could undermine these critical goals.

This Statement explains that Continental's attempts to base Section 2 antitrust violations upon alleged breaches of "fair, reasonable, and nondiscriminatory" ("FRAND") commitments made during standard-setting processes, including claims of purported "deception" regarding FRAND rates, do not articulate cognizable antitrust claims.[2]  Breaches of FRAND commitments—that is, breaches of contractual obligations—are quintessential contract law problems.  The Supreme Court has made clear that not all contract disputes are antitrust disputes, even when a monopolist is involved.  The allegations in the complaint fail to state a harm to the

---

[1] *See* U.S. Dep't Of Justice & Fed. Trade Comm'n, Antitrust Guidelines For The Licensing Of Intellectual Property (2017), https://www.ftc.gov/system/files/documents/public_statements/1049793/ip_guidelines_2017.pdf [hereinafter IP Guidelines]; U.S. Dep't of Justice & Fed. Trade Comm'n, Antitrust Enforcement and Intellectual Property Rights: Promoting Innovation and Competition (2007), https://www.justice.gov/sites/default/files/atr/legacy/2007/07/11/222655.pdf [hereinafter 2007 Antitrust-IP Report].

[2] The United States takes no position on the merits of the remaining claims or the motion to dismiss them.  Deception, of course, can ground a valid Section 2 claim in certain circumstances.  *See, e.g., United States v. Microsoft Corp.*, 253 F.3d 34, 76-77 (D.C. Cir. 2001) (en banc) (per curiam) (premising Section 2 liability in part on Microsoft's intentionally false statements to developers that applications they developed to run on Microsoft systems would be compatible with non-Microsoft operating systems).  In this Statement of Interest, the United States focuses solely on the availability of antitrust claims for a particular type of purported deception in the standard-setting context.

competitive process, which is fatal to purported antitrust claims.  Recognizing a Section 2 cause of action premised on alleged violations of commitments to offer patent licenses at rates that are FRAND would (1) run contrary to the policies underlying the antitrust laws that encourage market-based pricing; (2) risk distorting licensing negotiations for standard-essential patents ("SEPs"); and (3) threaten to deter procompetitive or competitively neutral conduct.  Accordingly, the United States respectfully submits that the Court should dismiss the Section 2 antitrust claims based upon breaches of FRAND commitments in the standard-setting process, including claims that a licensor purportedly engaged in "deception" regarding the rates it intended to offer to licensees.

## II. BACKGROUND

### A. Patent Law and Antitrust Law Serve the Same Goal of Promoting Dynamic Competition

The patent laws are rooted in Article I, Section 8 of the Constitution, which establishes a patent framework bestowing inventors with "exclusive Right[s]" over their "Writings and Discoveries," in order "[t]o promote the Progress of Science and useful Arts."  U.S. Const. art. I, § 8.  Exercising its constitutional authority, Congress created a patent regime that allows markets, not regulators, to determine how best to reward inventors for their technological advances.  Protected by the constitutional guarantee of "exclusiv[ity]," inventors may reap the benefits of their investments in research and development by marketing and selling their new technologies, or by licensing their patent rights to implementers who can more efficiently deliver those technologies to end users.  The guarantee of market-driven financial rewards for invention serves as a powerful incentive for the development of new inventions that can render old technologies obsolete.

Innovation is vital to a vibrant free market.  The strong intellectual property rights envisioned by the Founders help level the competitive playing field for small innovative companies.  Without the benefit of strong IP protection, a larger firm is generally better able to appropriate the benefits of innovation.  First, "if the benefit from an innovation is proportional to the scale of operations that employ the innovation," a larger firm benefits from greater

appropriation due to the larger size of the operations that profit from the innovation.  Richard J. Gilbert & Hillary Greene, *Merging Innovation into Antitrust Agency Enforcement of the Clayton Act*, 83 Geo. Wash. L. Rev. 1919, 1925 (2015).  Second, with a greater market share, a larger firm "can increase appropriation by reducing the share of the market that may imitate the innovation without compensating the innovator."  *Id.* at 1925-26.  As a result, strong IP protection reduces the influence of market size and market share on incentives to innovate.

The antitrust laws seek to achieve the same goal of protecting and promoting the reinforcing cycle of competition and innovation, which generates dynamic competition in the marketplace and ultimately allows consumers to reap the rewards of new products.[3]  Like the patent laws, antitrust laws rely on free markets as the best means of allocating resources and determining prices.  As the Supreme Court famously explained, "[t]he Sherman Act was designed to be a comprehensive charter of economic liberty aimed at preserving free and unfettered competition as the rule of trade.  It rests on the premise that the unrestrained interaction of competitive forces will yield the best allocation of our economic resources, the lowest prices, the highest quality, and the greatest material progress . . . ."  *N. Pac. Ry. Co. v. United States*, 356 U.S. 1, 4 (1958).

Antitrust law thus does not function merely as a means for ensuring low prices.  High demand for a creative new product may drive up its price, but that price may simply reflect consumer preferences for a superior product relative to alternatives.  *See Harrison Aire, Inc. v. Aerostar Int'l, Inc.*, 423 F.3d 374, 381 (3d Cir. 2005) ("Competitive markets are characterized by

---

[3] *See generally* Jorge Padilla, Douglas H. Ginsburg & Koren W. Wong-Ervin, *Antitrust Analysis Involving Intellectual Property and Standards: Implications from Economics*, *forthcoming* Harv. J.L. & Tech. (2019); Joshua D. Wright & Douglas H. Ginsburg, *Whither Symmetry? Antitrust Analysis of Intellectual Property Rights at the FTC and DOJ*, 9(2) Comp. Policy Int'l, 41 (2013) ("The proposition that antitrust enforcement and [intellectual property rights] conflict has been overtaken by the realization that each regime spurs dynamic competition."); Thomas O. Barnett, *Maximizing Welfare Through Technological Innovation*, 15 Geo. Mason L. Rev. 1191, 1200 (2008) ("[W]hen innovation leads to dynamic efficiency improvements . . . it is a particular *type* of competition, and one that we should be careful not to mistake for a violation of the antitrust laws.").

both price and quality competition, and a firm's comparatively high price may simply reflect a superior product."). Antitrust law protects this behavior rather than punishes it, so that others will have incentives to innovate and compete themselves—all for the benefit of consumers. *See* IP Guidelines § 1.0; Wright & Ginsburg, *Whither Symmetry*, *supra*. Rather than focusing on prices in isolation, antitrust law instead protects consumers from practices that *harm competition*—that is, they harm some "competitive process" in a manner can harm consumers in the form of above-competitive prices, lower output, reduced innovation, or a deprivation of consumer choice. *See United States v. Microsoft, Corp.*, 253 F.3d 34, 58 (D.C. Cir. 2001) (en banc) (per curiam).

In this regard, the policies of the patent laws and antitrust laws are aligned in their mutual aim to foster innovation that creates dynamic competition. *See* IP Guidelines § 1.0. They accomplish this objective by ensuring that innovators have adequate incentives to invest in, and monetize, their technological advances. *See Atari Games Corp. v. Nintendo of Am., Inc.*, 897 F.2d 1572, 1576 (Fed. Cir. 1990) ("[T]he aims and objectives of patent and antitrust laws may seem, at first glance, wholly at odds. However, the two bodies of law are actually complementary, as both are aimed at encouraging innovation, industry and competition.").

## B. Standard Setting and Development Activity Creates Economic Efficiency Through the Selection of a Superior Technology

"Industry standards are widely acknowledged to be one of the engines driving the modern economy." 2007 Antitrust-IP Report at 33. Standardization can help fuel dynamic competition by ensuring market-wide acceptance of the most innovative new technologies. Many products in the modern economy, especially those that utilize advanced technologies and patented inventions, are standardized. Industry-wide standards ensure interoperability among products that work together (complements) and products that can replace one another (substitutes). In this way, standards facilitate the adoption and development of technology, and they tend to lower production costs, reduce switching costs, and lead to earlier adoption of new technology. *See Microsoft Corp. v. Motorola, Inc.*, 696 F.3d 872, 875-76 (9th Cir. 2012); *Apple, Inc. v. Motorola Mobility, Inc.*, 886 F. Supp. 2d 1061, 1067 (W.D. Wis. 2012). *See generally* 2007 Antitrust-IP

Report at 33-35; Mark A. Lemley, *Intellectual Property Rights and Standard-Setting Organizations*, 90 Cal. L. Rev. 1889, 1896-98 (2002).

Private standard setting organizations ("SSOs") create many of these technical standards. As the D.C. Circuit observed in one seminal case:  "Before an SSO adopts a standard, there is often vigorous competition among different technologies for incorporation into that standard." *Rambus Inc. v. FTC*, 522 F.3d 456, 459 (D.C. Cir. 2008).  Once the winning technical solutions are chosen and a standard is set, that competition is replaced by consensus as industry members begin implementing the standard.  Broad participation in the standard-setting process is widely recognized to be procompetitive.  With many innovators participating, for instance, it is more likely that the best technologies will be submitted to be considered for inclusion in the standard. In contrast, less participation could result in suboptimal standards and less implementation in the marketplace, which would tend to significantly diminish key benefits of standards: interconnectivity and interoperability.[4]  As a general matter, then, SSO policies that promote participation in standard setting have the potential to promote innovation and consumer welfare overall.

Many SSOs adopt intellectual property rights ("IPR") policies that seek to encourage participation by both innovators and implementers of standardized technology in the standard-setting process.  These policies, such as the IPR policy of the European Telecommunications Standards Institute ("ETSI"), one of the SSOs at issue here, often require patent holders to commit contractually to license any technology essential to the standard, on fair, reasonable, and non-discriminatory ("FRAND") terms.[5]  FRAND licensing commitments are contractual obligations that are designed to facilitate access to the technology needed to implement a standard and to help ensure that intellectual property holders are adequately compensated for

---

[4] *See generally* Kristen Osenga, *Ignorance Over Innovation: Why Misunderstanding Standard Setting Operations Will Hinder Technological Progress*, 56 U. Louisville L. Rev. 159 (2018).

[5] *See, e.g.*, ETSI IPR Policy § 6.1 (2019), https://www.etsi.org/images/files/IPR/etsi-ipr-policy.pdf..

their contributions.[6]  Typically, the exact terms of a license are negotiated bilaterally between patent holder and implementer, after the standard-setting process is complete.[7]  Indeed, the joint discussion of licensing terms during the standard-setting process can raise antitrust concerns,[8] and therefore most SSOs, like ETSI, rely on bilateral licensing negotiations to determine exact licensing rates and terms.

In addition to IPR policies, market factors often influence how patent holders seek to compete in the standard-setting process and in *ex post* licensing.[9] For instance, many patent holders, including those in ETSI, are frequent SSO participants with a strong financial interest in developing and maintaining a reputation for reasonableness such that there is continued interest by implementers in incorporating their technology across successive generations of standards. These patent holders would suffer reputational and business harm from counterproductive *ex post* licensing behavior.

### C.  Relevant Factual Allegations

On May 10, 2019, Continental Automotive Systems, Inc. ("Continental" or "Plaintiff") filed suit in the Northern District of California against Avanci LLC and Avanci Platform International Limited (collectively "Avanci") and other entities[10]

---

[6] *See*, *e.g.,* ETSI IPR Policy § 3.1 ("[T]he ETSI IPR POLICY seeks a balance between the needs of standardization for public use in the field of telecommunications and the rights of the owners of [intellectual property.]"); *id.* at § 3.2. ("IPR holders . . . should be adequately and fairly rewarded for the use of their IPRs in the implementation of STANDARDS and TECHNICAL SPECIFICATIONS.").

[7] ETSI's IPR Guide provides that "specific licensing terms and negotiations are commercial issues between the companies and shall not be addressed within ETSI." ETSI Guide on Intellectual Property Rights § 4.1 (2013), https://www.etsi.org/images/files/IPR/etsi-guide-on-ipr.pdf; *see also id.* at § 2.2 ("Any . . . commercial terms are a matter for discussion between the IPR holder and the potential licensee, outside of ETSI"); see also *Id.* at § 4.1 (participants have no obligation to disclose "any licensing terms related to any of its IPRs;" rather a FRAND commitment "is sufficient when selecting technologies for ETSI standards and technical specifications.").

[8] *See generally* 2007 Antitrust-IP Report at 49-56.

[9]  *See* 2007 Antitrust-IP Report at 40-41 (discussing market-based factors that can influence conduct in SSOs).

[10] The other defendants include Nokia Corporation, Nokia of America Corporation, Nokia Solutions and Networks US LLC, Nokia Solutions and Networks Oy, Nokia

(collectively, with Avanci, "Defendants") alleging various legal violations deriving from Defendants' patent licensing practices.  According to Continental's Amended Complaint, Doc. 97 ("Compl."), certain Defendants (Nokia, Conversant, Optis, and Sharp) own standard-essential patents ("SEPs") that the Defendants allege are essential to various cellular standard technologies.  *See* Compl. ¶ 4.  As part of the standard-setting process, the Defendants, or their predecessors-in-interest, made contractual commitments to the SSOs to license these SEPs on FRAND terms.  Compl. ¶¶ 5, 15, 152.  Continental alleges that Defendants "concealed [their] intent to [] refuse to license certain users of standards in a given supply chain, charge supra-competitive royalty rates, and demand discriminatory terms and conditions."  Compl. ¶¶ 87-98. After being incorporated into the standards, Continental alleges that Defendants, via their licensing vehicle Avanci, sought "inflated and non-FRAND royalty rates" that "Avanci knew Continental could not agree to."  Compl. at ¶ 8.  Continental alleges that these actions have amounted to "illegally maintaining the monopoly power [Defendants] initially obtained when their patented technologies became standardized." Compl. at ¶ 126.

On August 30, 2019, Defendants moved to dismiss Continental's claims on a number of grounds.  As to the Section 2 claims, Defendants argue that Continental's allegations rest upon "an alleged breach of contract" not a violation of the antitrust laws, and that "a pricing disagreement over a contractual royalty rate commitment is not exclusionary conduct."  Defendants' Motion to Dismiss, Doc. 162, ("MTD") at 13. Defendants further argue Continental failed to plead with the required specificity that Defendants deceived the relevant SSOs regarding their commitment to offer a FRAND rate.  *Id.* at 13-14.  Continental opposes this motion, contending that "purposefully reneg[ing] on a prior FRAND commitment," alone, violates antitrust laws and that, in any event, it adequately pled that Defendants deceived the relevant SSOs regarding their

Technologies Oy (collectively "Nokia"); Conversant Wireless Licensing SARL ("Conversant"); Optis UP Holdings, LLC, Optis Cellular Technology, LLC, Optis Wireless Technology, LLC (collectively "Optis"); and Sharp Corporation ("Sharp").  *See generally* Compl.

intentions to license on FRAND terms.  Continental's Opposition to the Motion to
Dismiss, Doc. 182, ("MTD Opp.") at 13-14.

### III. ARGUMENT

The United States agrees with Defendants that Continental's Section 2 claims
based on alleged breaches of contractual FRAND commitments in the standard-setting
context do not sound in antitrust law.  Recognizing such claims under Section 2 of the
Sherman Act inappropriately would turn breach of contract claims into a basis for
antitrust liability despite an absence of harm to competition.  Continental's allegations
that Defendants engaged in "deception" also fail.  To be sure, the Third Circuit provided
a roadmap for this approach in *Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297 (3d Cir.
2007), based on claims that a patent-holder purportedly deceived an SSO regarding its
intention to license on FRAND terms.  The United States submits, however, that this
Court should decline to follow *Broadcom*.[11]

The Supreme Court has never found an antitrust duty to license standard-essential
patents at a FRAND rate.  Nor is there harm to competition when a patent holder makes a
contractual FRAND commitment—which is, by design, indefinite and requires *ex post*
negotiation—to sophisticated parties in the SSO context and subsequently (allegedly)
breaches that commitment.

The SSO process deliberately trades off some amount of certainty regarding
licensing rates and terms *ex ante*, and an alleged breach of that intentionally vague
contractual commitment *ex post* is insufficient, on its own, to harm the competitive
process.  This is particularly true when sophisticated parties (including many repeat
players) who understand the risks of such vague commitments are on all sides of the *ex
ante* negotiation and decision-making process.  To the extent that a defendant reneging on

---

[11] The United States recognizes that the Northern District of Texas's decision in *Research
in Motion Ltd. v. Motorola, Inc.*, 644 F. Supp. 2d 788, 797 (N.D. Tex. 2008), embraced
the *Broadcom* approach shortly after that ruling issued, but notes that neither the Fifth
Circuit nor any other Court of Appeals has yet endorsed *Broadcom*.

a FRAND commitment somehow deprives a plaintiff of the benefit of the bargain that the SSO may have negotiated as consideration for selecting a proprietary technology during the competitive process of standard setting, that injury is properly vindicated through contract law remedies.  *See, e.g.*, *Microsoft Corp. v. Motorola, Inc.*, 795 F.3d 1024, 1040-45 & n.2 (9th Cir. 2015) (upholding district court's analysis of FRAND rate and range in breach of contract action).

Indeed, the contract and patent laws adequately police the types of potentially problematic behavior (deception regarding contractual commitments and breaches of those commitments) alleged in the complaint.  Additional liability—and treble damages in particular—in these circumstances would tend to chill dynamic competition and innovation, the exact goals that the antitrust laws are intended to promote.  These claims, therefore, should be dismissed with prejudice.

### A.  Continental's Breach of FRAND Claims Do Not Allege that Defendants Engaged in Any Unlawful Exclusionary Conduct

Antitrust law is premised upon the twin goals of protecting the marketplace from abuses to the competitive process while simultaneously protecting incentives for firms to compete fiercely.  Accordingly, a "firm violates § 2 only when it acquires or maintains, or attempts to acquire or maintain, a monopoly by engaging in exclusionary conduct 'as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident.'"  *United States v. Microsoft Corp.*, 253 F.3d 34, 58 (D.C. Cir. 2001) (en banc) (per curiam) (*quoting United States v. Grinnell Corp.*, 384 U.S. 563, 571 (1966)); *see also Abraham & Veneklasen Joint Venture v. Am. Quarter Horse Ass'n*, 776 F.3d 321, 327-28 (5th Cir. 2015). "Exclusionary" or "anticompetitive conduct" is a required element of monopolization claims under Section 2.  *See Retractable Techs., Inc. v. Becton Dickinson & Co.*, 842 F.3d 883, 891 (5th Cir. 2016); *Surgical Care Ctr. of Hammond, L.C. v. Hosp. Serv. Dist. No. 1*, 309 F.3d 836, 839, 842 (5th Cir. 2002).

An exclusionary act is one that "ha[s] an 'anticompetitive effect.'  That is, it must harm

the competitive *process* and thereby harm consumers. . . . [H]arm to one or more *competitors* will not suffice." *Microsoft*, 253 F.3d at 58. Because discerning "[w]hether any particular act of a monopolist is exclusionary, rather than merely a form of vigorous competition, can be difficult," *id.*, courts applying Section 2 are careful not to condemn conduct, such as innovation, that is driven by competition on the merits. *Verizon Comm'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 407 (2004) ("To safeguard the incentive to innovate, the possession of monopoly power will not be found unlawful unless it is accompanied by an element of anticompetitive *conduct*."). Courts for the same reasons also require harm to the competitive process for antitrust claims relying on allegations of fraudulent or deceptive conduct. *See, e.g.*, *NYNEX v. Discon*, Inc., 525 U.S. 128, 136-37 (1998); *Retractable Techs.*, 842 F.3d at 895-97 ("'The thrust of antitrust law is to prevent restraints on competition. . . .' [A]bsent a demonstration that a competitor's false advertisements had the potential to eliminate, or did in fact eliminate, competition, an antitrust lawsuit will not lie." (quoting *Nw. Power Prods., Inc. v. Omark Indus., Inc.*, 576 F.2d 83, 88 (5th Cir. 1978))); *Rambus*, 522 F.3d at 466 ("[A]s in *NYNEX*, an otherwise lawful monopolist's end-run around price constraints, even when deceptive or fraudulent, does not alone present a harm to competition in the monopolized market.").

As set forth below, the Complaint does not allege that Defendants engaged in any behavior that could constitute unlawful exclusionary conduct in violation of Sherman Act Section 2. The relevant SSOs allegedly selected Defendants' proprietary technologies, which necessarily excludes potential alternatives, but the Complaint fails to describe any failure in the competitive process by which that selection occurred. Although the United States takes no position on the sufficiency of specific allegations here, any allegations of

violations of FRAND commitments are adequately redressed under contract law.[12]

### 1. A Patent Holder's Effort to Maximize Its Licensing Rates after Agreeing to Abide by FRAND Terms Does Not Constitute Unlawful Exclusionary Conduct

Even a monopolist subject to FRAND commitments may seek to maximize its prices under the antitrust laws. Antitrust law makes a critical distinction between pricing efforts (and other behavior) that are the result of an illegal acquisition or maintenance of monopoly power (or efforts illegally to acquire or maintain market power), and those that reflect the outcome of a healthy competitive process leading to a legitimate winner. In the first case, antitrust law would find that the resulting higher prices, because they were obtained by abusing the competitive process, unlawfully harmed consumers. *See Nat'l Soc'y of Prof'l Eng'rs v. United States*, 435 U.S. 679, 695 (1978) ("The Sherman Act reflects a legislative judgment that ultimately competition will produce not only lower prices, but also better goods and services."). In the second, however, antitrust law explicitly does not condemn a firm for succeeding on the merits and charging the higher price for which it fought in the marketplace. *United States v. Aluminum Co. of Am.*, 148 F.2d 416, 430 (2d Cir. 1945) ("The successful competitor, having been urged to compete, must not be turned upon when he wins."). As the Supreme Court has explained, "The mere possession of monopoly power, and the concomitant charging of monopoly prices, is not only not unlawful; it is an important element of the free-market system." *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 407 (2004); *Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*, 555 U.S. 438, 447-48 (2009) ("Simply possessing monopoly power and charging monopoly prices does not violate § 2.").

Moreover, in the standard setting context, an SSO's decision to incorporate proprietary technology, including that allegedly covered by Defendants' patents, into a standard does not constitute "exclusionary conduct" for purposes of the antitrust laws. That is because the

---

[12] Defendants correctly note that Continental fails to plead, except in a wholly conclusory and general fashion, which Defendants made which commitments to which SSOs regarding which patents. The Complaint cannot be cured by repleading, however, because Continental cannot allege the requisite exclusionary conduct, as described herein.

exclusion of rival technologies, through an open and transparent process aimed at providing consumer benefits of interoperability or safety, generally does not harm competition or the competitive process, even though it may necessarily involve the literal "exclusion" of rival technologies that were not chosen.[13]

Indeed, the exclusion inherent to standard setting can be procompetitive when it is "based on the merits of objective expert judgments and through procedures that prevent the standard-setting process from being biased by members with economic interests in stifling product competition." *Allied Tube*, 486 U.S. at 501. The reduction in consumer choice that occurs when a winning technology is selected for inclusion in a standard can be offset by the standard's many procompetitive benefits, including enhanced interoperability of products and services and follow-on innovation.[14] Standardization sacrifices marketplace competition in favor of these benefits, achieved through an *ex ante* process in which rival technologies compete for inclusion in the standard. It shifts the timing and dimensions of competition; it does not eliminate competition. It would therefore be improper to infer harm to the competitive process from the lack of competitive constraints *ex post*, at the time of individual purchasing decisions.

Accordingly, the Complaint fails to state a claim by alleging that Defendants, after winning this sort of *ex ante* competition, refused to offer licenses on what Plaintiff perceives to be FRAND terms and instead "refus[ed] to offer [Continental] a direct license," sought "inflated and non-FRAND royalty rates," and "discriminate[d] against suppliers, like Continental." Compl. ¶¶ 8, 15.

---

[13] A concerted effort to abuse the standard-setting process and exclude certain technologies for anticompetitive ends, however, can subvert the competitive process and thereby violate Section 1 of the Sherman Act. *See Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492, 500 (1988) (affirming court of appeals' reinstatement of a jury verdict awarding damages for a Sherman Act violation where producers and sellers of steel conduit had packed a meeting with new members whose sole function was to vote against a proposal to allow the use of competing plastic conduit); *Am. Soc'y of Mech. Eng'rs, Inc. v. Hydrolevel Corp.*, 456 U.S. 556, 571 (1982) (finding SSO liable for actions of its agents acting with apparent authority to discourage customers from purchasing one competitor's water boiler safety device, stating that it did not comply with the SSO's safety code, even though it did).

[14] *See generally* 2007 Antitrust-IP Report ch. 2.

STATEMENT OF INTEREST OF THE UNITED STATES
Case No. 3:19-CV-02933-M                    12

Although Defendants may have committed to offer FRAND terms to compete for inclusion in the relevant standards, they had no *antitrust* obligation to do so, nor do they have an antitrust obligation to keep licensing rates "low" after being incorporated into the standards. *See Rambus*, 522 F.3d at 466 (explaining that "[a]n otherwise lawful monopolist's end-run around price constraints," like FRAND commitments, cannot support a Section 2 claim); *see also In re Adderall XR Antitrust Lit.*, 754 F.3d 128, 135 (2d Cir. 2014) ("The mere existence of a contractual duty to supply goods does not by itself give rise to an antitrust 'duty to deal.'").

In the standard-setting context, the opportunity to increase licensing revenue through bilateral negotiations after a patent has been incorporated into a standard encourages participation in the standard-setting process and competition among patent holders to have their patented technology selected. Such competition among patent holders also promotes the adoption of the best technical solutions in standards, ultimately benefitting consumers. Indeed, courts have recognized that "an otherwise lawful monopolist's" charging of high prices in this context "normally has no particular tendency to exclude rivals and thus to diminish competition." *Rambus*, 522 F.3d at 464; *see also NYNEX Corp.*, 525 U.S. at 136 (rejecting antitrust claim because consumer injury from paying higher prices "naturally flowed not so much from a less competitive market . . . as from the exercise of market power that is lawfully in the hands of a monopolist").

The antitrust laws likewise do not compel patent owners who have made FRAND commitments to license at potential licensees' preferred rates. As the Supreme Court has repeatedly emphasized, there is "no duty to deal under the terms and conditions preferred by [a competitor's] rivals." *Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*, 555 U.S. 438, 457 (2009); *see also Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*, 836 F.3d 1171, 1184 (9th Cir. 2016) (same). Imposing an antitrust duty to license at a rate that a potential licensee subjectively views as FRAND would run contrary to this principle. *See Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064, 1074-75 (10th Cir. 2013) (Gorsuch, J.) ("Even a monopolist generally has no duty to share

(or continue to share) its intellectual or physical property with a rival.").[15]

This principle—that the antitrust laws do not impose a duty to deal with a competitor on the competitor's preferred terms—follows from well-established antitrust precedent that a firm generally has no antitrust duty to deal with another company at all; only in limited circumstances will a refusal to deal give rise to a potential antitrust claim. *See Trinko*, 540 U.S. at 409 (describing *Aspen Skiing v. Aspen Highlands Skiing Corp.*, 472 U.S. 585 (1985), which recognized a refusal to deal claim based on a firm's voluntarily termination of a profitable course of prior dealing in order to exclude competition, as a case "at or near the outer boundary of § 2 liability").[16]  As the Tenth Circuit explained in *Novell*, a monopolist's refusal to license its intellectual property is actionable under the antitrust laws only if, at minimum, it is "irrational but for its anticompetitive effect."  731 F.3d at 1074-75.  Attempting to maximize licensing revenues is rational behavior.  Thus, that narrow window for a refusal to deal claim is irreconcilable with the Complaint's implicit contention that Section 2 of the Sherman Act imposes an antitrust duty on a SEP-holder subject to a contractual FRAND commitment to license its technology on FRAND terms.  *See Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*, 555 U.S. 438, 450 (2009) ("[I]f a firm has no antitrust duty to deal with its competitors at wholesale, it certainly has no duty to deal under terms and conditions that the rivals find commercially advantageous.").

Continental's allegations here thus cannot transform alleged contractual breaches into treble damages antitrust violations, nor impose upon Defendants heavy antitrust burdens regarding a firm's attempt to maximize licensing revenues after making FRAND commitments or refusal to license on Continental's preferred terms.  *See NYNEX*, 525 U.S. at 136-37

---

[15] *See also* IP Guidelines § 2.1 ("The antitrust laws generally do not impose liability upon a firm for a unilateral refusal to assist its competitors, in part because doing so may undermine incentives for investment and innovation.").

[16]  In *Aspen Skiing*, a large ski company entered into a joint venture with a smaller rival ski company and later terminated the venture, refusing to cooperate even when the rival offered to pay retail price for lift tickets to continue the collaboration.  *Aspen Skiing*, 472 U.S. at 593-94; *Trinko*, 540 U.S. at 409.

(cautioning against "transform[ing] cases involving business behavior that is improper for various reasons . . . into treble-damages antitrust cases").

### 2. A Patent Holder's Alleged "Deception" Regarding the Rates It Intends to Charge After Making a FRAND Commitment Does Not Constitute Unlawful Exclusionary Conduct

Continental's claims of a fraudulent or deceptive FRAND representation fails to convert the licensing dispute into a cognizable Section 2 claim.  When a patent holder discloses its intellectual property and complies with an SSO's IPR policy requiring a generic commitment to license at a "fair, reasonable, and non-discriminatory" rate if its patents are essential to a standard, then the licensor is bound by a contractual commitment enforceable by potential licensees (albeit not a specific licensing rate).  Even if the patent holder plans to maximize its licensing rates until a court or other tribunal determines those rates are above FRAND, that contingency is foreseeable the SSO with a term as flexible as "FRAND."  A patent holder's failure to be forthcoming about that intent, therefore, does not constitute a material deception. Where the standard setting participants are well-informed, the exclusionary effect on alternative technologies is inherently part of the competitive process, not harmful to it.  *See Microsoft*, 253 F.3d at 58 (behavior "must harm the competitive *process* and thereby harm consumers").

As the D.C. Circuit has held, the United States respectfully submits that in the standard-setting context, a deceptive representation could harm the competitive process only if two conditions are satisfied: (i) the defendant communicates material information that is false, and (ii) the misstatement causes the decision-makers to impair the defendant's rivals' opportunities by adopting a standard that excludes their technologies.  *See Rambus Inc. v. FTC*, 522 F.3d 456, 464 (D.C. Cir. 2008) ("Cases that recognize deception as exclusionary hinge . . . on whether the conduct impaired rivals in a manner tending to bring about or protect a defendant's monopoly power.").

There are several reasons why allegations of a deceptive representation relating to a commitment to license at a FRAND rate cannot satisfy these conditions.

*First*, an antitrust defendant's statement, which is alleged to be false, must not be so

indefinite that it is incapable of inducing reasonable reliance; otherwise, courts assume decision-makers—particularly sophisticated ones—take account of the various possible meanings and incorporate them into the decision-making process.  *See, e.g.*, *Retractable Techs.*, 842 F.3d at 895-97 (surveying circuits and holding the competitive process can account for deceit from false advertising unless it is, *inter alia*, "clearly false" and "clearly likely to induce unreasonable reliance");[17] *Lum v. Bank of Am.*, 361 F.3d 217, 226-28 (3d Cir. 2004), *abrogated on other grounds by Bell Atl. Corp. v. Twombly*, 550 U.S. 554, 557 (dismissing antitrust claim based on fraudulent promise because the contractual language at issue had different meanings and it was "unreasonable to infer that defendants' use of the equivocal term [] was reasonably calculated to deceive persons of ordinary prudence and comprehension into believing" the claimed deception).

This is consistent with other common law doctrines relating to claims based upon allegedly fraudulent misrepresentations, including that of "promissory fraud," which provides a close analogy to the claim here because the alleged misrepresentation is a contractual promise. *See Ex parte Michelin N. Am., Inc.*, 795 So. 2d 674, 678 (Ala. 2001) ("A claim of promissory fraud is 'one based upon a promise to act or not to act in the future.'" (internal quotation marks omitted)).  That doctrine recognizes that promises—including those incorporated in contracts—can be made with intentional falsity, and thus can form the basis of a claim for fraud.  Where a promise is "too vague to be determined," however, it is "insufficient to state a claim for promissory fraud."  *McHugh v. Westpac Banking Corp.*, Civ No. 93-3058, 1995 WL 476590, at *4 (N.D. Ill. Aug. 8, 1995); Ian Ayres & Gregory Klass, *Promissory Fraud*, 78 N.Y. St. B.A. J. 26, 30 (2006) ("Between sophisticated, repeat-players, it may be understood that one or each of the parties retains an option of breaching and paying damages — and therefore may only intend to perform or pay damages.").[18]  The theme is that a baseline level of clarity regarding what

---

[17] As *Retractable Technologies* explains, another typical factor is that the alleged falsehood is "made to unsophisticated parties"—which, again, is hardly likely to be the case in the SSO context, where very sophisticated, long-term and repeat players are making the decisions regarding which technologies to adopt.  842 F.3d at 896.

[18] In *McHugh v. Westpac Banking*, the Northern District of Illinois analyzed a promissory fraud claim where an employer said he would give a recruit "an incentive compensation

constituted the fraudulent representation is required, such that a party might reasonably rely on it and exclude certain other possible outcomes. FRAND commitments in the SSO context fail to meet these requirements for purposes of antitrust liability.[19]

     *Second*, deception is not actionable under Section 2 of the Sherman Act unless it has a material adverse impact on competition. *See Rambus*, 522 F.3d at 464 (cases require that "the conduct impaired rivals in a manner tending to bring about or protect a defendant's monopoly power" (citing *Microsoft*, 253 F.3d at 76)); *Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 289 (2d Cir. 1979) (a *de minimis* effect on competition is insufficient to support a § 2 claim). No such harm to competition is likely to occur in this context. Even if a patent holder deceives an SSO as to the rates that would be sought after the standard is set, there is still no harm to the competitive process unless the organization would have declined to include the defendant's proprietary technology in the standard but for the patent holder's deceptive conduct. That requirement follows from the D.C. Circuit's holding when it considered the deceptive conduct of a patent holder that had, according to the FTC, willfully misled an SSO by failing to disclose patents that read on a standardized technology. *Rambus*, 522 F.3d at 459. The court held that the FTC failed to show that the patent holder's conduct was anticompetitive because the

---

plan which was consistent with those being offered elsewhere in the corporate finance industry." *Id.* The court found that offer was "a vague expression of good will" and "not one which can be used to support a claim of promissory fraud." 1995 WL 476590 at *4. Similarly, in *LaScola v. U.S. Sprint Communications*, the Seventh Circuit found that an offer of a "lucrative compensation plan" to a recruit was "too general and difficult to substantiate to be considered [a] statement[] of fact" and thus could not support a claim for fraudulent misrepresentation. 946 F.2d 559, 568 (7th Cir. 1991).

[19] Of course, courts are able to, and do, give FRAND terms determinative scope. But that does not mean that, when they do so, they are determining the subjective intent of the promisor. To the contrary, courts look to numerous objective non-intent factors—SSO policy, comparable licenses, caselaw on reasonable royalties—to determine a reasonable rate, *see HTC Corp. v. Telefonaktiebolaget LM Ericsson*, 407 F. Supp. 3d 631, 636-40 (E.D. Tex. 2019), whether or not the particular rate or the evidence used to determine the rate corresponded to the licensor's subjective intentions. Thus, courts' use of external criteria to determine the meaning of FRAND in a particular dispute, rather than looking at subjective intent, is fully consistent with a conclusion that the subjective meaning of a promise to license at reasonable rates is indefinite and thus not capable of being misrepresented.

FTC "left open the likelihood that [the SSO] would have standardized [defendant's] technologies *even if [defendant] had disclosed* its intellectual property." *Id.* at 466. Unless "more complete disclosure would have caused [the SSO] to adopt a different . . . standard," there could be no liability under Section 2. *Id.* at 463.

The *Rambus* court's discussion of *Broadcom*—which involved allegations analogous to those Continental alleges here[20]—reaffirmed that, in the standard-setting context, actionable deception must be the but-for cause of an exclusionary effect. The Third Circuit had allowed an antitrust claim to proceed on the allegation that the patent holder defendant had made an "intentionally false promise to license essential proprietary technology on FRAND terms" and that the SSO had "reli[ed] on that promise when including the technology in a standard." 501 F.3d at 314. The D.C. Circuit in *Rambus* clarified that antitrust liability should attach only if the patent holder's conduct was the but-for cause of the exclusion—i.e., that the conduct "lured the SSO away from non-proprietary technology." 522 F.3d at 466. Otherwise, the D.C. Circuit reasoned, the holding would conflict with Supreme Court precedent. *Id.* (citing *NYNEX*, 525 U.S. 128, for the proposition that deceit is not anticompetitive if it affects only prices only through a mechanism other than harm to competitive structure).

It would be especially difficult to lure a sophisticated SSO—like ETSI, TIA, and ATIS—

---

[20] Continental alleges that the "anticompetitive effects of Defendant Licensor's breaches of their FRAND promises are the same whether Defendant licensors intentionally deceived the SSOs at the time they made FRAND promises, or later opportunistically breached their FRAND promises once their technologies became locked into the standards." *See* Compl. ¶ 183; MTD Opp. at 15-16. These allegations are similar to the theory of harm the D.C. Circuit rejected in *Rambus*—that is, alternative scenarios, one which may theoretically have alleged a harm to competition and one which clearly did not. In *Rambus*, the D.C. Circuit "assume[d] without deciding" that under one scenario, where a "more complete disclosure would have caused [the SSO] to adopt a different (open, non-proprietary) standard, then [the SEP holder's] failure to disclose harmed competition and would support a monopolization claim." 522 F.3d at 463. But it rejected the argument that anticompetitive harm was present if the SSO would have adopted the same standard regardless, and found the case failed as a result. *Id.* at 463-64. Similarly here, Continental alleges that either an initial deception, or a later action (that did not involve harm to competition, as discussed above), led to the complained-of harms. Those allegations are certainly insufficient to support a Section 2 claim.

that imposes a FRAND commitment as part of its IPR policy into an uninformed choice about the effect of such a commitment because the SSO intentionally designed the commitment to be somewhat vague in nature, to require *ex post* negotiation, and to bind equally all patent holders who offer their technologies for inclusion in the standard.  A *Broadcom* antitrust claim based upon deception in the SSO process, therefore, is not and should not be cognizable.

SSOs rely on FRAND commitments because prohibiting members from discussing licensing rates, and allowing them instead to make only the more generic FRAND commitment, ensures the SSO and its members steer clear of antitrust law's prohibition on collective price-setting.  By its nature, therefore, the FRAND commitment allows for flexibility in the pricing term—it is intentionally subject to future bilateral negotiation, during which the patent holder can attempt to maximize its licensing rate based on the value of its patent to the standard.  Indeed, many SSOs deem such generic FRAND commitments sufficient to proceed in setting a standard that may incorporate proprietary technology, and members are on notice and can be expected to engage in bilateral licensing negotiations after the standard is set.

Consequently, if an SSO decides to standardize a technology—and to accept proprietary, patented contributions to that standard—then the result will be what the IPR policy contemplates: patent holders and patent implementers will negotiate a rate (and other terms) *ex post*, subject to the contractual FRAND commitment, while recognizing that a court or neutral decision-maker may be called upon to decide, should there be disagreement, the fair, reasonable, and non-discriminatory terms appropriate for the technology at issue.[21]  The decision to standardize, therefore, is a product of the informed competitive process.[22]  Even if an SSO

---

[21] Courts have determined FRAND rates using, among other things, the multiple "*Georgia-Pacific* factors."  *See Broadcom*, 501 F.3d at 314 n. 8 (citing *Georgia–Pacific Corp. v. United States Plywood Corp.*, 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970)); *Ericsson, Inc. v. D-Link Sys., Inc.*, 773 F.3d 1201, 1232 (Fed. Cir. 2014) ("[D]istrict courts must consider the facts of record when instructing the jury and should avoid rote references to any particular damages formula [for determining a RAND rate].").

[22] Scholars have also noted that members of SSOs, and the implementers especially, are sophisticated negotiators who can work within the policy process at the SSO to bargain for competitively derived benefits that should be policed by contract, not antitrust law.  *See* Alden Abbott, *Standard Setting, Patents, and Competition Law Enforcement—The*

knows that a patent holder intends to maximize licensing rates subject to the FRAND determination, the decision to include the technology in the standard would be the same because contract law ensures that patent implementers will receive the benefit of the bargain—i.e. the commitment to license on FRAND terms.

Because Continental cannot reasonably claim that the SSOs here made uninformed decisions to include Defendants' patented technology into the relevant standards, Continental's *Broadcom*-style claims must be dismissed.

### 3. There Is No Antitrust Duty to License on FRAND Terms

Finally, recognizing a claim under Section 2 for an alleged violation of a contractual FRAND commitment based on an allegation that a patent holder seeks to charge high prices would be contrary to the notion that competition, not courts, should dictate terms in the marketplace. The Sherman Act is agnostic as to the particular price that a patent holder seeks to charge after making a FRAND commitment, and allegedly "exclusionary" effects that might flow from that patent holder's unilateral attempt to maximize its licensing rates in violation of its contractual FRAND commitment would not violate the antitrust laws. Breaking down "FRAND" by its component terms—fair, reasonable, and non-discriminatory—illustrates why this is so.

First, the Sherman Act protects against injury to the competitive process that, in turn, harms consumers; whether a price is "fair" may be a matter of patent law or contract law, but not of antitrust law. *See linkLine*, 555 U.S. at 454 ("[H]ow is a judge or jury to determine a 'fair price?' Is it the price charged by other suppliers of the primary product? None exist. Is it the price that competition 'would have set' were the primary level not monopolized? How can the court determine this price without examining costs and demands, indeed without acting like a rate-setting regulatory agency, the rate-setting proceedings of which often last for several years?"

---

*Need for U.S. Policy Reform*, CPI Antitrust Chron. (Mar. 2015), https://www.competitionpolicyinternational.com/assets/Uploads/AbbottMar-151.pdf ("[S]ophisticated SSO members generally are able to protect themselves from potential future abuses. . . .").

(quoting *Concord v. Boston Edison Co.*, 915 F.2d 17, 25 (1st Cir. 1990) (Breyer, C.J.))); *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 225 (1993) (explaining that "the federal antitrust laws . . . do not create a federal law of unfair competition").

Second, the Sherman Act inquires into whether prices are the result of the competitive process, not whether they are "reasonable." The Supreme Court has cautioned against an interpretation of the antitrust laws that would make "the difference between legal and illegal conduct in the field of business relations depend upon so uncertain a test as whether prices are reasonable—a determination which can be satisfactorily made only after a complete survey of our economic organization and a choice between rival philosophies." *United States v. Trenton Potteries Co.*, 273 U.S. 392, 398 (1927).

Third, the Sherman Act is generally indifferent to price discrimination, particularly with respect to licensing intellectual property. Price discrimination, whether by licensing at different rates to licensees that are similarly situated or licensing at the same rate to licensees that are not, can allow a patent holder to better capture the value of its intellectual property, which in turn preserves incentives to innovate. *See, e.g.*, *USM Corp. v. SPS Techs., Inc.*, 694 F.2d 505, 512 (7th Cir. 1982) (Posner, J.) ("[T]here is no antitrust prohibition against a patent owner's using price discrimination to maximize his income from the patent."). Using the antitrust laws to police price discrimination in the IP licensing context could actually be harmful. 3A Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 721 (4th ed. 2016) ("[P]rice discrimination alone should not generally be considered unlawful and that, in any event, court-ordered remedies are likely to do more harm than good. . . . the type and amount of power evidenced by price discrimination in IP licensing are insufficient to require invocation of the antitrust laws unless other indicia of power are also present.").

### B. Imposing Antitrust Liability for Violations of FRAND Commitments in the Standard Setting Context Risks Over-Deterring Conduct That Is Already Adequately Policed by Contract and Patent Law

Contract and patent remedies are available to Continental if Defendants have, in fact, breached their FRAND commitments, deceived the SSOs about their licensing intentions,

erroneously asserted their patents, or otherwise acted in bad faith. *See, e.g.*, *Microsoft Corp. v. Motorola, Inc.*, 795 F.3d 1024 (9th Cir. 2015). Indeed, an implementer does not need to rely on antitrust law and the threat of treble damages to enforce a FRAND promise when it can also seek declaratory relief and a FRAND determination. Similarly, for alleged abuses of patent rights, including bad-faith assertion, implementers have adequate recourse within patent law. Where contract and patent remedies are available to deter breach and to facilitate transparent dealing, an additional remedy—treble damages under the antitrust laws—would threaten to chill lawful, pro-competitive licensing conduct. *See Trinko*, 540 U.S. at 414 ("Mistaken inferences and the resulting false condemnations 'are especially costly, because they chill the very conduct the antitrust laws are designed to protect.'" (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 594 (1986)));[23] *see also NYNEX*, 525 U.S. at 136-37 (cautioning against "transform[ing] cases involving business behavior that is improper for various reasons . . into treble-damages antitrust cases"). Moreover, improperly extending the scope of liability to include antitrust treble damages in the U.S. could have a cascade effect in foreign jurisdictions—either as a consequence of misunderstanding, misinterpretation or even misuse by foreign governments or parties—further amplifying the risk of harm to innovators and undermining dynamic competition in the US economy for no appreciable efficiency gains in licensing

---

[23] Indeed, as several experts have recognized, opportunistic behavior, such as *ex post* holdup, lies squarely within contract law's wheelhouse. Benjamin Klein, *Market Power in Antitrust: Economic Analysis After Kodak*, 3 Sup. Ct. Econ. Rev. 43, 62-63 (1993) ("Antitrust law should not be used to prevent transactors from voluntarily making specific investments and writing contracts by which they knowingly put themselves in a position where they may face a 'hold-up' in the future . . . . [C]ontract law inherently recognizes the pervasiveness of transactor-specific investments and generally deals with 'hold-up' problems in a subtle way, not by attempting to eliminate every perceived 'hold-up' that may arise."); *see also* Bruce H. Kobayashi & Joshua D. Wright, *Federalism, Substantive Preemption, and Limits on Antitrust: An Application to Patent Holdup*, 5 J. Comp. L. & Econ. 469, 484, 506-13 (2009); Douglas H. Ginsburg, Koren W. Wong-Ervin & Joshua D. Wright, *The Troubling Use of Antitrust to Regulate FRAND Licensing*, Comp. Policy Int'l (Oct. 2015), https://competitionpolicyinternational.com/assets/Uploads/GinsburgetalOct-151.pdf.

conduct.[24]

Antitrust remedies are too blunt an instrument to address conduct that violates the expectations of contracting parties but does not harm the competitive process.  If a party can threaten its counter-party with treble damages under Section 4 of the Clayton Act by alleging violations of a contractual commitment, then it may be able to extract more than the benefit of its bargain.  This risk could deter parties from entering into efficient contracts in the first place, resulting in deadweight economic losses.[25]  Indeed, many scholars have expressed concern that the use of antitrust remedies to address the breach of FRAND commitments will have the consequence of deterring procompetitive participation in standard setting organizations—which would, ironically, undermine the fundamental goal of both antitrust and IP laws, which is to promote innovation and dynamic competition.[26]

If patent holders with valuable technology must risk antitrust liability whenever they negotiate in an effort to obtain rates that reflect the true value of their inventions, they will be less likely to contribute their technology to a standard that requires a FRAND commitment.  This could lead to lower-quality standards, competing standards that fragment the market, or an unwillingness to enter FRAND commitments in the first place.

For much the same reasons, to the extent there is any possibility that deceptive FRAND

---

[24] *See, e.g.,* Maureen Ohlhausen, Testimony Before the US-China Economic and Security Review Comm'n, at 16 (Jan. 28, 2015) (describing expansive interpretation of US FTC enforcement actions in China with potentially harmful effects on innovation), https://www.uscc.gov/sites/default/files/transcripts/January%2028%202015%20Hearing%20Transcript.pdf.

[25] *See generally* Richard A. Posner, *Economic Analysis of Law* § 4.12 (9th ed. 2014).

[26] *See, e.g.,* Kristen Osenga, *Ignorance Over Innovation: Why Misunderstanding Standard Setting Operations Will Hinder Technological Progress*, 56 U. Louisville L. Rev. 159, 162 (2018) ("At the end of the day, disincentivizing participation in standard setting activities will hinder innovation."); Ginsburg, Wong-Ervin & Wright, *supra* note 23; Alden Abbott, *Standard Setting, Patents, and Competition Law Enforcement—The Need for U.S. Policy Reform*, CPI Antitrust Chron., Mar. 2015, https://www.competitionpolicyinternational.com/file/view/7345; Bernhard Ganglmair, Luke M. Froeb & Gregory J. Werden, *Patent Hold-Up and Antitrust: How a Well-Intentioned Rule of Reason Could Retard Innovation*, 60 J. Indus. Econ. 249 (2012).

licensing rate promises could harm competition, they are "beyond the practical ability of a judicial tribunal to control without courting intolerable risks of chilling" legitimate innovation. *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 223 (1993).

### C. A Section 2 Cause of Action Premised on Alleged Violations of a FRAND Commitment Is Not Administrable Because It Would Require Courts Applying Antitrust Law to Act as Central Planners

In all events, this Court should reject Continental's Section 2 claim premised on Defendants' alleged violations of FRAND commitments because accepting it would effectively transform the Sherman Act into a mechanism for price regulation, thereby increasing the administrative burden and potential error costs associated with licensing FRAND-encumbered patents. That also would run afoul of the system of patent law, which rejects regulation for determining the appropriate rewards for investors and innovators in favor of market rates. That is, by instructing Congress to bestow inventors with the "exclusive Right" over their inventions, the patent system embraced a decentralized system of innovation, subject to judicial inquiry into rates when necessary to remedy infringement on patent rights. U.S. Const. art. I, §8.[27]

Although patent law anticipates a judicial role in determining reasonable royalties in an infringement action, and contract law permits a court to determine damages for the breach of a licensing agreement, the antitrust laws contain no such mandate. As a general matter, regulators and central planners tend to arrive at suboptimal outcomes as compared to the free market when it comes to setting prices or other terms of commercial engagement. This failure arises mainly from the regulators' lack of access to the dynamic and nuanced market information enjoyed by market participants.[28] Indeed, the Supreme Court has repeatedly raised administrability concerns

---

[27] *See* Anup Malani & Jonathan S. Masur, *Raising the Stakes in Patent Cases*, 101 Geo. L.J. 637, 638 (2013) ("That the United States has chosen to employ patents rather than direct rewards to encourage innovation reflects a decision to decentralize the task of picking winners.").

[28] *See, e.g.*, Hon. Maureen K. Ohlhausen, *The Elusive Role of Competition in the Standard-Setting Antitrust Debate*, 20 Stan. Tech. L. Rev. 93, 100 (2017) (observing that, unlike free market actors, "central planners lack the information needed to allocate scarce resources, as well to incentivize economic actors to invest in infrastructure and technology.").

as a ground for rejecting a Section 2 remedy, explaining that "[n]o court should impose a duty to deal that it cannot explain or adequately and reasonably supervise." *linkLine*, 555 U.S. at 452-53. Antitrust suits premised on violations of a FRAND commitment necessarily require courts to conduct an inquiry into the reasonableness of licensing rates, thereby "act[ing] as central planners, identifying the proper price, quantity, and other terms of dealing—a role for which they are ill suited." *Trinko*, 540 U.S. at 408; *Novell*, 731 F.3d at 1073 (citing these same "administrability" concerns that would arise where courts must "pick and choose the applicable terms and conditions" as part of an antitrust inquiry, "a role for which we judges lack many comparative advantages and a role in which we haven't always excelled in the past").

Rather than subjecting alleged violations of FRAND commitments to judicial oversight under the guise of Section 2 of the Sherman Act, this Court should dismiss outright these claims. When contract or patent law is available to police the unilateral FRAND commitments of patent holders to standard setting bodies, a treble-damages remedy carries too great a risk of deterring lawful, procompetitive conduct, undermining the policies of the antitrust laws and the patent laws, and harming consumers. Such a "general rule" of legality under the antitrust laws for seeking to maximize licensing rates for a FRAND-encumbered patent "gives a degree of predictability to judicial outcomes and permits reliance by all market participants, themselves goods for both the competitive process and the goal of equal treatment under the law." *Novell*, 731 F.3d at 1073.

## IV. CONCLUSION

For the foregoing reasons, the United States respectfully submits the Court should grant Defendants' motion to dismiss as to the Section 2 antitrust claims based upon breaches of FRAND commitments, including claims of purported deception regarding FRAND rates in the standard-setting context. The United States otherwise takes no position on the merits of the pending motion.

Respectfully submitted,

MAKAN DELRAHIM
Assistant Attorney General

MICHAEL F. MURRAY
Deputy Assistant Attorney General

WILLIAM J. RINNER
Senior Counsel and Chief of Staff to
the Assistant Attorney General

ELYSE DORSEY,
TAYLOR M. OWINGS
Counsel to the Assistant Attorney
General


DANIEL E. HAAR,
ANDREW N. DeLANEY,
JENNIFER DIXTON
Attorneys

Dated:  February 27, 2020                    /s/ Andrew DeLaney
                                             ANDREW N. DeLANEY

                                             Attorneys for the United States of
                                             America