# EXHIBIT A

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

CONTINENTAL AUTOMOTIVE
SYSTEMS, INC.,

§
§
§
§

         Plaintiff,

§
§

    v.

§
§

Case No. 3:19-cv-02933-M

AVANCI, LLC, et al.

§
§
§

        Defendants.

§
§
§

**PLAINTIFF'S OPPOSITION TO DEFENDANTS' AMENDED**
**MOTION TO DISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT**

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION ................................................................................................1

II. CONTINENTAL EASILY SATISFIES ARTICLE III STANDING. ...................1

    A. The Liberal Pleading Standard Favors Continental. ................................1

    B. Continental Has Alleged (and Can Show) the Requisite Harm. .............2

III. CONTINENTAL HAS ADEQUATELY PLED ITS ANTITRUST CLAIMS. ...................6

    A. Defendants' Antitrust Standing Arguments Lack Merit. ........................6

        1. Continental is not too remote to seek equitable relief under Section 16. ...................................................................................6

        2. As a direct victim of Defendants' concerted boycott, Continental is threatened with the type of injury the antitrust laws are intended to redress. ...................................................................8

    B. Continental Has Sufficiently Alleged Concerted Agreements Among the Defendants to Boycott Continental and Other Upstream Suppliers. ..........9

        1. Continental has alleged an overarching conspiracy to boycott upstream suppliers like Continental. .............................................9

        2. Neither Avanci's status as a pool, nor the theoretical possibility of individual licenses, is sufficient to immunize Defendants from liability. ...............................................................................12

    C. Continental Has Sufficiently Pled a Section 2 Sherman Act Claim. ......14

        1. FRAND violations of the type alleged here constitute antitrust violations. ...........................................................................14

        2. Continental has alleged actionable exclusionary conduct under Section 2. ...............................................................................17

    D. The Complaint Adequately Alleges a Conspiracy to Monopolize. .........20

    E. The Complaint Adequately Alleges Relevant Markets. ..........................21

IV. DEFENDANTS' ATTACKS ON CONTINENTAL'S OTHER CLAIMS ALL FAIL. ..............................................................................................23

    A. Continental Has Pled a Viable Promissory Estoppel Claim. .................23

    B. Continental Is Entitled to Seek Declaratory Relief. ..............................24

    C. Specific Performance Is an Obvious and Appropriate Remedy Here. ....25

| | D. | Continental's UCL Claim Is Also Properly Pled and Supported. | 27 |
| | E. | Continental Has Pled Facts to Support Its Contract Claim Against Avanci. | 28 |
| V. | | PERSONAL JURISDICTION IS PROPER AS TO ALL "STATE LAW" CLAIMS. | 30 |
| VI. | | OPTIS'S ADDITIONAL ARGUMENTS HAVE NO MERIT. | 30 |
| VII. | | CONCLUSION | 31 |

Case No. 3:19-cv-02933-M
CONTINENTAL'S OPPOSITION TO MOTION TO DISMISS

1

# TABLE OF AUTHORITIES

2

**Page(s)**

3

Cases

4

*AG v. InterDigital, Inc.*
   3:19-cv-001-CAB-(BLM), 2019 WL 1574322 (S.D. Cal. Apr. 4, 2019) ...................................8

5

*Allied Tube & Conduit Corp. v. Indian Head, Inc.*
   486 U.S. 492 (1988) ....................................................................................................................15, 17

6

7

*Am. Cent. E. Tex. Gas Co. v. Union Pac. Res. Group*
   93 Fed. Appx. 1 (5th Cir, 2004) ...............................................................................................7

8

*Am Soc'y of Mech. Eng'rs v. Hydrolevel Corp.*
   456 U.S. 556 (1982) .......................................................................................................................15

9

10

*American Tobacco Co. v. U.S.*
   328 U.S. 781 (1946) .......................................................................................................................20

11

12

*Apani Sw., Inc. v. Coca-Cola Enters., Inc.*
   300 F.3d 620 (5th Cir. 2002) ......................................................................................................21

13

*Apple, Inc. v. Samsung Elecs. Co., Ltd.*
   No. 11-CV-01846-LHK, 2012 WL 1672493 (N.D. Cal. May 14, 2012) ..............................8, 22

14

15

*Ashcroft v. Iqbal*
   556 U.S. 662 (2009) .......................................................................................................................2

16

17

*Bauer v. Texas*
   341 F.3d 352 (5th Cir. 2003) ......................................................................................................2

18

*Bell Atl. Corp. v. Twombly*
   550 U.S. 544 (2007) .......................................................................................................................1

19

20

*Berk v. Ascott Inv. Corp.*
   759 F. Supp. 245 (E.D. Pa. 1991) ..............................................................................................2

21

22

*Blue Shield of Va. v. McCready*
   457 U.S. 465 (1982) .......................................................................................................................9

23

*Boada v. Young*
   No. 12-cv-3008, 2013 WL 5757831 (E.D. La. Oct. 23, 2013) ...................................................1

24

25

*Broadcast Music, Inc. v. Columbia Broadcasting System, Inc.*
   441 U.S. 1 (1979) ..........................................................................................................................14

26

*Broadcom Corp. v. Qualcomm, Inc.*
   501 F.3d 297 (3d Cir. 2007) .................................................................................8, 15, 16, 17, 21

27

28

*Buckley v. Nat'l Football League*
  18-cv-3009 (LGS), 2018 WL 6198367 (S.D.N.Y. Nov. 16, 2018)...........................29

*Cargill, Inc. v. Monfort of Colo. Inc.*
  479 U.S. 104 (1986) ...........................................................................................6

*CBS v. Am. Soc'y of Composers*
  620 F.2d 930 (2d Cir. 1980) ........................................................................12, 14

*In re Chicken Antitrust Litig.*
  669 F.2d 228 (5th Cir. 1982) ............................................................................7

*Clothesrigger, Inc. v. GTE Corp.*
  191 Cal. App. 3d 605 (1987) ...........................................................................28

*Cont'l Ore Co. v. Union Carbide & Carbon Corp.*
  370 U.S. 690 (1962) ...........................................................................................9

*Daimler AG v. Bauman*
  571 U.S. 117 (2014) .........................................................................................30

*Davidson v. Kimberly-Clark Corp.*
  889 F.3d 956 (9th Cir. 2018).............................................................................2

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*
  504 U.S. 451 (1992) .........................................................................................21

*El Sereno, LLC v. City of Garland*
  No. 09-cv-0556, 2010 WL 1741334 (N.D. Tex. Apr. 29, 2010) .................................5

*Ericsson, Inc. v. D-Link Sys., Inc.*
  773 F.3d 1201 (Fed. Cir. 2014) ....................................................................16, 17

*FTC v. Qualcomm Inc.*
  No. 17-CV-00220-LHK, 2019 WL 2206013 (N.D. Cal. May 21, 2019)...................14, 17

*Funai Elec. Co. v. LSI Corp.*
  No. 16-CV-01210-BLF, 2017 WL 1133513 (N.D. Cal. Mar. 27, 2017) .................3, 8, 25

*Garabet v. Autonomous Techs. Corp.*
  116 F. Supp. 2d 1159 (C.D. Cal. 2000)...............................................................7

*Georgia-Pacific Corp. v. United States Plywood Corp.*
  318 F. Supp. 1116 (S.D.N.Y. 1970), *mod. and aff'd*, 446 F.2d 295 (2d Cir.
  1971).................................................................................................................23

*Haier Am. Trading, LLC v. Samsung Elecs., Co.*
  No. 1:17-cv-921 TJM, 2018 WL 4288617 (N.D.N.Y. Sept. 7, 2018) ...................23, 24

*Hardware Mut. Cas. Co. v. Schantz*
    178 F.2d 779 (5th Cir. 1949)............................................................................24

*Harrison v. E.I. Dupont De Nemours & Co.*
    No. 13-cv-1180-BLF, 2016 WL 3231535 (N.D. Cal. Jun. 13, 2016) ..........................2

*HTC Corp. v. Telefonaktiebolaget LM Ericsson*
    No. 18-cv-00243, 2018 WL 6617795 (E.D. Tex. Dec. 17, 2018)............................3

*Huawei Techs., Co v. Samsung Elecs. Co.*
    340 F. Supp. 3d 934 (N.D. Cal. 2018) .....................................................20

*Hunt-Wesson Foods, Inc. v. Ragu Foods, Inc*.
    627 F.2d 919 (9th Cir. 1980)...............................................................20

*Impax Media, Inc v. Northeast Adver. Corp.*
    Case No. 17-cv-8272, 2018 WL 3962841 (S.D.N.Y. Aug. 17, 2018) .....................29

*Indus. Maritime Carriers, Inc. v. Japan Heavy Lift*
    No. 03-cv-1041, 2006 WL 860979 (E.D. La. Mar. 20, 2006) ..............................28

*In re Innovatio IP Ventures*
    1:11–cv–09308, 2013 WL 5593609 (N.D. Ill. Oct. 3, 2013) .......................18, 19, 27

*Interstate Traffic Control v. Beverage*
    101 F. Supp. 2d 445 (S.D. W.Va. 2000) ....................................................4

*Kajima/Ray Wilson v. L.A. Cnty. Metro. Transp. Auth.*
    23 Cal. 4th 305 (2000)......................................................................24

*Kel Lee Props. v. Evanston Ins. Co.*
    No. 17-cv-292, 2018 U.S. Dist. LEXIS 1418 (S.D. Tex. Jan. 4, 2018) ....................19

*Kirola v. City and County of San Francisco*
    860 F.3d 1164 (9th Cir. 2017)...............................................................2

*Klor's v. Broadway-Hale Stores*
    359 U.S. 207 (1959) .......................................................................23

*Knevelbaard Dairies v. Kraft Foods, Inc.*
    232 F.3d 979 (9th Cir. 2000)...............................................................10

*Kwikset Corp. v. Superior Ct.*
    51 Cal. 4th 310 (2011).....................................................................28

*Lake City Stevedores, Inc. v. E. W. Shipping Agencies, Inc.*
    474 F.2d 1060 (5th Cir. 1973)..............................................................29

*Larson v. Valente*
    456 U.S. 228 (1982) ........................................................................6

*Leite v. Crane Co.*
   749 F.3d 1117 (9th Cir 2014).................................................................................1

*Lucas Auto. Eng'g, Inc. v. Bridgestone/Firestone, Inc.*
   140 F.3d 1228 (9th Cir. 1998)...........................................................................6, 7

*Lumbermens Mut. Cas. Co. v. McIver*
   27 F. Supp. 702 (S.D. Cal. 1939) ...................................................................24, 25

*Matsushita Elec. Indus. Co. v. Cinram Int'l, Inc.*
   299 F. Supp. 2d 370 (D. Del. 2004) ..................................................................14

*McGee v. Int'l Life Ins. Co.*
   355 U.S. 220 (1957) .........................................................................................30

*Microsoft Corp. v. Motorola, Inc.*
   696 F.3d 872 (9th Cir. 2012)..........................................................................4, 24

*Microsoft Corp. v. Motorola, Inc.*
   795 F.3d 1024 (9th Cir. 2015)...........................................................................22

*Microsoft Corp. v. Motorola, Inc.*
   No. 10-cv-1823-JLR, 2011 WL 11480223 (W.D. Wash. June 1, 2011)....................24

*Microsoft Corp. v. Motorola, Inc.*
   No. 10-cv-1823-JLR, 2013 WL 2111217 (W.D. Wash. Apr. 25, 2013)....................27

*Microsoft Mobile Inc. v. Interdigital, Inc.*
   No. 15-cv-723-RGA, 2016 WL 1464545 (D. Del. Apr. 13, 2016) .......................3, 4

*In re Mirant Corp.*
   675 F.3d 530 (5th Cir. 2012).............................................................................2

*N. Mississippi Commc'ns, Inc. v. Jones*
   792 F.2d 1330 (5th Cir. 1986)...........................................................................20

*Nero AG v. MPEG LA, L.L.C.*
   No. 10-CV-3672-MRP-RZ, 2010 WL 4366448 (C.D. Cal. Sept. 14, 2010) .............13, 14

*Newcal Indus., Inc. v. IKON Office Solution*
   513 F.3d 1038 (9th Cir. 2008)...........................................................................21

*OTN v. Va. Hemotology Oncology*
   Case No. C 05-3033 WDB, 2006 WL 334532 (N.D. Cal. Feb. 10, 2006)................29

*Paladin Assocs., Inc. v. Montana Power Co.*
   328 F.3d 1145 (9th Cir. 2003)...........................................................................20

*In re Papst Licensing, GMBH Patent Litig.*
   No. CIV.A.99-3118, 2000 WL 1145725 (E.D. La. Aug. 11, 2000)...........................9

*Pegram v. Herdrich*
    530 U.S. 211 (2000) ..............................................................................................5

*Prime Healthcare Servs., Inc. v. Harris*
    216 F. Supp. 3d 1096 (S.D. Cal. 2016) ................................................................4

*Propat Int'l Corp. v. RPost, Inc.*
    473 F.3d 1187 (Fed. Cir. 2007) ..........................................................................29

*Qatalys, Inc. v. Mountain Med. Techs., Inc.*
    No. 14-cv-1784, 2015 WL 1401220 (N.D. Tex. Mar. 27, 2015) ........................12

*In re Qualcomm Antitrust Litig.*
    292 F. Supp. 3d 948 (N.D. Cal. 2017) ............................................................8, 17

*Quest v. Bandera Cnty*
    Case No. 13-cv-00506, 2013 WL 6835147 (W.D. Tex. Dec. 26, 2013)...............28

*Rambus Inc. v. FTC*
    522 F.3d 456 (D.C. Cir. 2008) ...........................................................16, 20, 22

*Realtek Semiconductor Corp. v. LSI Corp. et al.*
    No. 5:12-cv-03451-RMW, 2012 WL 4845628 (N.D. Cal. Oct. 10, 2012) ..............24

*RealTek Semiconductor v. LSI Corp.*
    No. 12-cv-3451-RMW, 2014 WL 3736116 (N.D. Cal. June 16, 2014)...................27

*Research In Motion Ltd. v. Motorola*, Inc.
    644 F. Supp. 2d 788 (N.D. Tex. 2008)..........................................3, 8, 12, 15, 16, 17, 19, 21, 24

*Richter Concrete Corp. v. Hilltop Basic Resources, Inc.*
    547 F. Supp. 893 (S.D. Ohio 1981) .....................................................................23

*Robinson v. Unilever United States, Inc*.
    2019 WL 2067941 (C.D. Cal. Mar. 25, 2019) .......................................................2

*Rolls-Royce Corp. v. Heros, Inc.*
    576 F. Supp. 2d 765 (N.D. Tex. 2008)..................................................................30

*Roman Catholic Diocese of Dallas v. Sibelius*
    927 F. Supp. 2d 406 (N.D. Tex. 2013) ...................................................................1

*Silvas v. E\*Trade Mortg. Corp.*
    514 F.3d 1001 (9th Cir. 2008)...............................................................................1

*Spector v. Norwegian Cruise Line Ltd.*
    No. 00-cv-2649, 2007 WL 2900588 (S.D. Tex. Sept. 28, 2007) .............................2

*In re Static Random Access Memory Antitrust Litig*.
    264 F.R.D. 603 (N.D. Cal. 2009) ...........................................................................5

*Sud v. Costco Wholesale Corp.*
  229 F. Supp. 3d 1075 (N.D. Cal. 2017) ........................................................................1

*Sumitomo Mitsubishi Silicon Corp. v. MEMC Elec. Materials, Inc.*
  C 05-2133 SBA, 2007 U.S. Dist. LEXIS 61964, *44 (N.D. Cal. August 13,
  2007) ...........................................................................................................................14

*In re Summit Tech., Inc.*
  127 F.T.C. 208 (1999) ................................................................................................13

*Swain v. CACH, LLC*
  699 F. Supp. 2d 1117 (N.D. Cal. 2009) ......................................................................28

*TCL Commc'n Tech. Holdings, Ltd. v. Telefonaktiebolaget LM Ericsson*
  No. 15-cv-2370, 2017 WL 6611635 (C.D. Cal. Dec. 21, 2017) .................................27

*TCL Commc'n Tech. Holdings v. Telefonaktiebolaget LM Ericsson*
  No. 15-cv-2370-JVS, 2018 WL 4488286 (C.D. Cal. Sept. 14, 2018)..........................27

*TCL Communications Technology Holdings, Ltd. v. Telefonaktiebolaget LM
  Ericsson*
  Case No. 14-cv-0341, 2016 WL 6562075 (C.D. Cal. Aug. 9, 2016)........................24, 27

*TCL Communs. Tech. Holdings Ltd. v. Telefonaktenbologet LM Ericsson*
  No. 14-cv-00341, 2014 U.S. Dist. LEXIS 197319 (C.D. Cal. July 28, 2014) .............27

*Texas v. U.S.*
  497 F.3d 491 (5th Cir. 2007) .......................................................................................2

*Todd v. Exxon Corp.*
  275 F.3d 191 (2d Cir. 2001) .......................................................................................21

*Transource Int'l, Inc. v. Trinity Indus., Inc.*
  725 F.2d 274 (5th Cir. 1984)........................................................................................30

*TravelPass Grp., LLC v. Caesars Entm't Corp.*
  No. 18-cv-153, 2019 WL 5691996 (E.D. Tex. Aug. 29, 2019) ...................................9

*Turnbow v. Life Partners, Inc.*
  No. 3:11-CV-1030-M, 2012 WL 4473080 (N.D. Tex. Sept. 28, 2012)......................2

*Union Oil Co. of Calif. v. Greka Energy Corp.*
  165 Cal. App. 4th 129 (2008)................................................................................26, 27

United States *v. Fisher-Otis Co.*, 496 F.2d 1146 (10th Cir. 1974) .................................24

United States *v. Grinnell Corp.*, 384 U.S. 563 (1966) ...................................................16

*Van Dusen v. Barrack*
  376 U.S. 612 (1964) ...................................................................................................26

*Vernon v. Southern Calif. Edison Co.*
  955 F.2d 1361 (9th Cir. 1992) ........................................................................8, 31

*Virginia Sur. Co. v. Northrop Grumman Corp.*
  144 F.3d 1243 (9th Cir. 1988) ................................................................................5

*Virginia Vermiculite, Ltd. v. W.R. Grace & Co.-Conn.*
  156 F.3d 535 (4th Cir. 1998) ................................................................................12

*Waggoner v. Denbury Onshore, LLC*
  612 Fed. Appx. 734 (5th Cir. 2015) ........................................................................7

*Westerngeco L.L.C. v. Ion Geophysical Corp.*
  776 F. Supp. 2d 342 (S.D. Tex. 2011) ....................................................................2

*Wi-LAN Inc. v. LG Electronics, Inc.*
  382 F. Supp. 3d 1012 ............................................................................................18

*Williamson v. Tucker*
  645 F.2d 404 (5th Cir. 1981) ..................................................................................1

*Wolfe v. Strankman*
  392 F.3d 358 (9th Cir. 2004) ..........................................................................1, 16

*Zenith Electronics, LLC v. Sceptre, Inc.*
  No. 14-cv-5150-JAK-AJW, 2015 WL 12765633
  (C.D. Cal. Feb. 5, 2015) ..........................................................5, 8, 13, 19, 21, 24

*Zimmerman v. Superior Court of San Diego Cnty.*
  220 Cal. App. 4th 389 (2013) ................................................................................29

Statutes

15 U.S.C. § 6(a) ..........................................................................................................9, 10

15 U.S.C. § 26 ................................................................................................................30

Civil Code, Article 1217 ................................................................................................26

Civil Code, Article 1221 ................................................................................................26

Clayton Act ....................................................................................................................30

Clayton Act § 4 ............................................................................................................6, 7

Clayton Act § 16 ..........................................................................................................6, 7

Declaratory Judgment Act ..............................................................................................24

Sherman Act § 2 ..........................................................................15, 16, 17, 20

1

<u>Other Authorities</u>

2

1 ABA Section of Antitrust Law, ANTITRUST LAW DEVELOPMENTS
  628 (8th ed. 2017).................................................................................................21

3

4

F.R.C.P. 9(b) ..........................................................................................................19

5

Fed. Trade Comm'n & Dept. of Justice Antitrust Div., Antitrust Enforcement and
  Intellectual Property Rights:  Promoting Innovation and Competition at 9, 58
  (April 2007) ("2007 IP Report") ........................................................................13

6

7

Rest.3d. Agency § 1.02 (2006)..............................................................................29

8

Rule 8 ......................................................................................................................2

9

Rule 12 ....................................................................................................................1

10

Rule 12(b)(1) ...........................................................................................................1

11

Rule 12(b)(6) ...........................................................................................................1

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## I.   **INTRODUCTION**

Defendants' motion to dismiss should be denied in its entirety.  A complaint is sufficient if it gives the defendant "fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal quotations omitted).  In deciding a motion to dismiss under Rule 12(b)(6), "allegations of material fact are taken as true and construed in the light most favorable to the nonmoving party." *Silvas v. E*Trade Mortg. Corp.*, 514 F.3d 1001, 1003 (9th Cir. 2008); *Wolfe v. Strankman*, 392 F.3d 358, 362 (9th Cir. 2004) (court must "draw all reasonable inferences in [plaintiff's] favor").  Defendants repeatedly seek to subvert these standards by mischaracterizing or ignoring Continental's allegations, or arguing the truth of contrary facts.  Continental's detailed and thorough FAC is more than sufficient to state a claim for relief, and put Defendants on notice of Continental's serious and urgent grievance.  Discovery is the proper vehicle for addressing the parties' factual disputes, not a Rule 12 motion to dismiss.

## II.   **CONTINENTAL EASILY SATISFIES ARTICLE III STANDING.**

### A.   **The Liberal Pleading Standard Favors Continental.**

Courts evaluate a motion to dismiss for lack of Article III standing and ripeness under Rule 12(b)(1).  *See Sud v. Costco Wholesale Corp.*, 229 F. Supp. 3d 1075, 1080-81 (N.D. Cal. 2017); *Roman Catholic Diocese of Dallas v. Sibelius*, 927 F. Supp. 2d 406, 415-16 (N.D. Tex. 2013).  To resolve a facial attack (as opposed to a factual attack), a court "must consider the allegations in plaintiff's complaint as true." *Williamson v. Tucker*, 645 F.2d 404, 412 (5th Cir. 1981); *Leite v. Crane Co.*, 749 F.3d 1117, 1121 (9th Cir 2014).[1]  The motion "should be granted only 'if it appears certain that the plaintiff cannot prove a plausible set of facts that establish subject-matter jurisdiction.'" *Boada v. Young*, No. 12-cv-3008, 2013 WL 5757831, at *2 (E.D. La. Oct. 23, 2013) (citation omitted).

To satisfy Article III standing, a plaintiff must plead that (1) it has suffered an injury-in-

---

[1] Although Defendants purport to make a facial attack regarding standing (MTD at 2-4), and never explicitly say they are making a factual attack (including not discussing the relevant legal standards), they nevertheless cite three factual declarations (from Nokia and Optis) in support of their standing argument.  (*Id.* at 4, n.2, and 29:5-18, n.12.)  In an abundance of caution, Continental further addresses these highly disputed factual issues in the Declaration of David Djavaherian, and also addresses certain factual arguments made by Optis *infra* at section VI.

1    fact that is (a) concrete and particularized and (b) actual or imminent, not conjectural or

2    hypothetical; (2) the injury is fairly traceable to the actions of the defendant; and (3) it is likely

3    that the injury will be redressed by a favorable decision.  *See In re Mirant Corp.*, 675 F.3d 530,

4    533 (5th Cir. 2012); *Kirola v. City and County of San Francisco*, 860 F.3d 1164, 1174 (9th Cir.

5    2017).  A plaintiff seeking declaratory and injunctive relief must show it is "realistically

6    threatened by a repetition of the violation in order to establish that such relief would redress the

7    alleged injuries."  *Robinson v. Unilever United States, Inc.*, 2019 WL 2067941, *5 (C.D. Cal. Mar.

8    25, 2019) (internal quotations and citation omitted); *accord, Bauer v. Texas*, 341 F.3d 352, 358

9    (5th Cir. 2003).  "Past wrongs" are "evidence bearing on whether there is a real and immediate

10   threat of repeated injury."  *Davidson v. Kimberly-Clark Corp.*, 889 F.3d 956, 967 (9th Cir. 2018);

11   *Spector v. Norwegian Cruise Line Ltd.*, No. 00-cv-2649, 2007 WL 2900588, at *5 (S.D. Tex. Sept.

12   28, 2007).

13          For ripeness, a court evaluates "(1) the fitness of the issues for judicial decision, and (2)

14   the hardship to the parties of withholding court consideration."  *Texas v. U.S.*, 497 F.3d 491, 498

15   (5th Cir. 2007).  Hardship "inhere[s] in legal harms, such as the harmful creation of legal rights or

16   obligations; practical harms on the interests advanced by the party seeking relief; and the harm of

17   being forced to modify one's behavior in order to avoid future adverse consequences."

18   *Westerngeco L.L.C. v. Ion Geophysical Corp.*, 776 F. Supp. 2d 342, 351 (S.D. Tex. 2011).

19          As the Supreme Court has made clear, the liberal Rule 8 pleading standard "does not

20   require 'detailed factual allegations.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citations

21   omitted); *see also Berk v. Ascott Inv. Corp.*, 759 F. Supp. 245, 250 (E.D. Pa. 1991).  Rather,

22   "general allegations of injury resulting from the defendant's conduct may suffice" to survive a

23   motion to dismiss because courts "presume that general allegations embrace those specific facts

24   that are necessary to support the claim."  *Harrison v. E.I. Dupont De Nemours & Co.*, No. 13-cv-

25   1180-BLF, 2016 WL 3231535, *2 (N.D. Cal. Jun. 13, 2016); *Turnbow v. Life Partners, Inc.*, No.

26   3:11-CV-1030-M, 2012 WL 4473080, at *3 (N.D. Tex. Sept. 28, 2012).

27          **B.     Continental Has Alleged (and Can Show) the Requisite Harm.**

28          Continental's allegations regarding harm easily meet the above standard.  In arguing that

Continental has not suffered or alleged any injury, Defendants ignore various allegations made by Continental, mischaracterize the nature of Continental's predicament, and improperly assume the truth of various facts which contradict the allegations of the First Amended Complaint ("FAC"). In so doing, Defendants improperly flip the standard of review on its head. *See Research In Motion Ltd. v. Motorola, Inc*., 644 F. Supp. 2d 788, 797 (N.D. Tex. 2008) ("*RIM*") (giving "no weight" to argument that "contradicts the factual accuracy" of the complaint).

In particular, Defendants falsely surmise that Continental is merely concerned that Defendants *might* charge supra-FRAND royalties to one of Continental's customers, such that the customer *might* ask Continental to indemnify them, and then Continental *might* have to do so, and then assert that none of the above has happened yet, and thus Continental has suffered no injury. Defendants either already know this account is false, or are remarkably naïve about the impact their unlawful conspiracy is having on the automotive industry. The reality is that Continental's many injuries all stem from the fact that Defendants unlawfully refuse to grant *Continental* a FRAND license for *its* products—*that* is the heart of this dispute. (Dkt. 97 (FAC), ¶¶ 136-150.) Continental's inability to obtain a FRAND license, despite Defendants' legal obligation to provide one, has already injured Continental by causing it to lose business opportunities, and change how it makes and supplies certain products (including mid-contract). The unavailability of a license has also restricted Continental's ability to create new products which practice the standards. Continental estimates that the resulting harm—both current and ongoing—has had (and will continue to have) a substantial impact on its earnings. This dynamic is covered by the FAC (*see* ¶¶ 135, 157, 164, 177, 186, 195, 203), but Defendants ignore these allegations. These allegations alone are enough to create standing and present a ripe dispute. *See HTC Corp. v. Telefonaktiebolaget LM Ericsson*, No. 18-cv-00243, 2018 WL 6617795, at *4-5 (E.D. Tex. Dec. 17, 2018) (injury adequately alleged where claimant was deprived of "contractual [FRAND] right"); *Funai Elec. Co. v. LSI Corp.*, No. 16-CV-01210-BLF, 2017 WL 1133513, *3, *11 (N.D. Cal. Mar. 27, 2017) (injury and ripeness adequately alleged where "Defendants have refused to license its technologies to [plaintiff] on FRAND terms"); *Microsoft Mobile Inc. v. Interdigital, Inc.*, No. 15-cv-723-RGA, 2016 WL 1464545, *3 (D. Del. Apr. 13, 2016) (injury adequately

1    alleged when plaintiff alleged that "[defendants'] wrongful conduct 'prevented [plaintiff] from

2    obtaining access to necessary technology' in the relevant markets . . ."); *Prime Healthcare Servs.,*

3    *Inc. v. Harris*, 216 F. Supp. 3d 1096, 1108 (S.D. Cal. 2016) (confirming Article III standing

4    because plaintiff's "alleged lost business opportunity and corresponding economic harm

5    constitutes an injury in fact"); *Interstate Traffic Control v. Beverage*, 101 F. Supp. 2d 445, 450

6    (S.D. W.Va. 2000) (finding that "the inability to compete on an equal footing in the bidding

7    process" is an injury in fact).

8          Also contrary to Defendants' arguments, it is not true that Continental is unsure whether

9    Defendants' rates are FRAND, or merely fears some future customer might accept those rates, or

10   further that no customer has made any indemnity demand on Continental.  To the contrary,

11   Continental *firmly believes and contends* that Defendants' rates greatly exceed what is FRAND,

12   and *knows* that several of its customers have been coerced to pay Avanci's supra-FRAND rates

13   out of fear of an injunction and because they believe they can externalize the cost through

14   demands on suppliers like Continental.[2]  Additionally, Continental has *directly experienced*

15   indemnity demands from OEM customers, as well as the other effects of not being able to get a

16   FRAND license from the Defendants.  Again, such matters are already generally captured in the

17   FAC (*see, e.g.*, ¶¶ 126, 135, 157), but are further described more specifically here:

18   • One OEM recently threatened to short-pay Continental's invoices in order to "set off the

19      additional license costs" on non-FRAND terms it had to pay Avanci;

20   • Earlier last year, one OEM conditioned the award of a potential contract on Continental's

21      reimbursement of the royalties charged by Avanci;

22   • An OEM recently required vendors like Continental to provide a bank guarantee of 100

23   ─────────────────────────

24   [2] Contrary to Defendants' self-serving claim, there is nothing "voluntary" about OEMs acceding to
     Defendants' royalty demands.  It is well-understood that the threat of an injunction can force an
     alleged infringer to enter into a license, even if it disputes the rates.  *See Microsoft Corp. v.*

25   *Motorola, Inc.*, 696 F.3d 872, 886 (9th Cir. 2012) (the threat of an injunction pressures infringers
     "to enter into a 'holdup' settlement before the litigation is complete").  Nokia argued this when it

26   previously litigated against Qualcomm (one of Avanci's founders).  (Dkt. 32 at 7-8.)  Now, Nokia
     is trying to extract a supra-FRAND license from Daimler (also a Continental customer) by seeking

27   injunctive relief in 10 patent infringement actions in Germany.  (*Id.* at 10-12.)

28

million Euros to protect the OEM against SEP infringement claims, which Continental did not provide and subsequently was not awarded the contract; and

- An OEM is currently forcing Continental to competitively re-quote business it already had won in an effort to obtain the best possible indemnity terms against SEP licensing costs payable to Avanci, telling Continental it views one of Continental's competitors as a lower risk because of that competitor's SEP portfolio and attendant licensing leverage.[3]

All told, there are at least 38 instances in which 16 OEMs have either demanded indemnity rights against Continental relevant to SEP licensing, or have otherwise demanded that Continental provide a specific assurance that it will handle licensing matters for Defendants' SEPs.  Again, this dynamic easily gives rise to standing.  *See El Sereno, LLC v. City of Garland*, No. 09-cv-0556, 2010 WL 1741334, at *2 (N.D. Tex. Apr. 29, 2010) (injury adequately alleged where defendant's conduct caused plaintiff to lose potential business and "has increased its business costs"); *Virginia Sur. Co. v. Northrop Grumman Corp*., 144 F.3d 1243, 1246 (9th Cir. 1988) (plaintiff's potential liability to customers under "its duty to indemnify" represents "an imminent and concrete injury" for standing purposes); *Zenith Electronics, LLC v. Sceptre, Inc*., No. 14-cv-5150-JAK-AJW, 2015 WL 12765633, *6 (C.D. Cal. Feb. 5, 2015) (finding standing where defendants "have been able to, and have, sought supra-competitive royalties, caus[ing] certain of [plaintiff's] customers to stop doing business with it"); *In re Static Random Access Memory Antitrust Litig*., 264 F.R.D. 603, 610-611 (N.D. Cal. 2009) (standing found where plaintiffs alleged defendants and co-conspirators conspired "to raise prices for SRAM [which] overcharges were then passed through the chains of distribution" to plaintiffs).

Importantly, Defendants' indemnity cases (MTD at 5) are all inapposite because, unlike those cases, this case is ***not*** about one party suing another party for indemnity.  Nor does ripeness or standing here turn on any future "judgment" of liability for an indemnity obligation.  Continental seeks relief from this Court because, as described throughout, Defendants have

---

[3] These examples are proffered to "clarify allegations in [the] complaint," which the Court may consider on a motion to dismiss.  *Pegram v. Herdrich*, 530 U.S. 211, 230 n.10 (2000).  Given the liberal notice pleading standard, it should not be necessary for Continental to amend the FAC to allege these details (they should be addressed in discovery), but it can do so if requested.

1  *already* breached contractual duties and violated antitrust laws, and thereby *already* caused

2  Continental concrete and ongoing harms.

3  Defendants' argument that they have played no role in causing Continental's harm because

4  this is all a matter of "voluntary" contract is the epitome of chutzpah. The indemnity obligations

5  at issue are a long-standing and expected feature of the automotive supply chain. Continental's

6  harm is a function of the fact Defendants disrupted the automotive industry by only licensing

7  OEMs at *supra*-FRAND rates. That, in turn, has caused a tsunami of turmoil and uncertainty for

8  suppliers like Continental, as well as their customers, in terms of who is responsible to cover the

9  licensing cost, what a FRAND rate is, and how products should be developed and priced when

10 there is so much unsettled risk. *Continental would not be suffering harm but for Defendants'*

11 *unlawful refusal to provide Continental a FRAND license.* If Continental had a license it could

12 develop and quote products free of further SEP licensing risks, and sell exhaustively licensed

13 products to its customers. Continental seeks to remedy this harm via an order requiring

14 Defendants to license Continental on FRAND terms and conditions, ruling that Defendants'

15 demanded rates are not FRAND, and setting the FRAND rates. *See Larson v. Valente*, 456 U.S.

16 228, 244 n.15 (1982) (a plaintiff "satisfies the redressability requirement [of Article III standing]

17 when [it] shows that a favorable decision will relieve a discrete injury to [itself]").[4]

18 **III.   CONTINENTAL HAS ADEQUATELY PLED ITS ANTITRUST CLAIMS.**

19    **A.   Defendants' Antitrust Standing Arguments Lack Merit.**

20       1.   Continental is not too remote to seek equitable relief under Section 16.

21 Antitrust standing requirements for plaintiffs, like Continental, who seek only equitable

22 relief pursuant to Section 16 of the Clayton Act are fundamentally less stringent than those

23 applicable to plaintiffs who seek damages under Section 4 of the Clayton Act. *Cargill, Inc. v.*

24 *Monfort of Colo. Inc.*, 479 U.S. 104, 111 n.6 (1986); *Lucas Auto. Eng'g, Inc. v.*

25

26 ---

27 [4] Defendants' revisions (Dkt. 270, Ex. B (redline) at 1, 5-6) incorrectly suggest that distinctions between Plaintiff and its affiliates are material to standing. *See, e.g.*, Dkt. 128-1 & 185-16

28 (Droessler declarations explaining that, *inter alia*, Plaintiff is global leader for telematics business unit and directs development, commercialization, and sale of TCUs for the Continental Group).

*Bridgestone/Firestone, Inc.*, 140 F.3d 1228, 1235 (9th Cir. 1998).  Defendants ignore this important distinction, but as their own authority recognizes, Section 16 standing "lacks several important limitations that have been applied to Section 4."  *Garabet v. Autonomous Techs. Corp.*, 116 F. Supp. 2d 1159, 1171 (C.D. Cal. 2000) (cited in MTD at 9).  For example, "[a]n antitrust plaintiff seeking injunctive relief need only show a *threatened* injury, not an actual one."  *Lucas*, 140 F.3d at 1235; *Garabet*, 116 F. Supp. 2d at 1171.

Moreover, the "directness" (or conversely, lack of "remoteness") element of antitrust standing analysis on which Defendants so heavily rely has little application to equitable actions, "given that injunctive relief does not require the same 'apportionment' among multiple plaintiffs that would be required for damages."  *Garabet*, 116 F. Supp. 2d at 1171.  Indeed, "a party too remote for damages might be granted an injunction."  *Lucas*, 140 F.3d at 1234.  Thus, even "indirect purchasers"—the ultimate "remote" plaintiffs in the antitrust context—"are not barred from bringing an antitrust claim for injunctive relief . . . ."  *Id.* at 1235, 1237 (indirect purchaser who competed "at the secondary level, *i.e.*, as a customer in a market controlled by a monopolist has standing to assert [] claim for equitable relief, including divestiture, under § 16"); *In re Chicken Antitrust Litig.*, 669 F.2d 228, 238 (5th Cir. 1982).  Defendants ignore these important distinctions, and instead rely on inapposite cases.[5]

In a passing reference, Defendants argue Fifth Circuit law "typically limits parties with antitrust injury to 'competitors, purchasers, or consumers in the relevant market.'"  (MTD at 8, quoting *Waggoner v. Denbury Onshore, LLC*, 612 Fed. Appx. 734, 737 (5th Cir. 2015).)  But *Waggoner* clarified (immediately following Defendants' quoted phrase) that "standing is not necessarily limited to this group."  *Id.*; *see also Am. Cent. E. Tex. Gas Co. v. Union Pac. Res.*

---

[5] *Associated Gen.*, *Norris*, *Static Control*, and *Texas Carpenters* (relied on by Defendants) all involved damages actions under Section 4.  *Meyer* involved cellphone purchasers *three levels removed* in the supply chain from the chipset technology market Qualcomm allegedly monopolized.  In *Garabet*, 116 F Supp. 2d at 1171, the court found that plaintiffs offered no evidence of their intent to purchase products from defendants or "*any* member of this market in the foreseeable future."  Here, Continental has demonstrated its willingness to take a FRAND license from Defendants.  Indeed, Continental is more directly injured than its customers, as it is *Continental's* connectivity products that enable automobiles to practice the standards.

1   *Group*, 93 Fed. Appx. 1, 7 (5th Cir, 2004) ("[r]elief for antitrust claims is not confined to

2   consumers, or to purchasers, or to competitors, or to sellers").  Nevertheless, Continental *is* a

3   participant in the market for cellular SEP licensing because its products use the standards.  (FAC,

4   ¶¶ 2, 7.)  "'[I]t is not the status as a consumer or competitor that confers antitrust standing, but the

5   relationship between the defendant's alleged unlawful conduct and the resulting harm to the

6   plaintiff.'"  *In re Qualcomm Antitrust Litig.*, 292 F. Supp. 3d 948, 966 (N.D. Cal. 2017).  As a user

7   of the standards impacted by Defendants' illegal boycott, Continental has sufficient antitrust

8   standing.  *See Zenith*, 2015 WL 12765633, *6 (holding claimant had standing based on similar

9   allegations against pool).

10      Finally, Defendants argue that FRAND violations are only a "breach of contract . . . not an

11   antitrust violation."  (MTD at 10, citing, *e.g.*, *Vernon v. Southern Calif. Edison Co.*, 955 F.2d

12   1361, 1368 (9th Cir. 1992).)  Not so.  First, as *Vernon* recognized, antitrust liability may attach to

13   "conduct which also happens to create a contract dispute."  *Id.*  Second, this ignores the important

14   role of FRAND licensing commitments in ameliorating the anticompetitive risks inherent in

15   standard setting.  *See Broadcom Corp. v. Qualcomm, Inc.*, 501 F.3d 297, 314 (3d Cir. 2007); *RIM*,

16   644 F. Supp. 2d at 795-96.[6]

17          2.      As a direct victim of Defendants' concerted boycott, Continental is

18                  threatened with the type of injury the antitrust laws are intended to redress.

19      Continental alleges Defendants have conspired to boycott suppliers, both through Avanci

20   and individually, so Defendants can extract supra-FRAND royalties from downstream OEMs.

21   (FAC, ¶¶ 130, 141-150.)  Continental further alleges it "directly bear[s] the artificially elevated

22   cost of Defendants' non-FRAND royalties" due to indemnity obligations to, and demands from, its

23   customers.  (*Id.*, ¶ 11.)  Defendants, in effect, argue their illegal boycott has divested Continental

24   of antitrust standing because they collusively do not deal with Continental.  But it is precisely this

25

26   _____

     [6] Courts repeatedly have held that FRAND violations of the type alleged here give rise to antitrust

27   liability.  *See, e.g., u-blox AG v. InterDigital, Inc.*, 3:19-cv-001-CAB-(BLM), 2019 WL 1574322,
     *3-4 (S.D. Cal. Apr. 4, 2019); *Funai Electric Co.*,  2017 WL 1133513, *7-8; *Zenith*, 2015 WL

28   12765633, *6-9; *Apple, Inc. v. Samsung Elecs. Co., Ltd.*, No. 11-CV-01846-LHK, 2012 WL
     1672493, *7-8 (N.D. Cal. May 14, 2012).

collusive boycott of "upstream suppliers" that forms the "heart" of Continental's antitrust claims. (FAC, ¶ 113.)  Indeed, it is the very tool that enables Defendants to collusively "maintain, and . . . further extend their end-product level licensing model" in the automotive industry because "a FRAND license to Tier 1, Tier 2, or Tier 3 suppliers would exhaust Avanci's [and Defendant SEP owners'] ability to license car OEMs at much higher royalties."  (*Id.*, ¶¶ 112-113.)  Those royalties exceed "any measure of FRAND" for the reasons alleged in the FAC.  (*Id.*, ¶¶ 8, 9.)

At a minimum, Defendants' boycott of Continental is an integral element of their scheme to extort the OEMs.  Continental's injury is "inextricably intertwined with the injury the conspirators sought to inflict on [OEMs,] flows from that which makes defendants' acts unlawful, and falls squarely within the area of congressional concern."  *Blue Shield of Va. v. McCready*, 457 U.S. 465, 484 (1982); *see also TravelPass Grp., LLC v. Caesars Entm't Corp.*, No. 18-cv-153, 2019 WL 5691996, at \*22 (E.D. Tex. Aug. 29, 2019) (allegation that plaintiff's exclusion was "an integral and necessary component" of defendants' scheme to eliminate competition established antitrust injury).

The law also squarely refutes Defendants' position that indemnity obligations to OEMs for the Defendants' unjustified royalties is not antitrust injury.  *See, e.g., In re Papst Licensing, GMBH Patent Litig.*, No. CIV.A.99-3118, 2000 WL 1145725, \*8 (E.D. La. Aug. 11, 2000) (plaintiff "adequately alleged antitrust injury" where "[defendant] Papst has fraudulently required [plaintiff] Minebea customers to pay for royalties on HDDs incorporating Minebea motors . . . [which] will result (and has resulted) in indemnification claims being made against Minebea").

**B.     Continental Has Sufficiently Alleged Concerted Agreements Among the Defendants to Boycott Continental and Other Upstream Suppliers.**

1.     Continental has alleged an overarching conspiracy to boycott upstream suppliers like Continental.

It is well-settled that antitrust "plaintiffs should be given the full benefit of their proof without tightly compartmentalizing the various factual components [of the complaint] and wiping the slate clean after scrutiny of each."  *Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962), *superseded on other grounds*, Pub.L. No. 97-290, 15 U.S.C. § 6(a).  Thus,

1  "[t]he character and effect of a conspiracy are not to be judged by dismembering it and viewing its

2  separate parts, but only by looking at it as a whole." *Id*.; *see Knevelbaard Dairies v. Kraft Foods,*

3  *Inc.*, 232 F.3d 979, 990 (9th Cir. 2000) (holding that "[a]ntitrust violations frequently entail

4  multiple means . . . (*e.g.*, restraining both purchase prices and sales prices or boycotting to enforce

5  price stabilization)" and thus "[t]he law requires that every conspiracy be judged as a whole").

6  Here, the conspiracy consists of multiple means and agreements, all intended to achieve a single

7  cohesive purpose—boycotting suppliers so Defendants can collect hold-up royalties downstream.

8      First, Continental properly alleges the existence of an express group boycott agreement

9  among Defendants.  Defendants concede that, pursuant to the Multilateral Agreement, Avanci

10  "grant[s] licenses to the collection of SEPs held by the other Defendants (and many other non-

11  defendant members of the Avanci platform) to *certain groups of potential licensees* (*e.g.*,

12  automotive OEMs)."  (MTD at 2 (emphasis added).)  This is consistent with Continental's

13  allegation that "Avanci refused to provide terms for a license to Continental [because] it is only

14  authorized to license the alleged SEPs under its control to the automotive OEMs, not to Tier 1

15  suppliers such as Continental."  (FAC, ¶ 141.)  And the terms of the Multilateral Agreement leave

16  no doubt as to its purpose to exclude upstream suppliers.  Specifically, section 4.1 provides that

17  "[e]ach licensing Program will be defined by the products to be licensed (*e.g.*, vehicles, smart

18  meters)."  (Dkt. 162-1 ("Papendick Decl."), Ex. A, § 4.1.)  Appendix A contains a list of Avanci's

19  "Existing Licensing Programs," which include only "Vehicle Licensing Program" for 2G/3G or

20  2G/3G/4G, and "Smart Meters Licensing Program" for 2G/3G or 2G/3G/4G).  (*Id.*, Appendix A.)

21  Defendants' intentional exclusion of the very components and subsystems in such products (*e.g.,*

22  TCUs, NADs, and baseband processors) that directly enable the standards gives rise to a

23  "plausible inference" of an express boycott agreement targeting suppliers like Continental.[7]

24      Second, Continental further alleges that despite self-serving language regarding individual

25

---

26  [7] *See also, e.g.*, FAC, ¶ 8 ("When Continental sought a license from Avanci, Avanci informed
    Continental that, as part of Avanci's collective agreement with its members, Avanci is only

27  authorized to license at the OEM level."), and ¶ 122 ("Avanci was . . . authorized through a
    multilateral agreement with and among its members to offer a collective license to its members'

28  SEPs only to manufacturers at the very end of a supply chain, like car OEMs.").

1  Avanci member licensing rights, the Multilateral Agreement in fact disincentivizes those members

2  from licensing suppliers "in any manner that would hinder Avanci's ability to collect its full stated

3  supra-FRAND royalty" on the vehicle, including by triggering exhaustion.  (FAC, ¶ 129.)

4  Defendants at best miscomprehend, and at worst misrepresent, the relationship between the

5  Multilateral Agreement and allegations of additional agreements among Defendants to boycott

6  upstream suppliers like Continental.  They incorrectly claim that "Continental alleges that

7  [Defendants] agreed to one thing in the [Multilateral] Agreement (independent licensing), but then

8  made some side agreements contradicting the Avanci Agreement").  (MTD at 13.)  While

9  Defendants tout a portion of section 4.4 as supposedly disallowing double dipping by Avanci

10  members (MTD at 12), they strategically leave out the first two key sentences, quoted below,

11  which are irreconcilable with individual licensing as a practical matter:

12  > **Effect of Existing Licenses**. The existence of a Patent License between any
> individual Licensor and any Licensee *will not affect the terms and conditions of*
13  > *which [Avanci] offers licenses* in accordance with any license program.  *It shall be*
> *the responsibility of each Licensor, and not [Avanci], to resolve the effect of any*
14  > *overlapping License*[.]

15  (Papendick Decl., Ex. A, § 4.1 at 8 (italics added); FAC, ¶ 129.)  In light of this provision, Avanci

16  members have little practical incentive to individually license their SEPs, because they are not

17  permitted to disturb Avanci's pool rates, and in fact would be required to refund any royalties paid

18  where an Avanci license is also secured (which is obviously Avanci's goal).  By the same token,

19  targeted licensees have little incentive to take individual licenses if doing so does not reduce the

20  Avanci rate, and instead will require the licensee to coordinate a refund with the individual Avanci

21  member.  (FAC, ¶ 129 ("[I]t is practically impossible for members to offer individual licenses to

22  suppliers that are fully exhaustive and yet avoid any effect on Avanci's ability to collect its full

23  stated price from car OEMs," and thus individual members "effectively do not compete [] with

24  each other or with Avanci in offering competitive SEP license terms[]" to upstream suppliers).)

25  The Multilateral Agreement's reference to the individual licensing rights is smoke and mirrors.[8]

26  _____

27  [8] The dynamic described above was recently demonstrated when Sharp never sought an individual license from Daimler, but instead sued Daimler for patent infringement in Germany and told
28  Daimler it needed to take an Avanci license.  (FAC, ¶ 145.)  Indeed, under the Multilateral

1   Finally, and with that context, Continental goes on to allege that each of the "Defendant

2   Licensors ha[s] refused to directly license Continental . . . on FRAND terms. (FAC ¶ 130, ¶¶ 136-

3   150 (individual refusals to license).[9]  "[A]t this stage of the case, the court [must] take[]

4   [Continental's] pleadings as true." *RIM*, 644 F. Supp. 2d at 797.  When these allegations of

5   Defendants' individual actions are considered together with those related to the Multilateral

6   Agreement, Continental's allegations *as a whole* give rise to more than just a plausible "inference"

7   of illegal conspiracy by Defendants to boycott suppliers, including Continental.  *Virginia*

8   *Vermiculite, Ltd. v. W.R. Grace & Co.-Conn.*, 156 F.3d 535, 541 (4th Cir. 1998) ("it is sufficient

9   that [defendant], regardless of its own motive, merely acquiesced in the restraint with the

10   knowledge that it would have anticompetitive effects").

11   2.   Neither Avanci's status as a pool, nor the theoretical possibility of

12   individual licenses, is sufficient to immunize Defendants from liability.

13   Next, Defendants incredibly claim they enjoy absolute antitrust immunity because their

14   pooling agreement includes self-serving language that patentees supposedly "retain" the right to

15   individually license their SEPs.  (MTD at 2.)  Defendants also at least suggest the Court should

16   refuse to reach the merits of their untested pooling agreement because patent pools, like Avanci,

17   supposedly can have "pro-competitive benefits."  (*Id.* at 1)  Through these baseless arguments,

18   Defendants invite the Court to elevate form over substance, without even considering the broader

19   context of Defendants' actual licensing practices.  Also, Continental "is not precluded from

20   demonstrating that terms contained in the contracts are contradicted by the actual conduct of the

21   contracting parties."  *Qatalys, Inc. v. Mountain Med. Techs., Inc.*, No. 14-cv-1784, 2015 WL

22   1401220, at *5 (N.D. Tex. Mar. 27, 2015).

23   _____

24   Agreement, Sharp will get its litigation costs reimbursed by Avanci if it succeeds in getting
Daimler to take an Avanci license.  (Papendick Decl., Ex. A, §§ 4.8, 5.1.2 at 11.)  This further

25   shows how the members are incentivized to put all their weight behind an Avanci license.

26   [9] In light of Sharp's pursuit of litigation against Daimler (Continental's customer), Continental
was not required to wait until Sharp expressly refused Continental's licensing request before suing

27   Sharp.  *See CBS v. Am. Soc'y of Composers*, 620 F.2d 930, 936 (2d Cir. 1980) ("An antitrust
plaintiff is not obliged to pursue any imaginable alternative, regardless of cost or efficiency, before

28   it can complain that a practice has restrained competition.").  In any event, Sharp has failed to
make any license offer to Continental, despite Continental's request.

1    First, Defendants cite no authority holding either that patent pools are always *per se*

2  procompetitive, or that the mere insertion of individual licensing language in a pooling agreement

3  makes the agreement *per se* lawful.  To the contrary, the law offers no such immunity to patent

4  pools or their members for collusive activity.  *See Zenith*, 2015 WL 12765633, *2, *6-9 (denying

5  motion to dismiss antitrust claims collectively against pool and its members, wherein the pool at

6  issue was modeled after another pool which supposedly featured "the availability of the Portfolio

7  patents independent of the Portfolio"); Decision and Order, *In re Summit Tech., Inc.*, 127 F.T.C.

8  208, 217 (1999) (No. 9286), available at https://www.ftc.gov/enforcement/cases-

9  proceedings/summit-technology-inc-visx-inc-matter (enforcement action by FTC against a patent

10  pool for anticompetitive and collusive conduct).

11    Moreover, that *some* patent pools may be procompetitive says nothing about *this* patent

12  pool, which is alleged to lack the necessary protections.[10]  In fact, the antitrust regulators have

13  consistently recognized that "[p]ooling agreements typically warrant greater antitrust scrutiny . . .

14  due to the collective pricing of pooled patents, greater possibilities for collusion, and generally a

15  larger number of market participants."  Fed. Trade Comm'n & Dept. of Justice Antitrust Div.,

16  Antitrust Enforcement and Intellectual Property Rights:  Promoting Innovation and Competition at

17  9, 58 (April 2007) ("2007 IP Report"), available at https://www.justice.gov/atr/antitrust-

18  enforcement-and-intellectual-property-rights-promoting-innovation-and-competition.

19    Second, as even Defendants' own cited cases acknowledge, for a pool to avoid Section 1

20  liability, potential licensees at a minimum must have a "realistic" opportunity—not a mere

21  theoretical one—to obtain licenses from individual patent owners.  *See Nero AG v. MPEG LA,*

22  *L.L.C.*, No. 10-CV-3672-MRP-RZ, 2010 WL 4366448, *6 (C.D. Cal. Sept. 14, 2010) ("Thus, the

23  'true issue' in situations involving a patent pool is whether the antitrust plaintiff lacked a '*realistic*

24  *opportunity*' as a '*practical matter*' to obtain individual licenses from individual owners as

25  opposed to a single license from the pool.") (emphasis added); *id.* ("alternative opportunity to

26  ───────────────

[10] *See* FAC, ¶¶ 115-118 (alleging infirmities of Avanci pool include:  refusing to license on
27  FRAND terms, discriminating against upstream suppliers, licensing many over-declared purported
SEPs not properly vetted for actual essentiality, and lacking transparency as to the number and
28  identity of actual SEPs being licensed and how essentiality was determined as to each).

acquire individual rights [must be] *fully* available") (emphasis added); *Sumitomo Mitsubishi Silicon Corp. v. MEMC Elec. Materials, Inc.*, C 05-2133 SBA, 2007 U.S. Dist. LEXIS 61964, *44 (N.D. Cal. August 13, 2007); *Matsushita Elec. Indus. Co. v. Cinram Int'l, Inc.*, 299 F. Supp. 2d 370, 378-79 (D. Del. 2004); *see also CBS v. Am. Soc'y of Composers*, 620 F.2d 930, 935-36 (2d Cir. 1980) (case newly cited by Defendants in amended motion, finding that if "an alternative opportunity to acquire individual rights is fully available . . . and if [individual pool members] retain unimpaired independence to set competitive prices for individual licenses . . . , the blanket license is not a restraint of trade").[11]

Defendants cannot seriously argue that Continental in fact has had a "full[]" and "realistic opportunity" as a "practical matter" to obtain exhaustive direct licenses from all individual Avanci members, let alone on FRAND terms. *Nero*, 2010 WL 4366448, *6. Such a claim would be absurd in light of Continental's allegations that Avanci and its members have repeatedly refused to license Continental. (FAC, ¶¶ 141-150; *compare CBS*, 620 F.2d at 933 (no restraint where parties "*stipulated* . . . that CBS could obtain non-exclusive licenses . . . directly from copyright owners" but "never made any attempt to obtain [such] rights directly") (emphasis added).) It is well-known that at least the three largest Avanci members refuse to exhaustively license upstream suppliers. *See FTC v. Qualcomm Inc.*, No. 17-CV-00220-LHK, 2019 WL 2206013, *79 (N.D. Cal. May 21, 2019) ("[O]ther SEP holders like Nokia and Ericsson have followed Qualcomm's lead and refuse to license modem chip suppliers because it is more lucrative to license only OEMs."). Defendants and other co-conspirator Avanci members now have become complicit in that business model. (FAC ¶¶ 129, 130, 141-150.)

### C. <u>Continental Has Sufficiently Pled a Section 2 Sherman Act Claim.</u>

1. <u>FRAND violations of the type alleged here constitute antitrust violations.</u>

---

[11] *CBS* and *Broadcast Music, Inc. v. Columbia Broadcasting System, Inc.* ("*BMI*"), 441 U.S. 1, 24 (1979), which were related proceedings, are inapposite as "CBS had failed to prove its allegations." *CBS*, 620 F.2d at 932. Moreover, *BMI* did ***not*** hold, as Defendants claim, that a blanket pool license is *per se* lawful, but instead that "we cannot agree [a blanket license] should ***automatically*** be declared illegal." 441 U.S. at 1565 (emphasis added). In fact, *BMI* found that "when attacked, [a blanket license] should be subjected to a ***more discriminating examination***." *Id.* (emphasis added). *BMI* supports having this dispute decided on the merits.

With respect to Section 2, Defendants recycle their half-hearted argument that FRAND violations merely amount to contractual disputes.  But as noted above, precedent, including from this District, squarely rejects their argument.  *E.g., RIM*, 644 F. Supp. 2d at 793-97.  Defendants once again overlook that "FRAND commitments are intended as a 'bulwark' against the unlawful accumulation of monopoly power that antitrust laws are designed to prevent." *Id.* at 795-96 (citing *Broadcom*, 501 F.3d at 305 (reversing order on motion to dismiss where the district court failed to consider this important role of FRAND commitments).  As the Supreme Court declared long ago, "members of [standards] associations often have economic incentives to restrain competition and that the product standards set by such associations have a serious potential for anticompetitive harm." *Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492, 500 (1988).  The SSOs' collective conduct is immune from antitrust scrutiny only to the extent they "promulgate . . . standards based on the merits of objective expert judgments and *through procedures that prevent the standard-setting process from being biased by members* . . . ." *Id.* at 501 (emphasis added); *RIM*, 644 F. Supp. 2d at 795 ("[T]here were several ways [SSOs] might have prevented the use of standards from automatically granting monopoly power to essential patent holders. . . . FRAND commitments are one such method."); *accord Am Soc'y of Mech. Eng'rs v. Hydrolevel Corp.*, 456 U.S. 556, 571 (1982) (noting that SSOs are "rife with opportunities for anticompetitive activity").  Thus, the relevant SSOs all have promulgated IPR Policies precisely to "prevent the standard-setting process from being biased by members"—as alleged here, *see* FAC, ¶¶ 13-14—in violation of the antitrust laws.  *See Allied Tube*, 486 U.S. at 501.  Accordingly, when SEP holders who have voluntarily committed to FRAND licensing (or their successors, who are likewise bound) intentionally undermine the very safeguards that immunize collective standard setting from antitrust exposure, they are subject to antitrust liability.  *See RIM*, 644 F. Supp. 2d at 796 ("when an entity side-steps these safeguards in an effort to return the standard to its natural anti-competitive state anticompetitive effects are inevitable."); *see also Broadcom*, 501 F.3d at 314 (inducing SSOs to adopt proprietary technology through false FRAND

1   promises constitutes exclusionary conduct in violation of Section 2).[12]

2   　　　The best Defendants can do is somehow suggest that some of them may not have "actively

3   participated" in the standardization process, and thus may not have made false FRAND promises.

4   (MTD at 17.)  First, that is not what the FAC alleges (*see, e.g.*, FAC, ¶ 87-100), and the Court is

5   bound to accept all of the allegations in the FAC as true and "draw all reasonable inferences in

6   [Continental's] favor" on this motion to dismiss.  *Wolfe*, 392 F.3d at 362.

7   　　　Second, Defendants ignore the fact that Section 2 proscribes "the willful acquisition *or*

8   *maintenance* of [monopoly] power . . . ."  *U.S. v. Grinnell Corp.*, 384 U.S. 563, 570-71 (1966).  A

9   SEP holder acquires monopoly power through the standardization process.  But that SEP holder

10  engages in unlawful *maintenance* of that power when it purposely reneges on a prior FRAND

11  commitment in order to collect the very monopoly rents that were bargained away to obtain

12  inclusion of its SEPs into the standards.  The well-established proscription against willful

13  monopoly maintenance is in no way displaced by *Broadcom* or any other cases, particularly in

14  light of the important role of the FRAND commitments "as a bulwark against unlawful

15  monopoly."  *Broadcom*, 501 F.3d at 314; *RIM*, 644 F. Supp. 2d at 795-96 (same).

16  　　　Nor are Defendants correct that, despite the voluntary FRAND licensing commitments that

17  encumber any SEPs they claim to license, they "have the unlimited right to exclude others" or

18  charge whatever royalties they desire.  (MTD at 15.)  This argument misapprehends the important

19  distinction between FRAND-encumbered SEPs and patents that are not so encumbered.  *See*

20  *Ericsson, Inc. v. D-Link Sys., Inc.*, 773 F.3d 1201, 1230 (Fed. Cir. 2014) ("Because of Ericsson's

21  RAND commitment[] . . . it cannot" enforce a "policy and marketing program to maintain [its]

22  patent monopoly by not licensing others to use the invention or by granting licenses under special

23

24  _____

     [12] Defendants' reliance on *Rambus Inc. v. FTC*, 522 F.3d 456 (D.C. Cir. 2008), is misplaced.
25  First, Rambus withdrew from JEDEC without ever making *any* FRAND commitments.  *See id.* at
     461, 466; *compare* FAC, ¶¶ 5, 86-101 (alleging all of the SEPs are FRAND-encumbered).
26  Second, *Rambus* was appealed after a lengthy trial and appeal to the full Commission, "which
     reopened the record to receive additional evidence . . . ," and thus the court assessed the
27  sufficiency of the Commission's *proof*, not the FTC's complaint allegations.  *See id.* at 461-62,
     464.
28

1    conditions designed to preserve that monopoly."); *id.* at 1231 ("A RAND commitment limits the

2    market value [of the SEPs]" to a reasonable royalty).  And, contrary to Defendants' suggestion,

3    preventing such exercise of monopoly power to hold up standards users is precisely the goal of the

4    SSOs' FRAND licensing requirements.  *See Broadcom*, 501 F.3d at 314 ("FRAND commitments

5    [are] important safeguards against monopoly power" that is created by "lock[] in"); *RIM*, 644, F.

6    Supp. 2d at 791, 795-96. *See also Allied Tube*, 486 U.S. at 501.[13]

7              2.   <u>Continental has alleged actionable exclusionary conduct under Section 2.</u>

8         Separately as to each Defendant SEP-owner (referred to as "Defendant Licensors," as

9    defined in the FAC at 1), Continental specifically alleges (i) its participation in the SSOs of which

10   it is known to be a member; (ii) that it made FRAND licensing declarations to those SSOs (the

11   contents of which are fully known to each Defendant Licensor); (iii) that such declarations were

12   made "to ensure that the cellular standards incorporated [the Defendant Licensor's] technologies

13   to the exclusion of alternative technologies"; and (iv) that in making such declarations, each

14   Defendant Licensor "*concealed its intent to, among other things, charge supra-competitive royalty*

15   *rates and demand discriminatory terms and conditions* for a license to its alleged SEPs."  (FAC,

16

17   ───────────────

      [13] It is telling that several Avanci members, including Nokia and Ericsson, have previously taken
18   the contrary position—that breaches of FRAND amount to competition violations.  In 2006, Nokia
      filed an antitrust complaint against Qualcomm with the European Commission "regarding
19   exclusionary and exploitative practices of Qualcomm infringing Article 82 EC restricting
      competition in the licensing of CDMA and W-CDMA standard technologies . . . ."  (Decl. of
20   Matthew W. Holder, Ex. 1 (*Qualcomm*, 17-cv-00220-LHK, Dkt. 893-2); *see also* Request for
      Judicial Notice ("RJN"), ¶ 1.)  There, Nokia "alleged Qualcomm's termination of a modem chip
21   license agreement [to Nokia's chip supplier] 'after having induced SSOs to base . . . standards on
      Qualcomm's technology' breached 'Qualcomm's duty to license on FRAND terms' based on
22   multiple IPR policies[,]" thus amounting to a breach of the European Union competition law.
      *Qualcomm*, 2019 WL 2206013, *79.  Ericsson, one of Avanci's founders, also previously argued
23   that "[i]t would like to emphasize that even if (F)RAND obligations could be enforceable through
      contract law, *it is also important that competition law can be used*.  If one company that owns
24   patents that are essential for a given standard imposes excessive and discriminatory terms on all
      licensees, downstream competition is restricted and all the licensees suffer loss, and all consumers
25   and users of the products concerned suffer corresponding losses."  (Holder Decl., Ex. 2 (Ericsson's
      Response to FTC's Request for Comments, Standard Setting Workshop, FTC Project No.
26   P111204) (emphasis added); *see also id.*, Ex. 27 (Ericsson presentation to Korean regulators
      regarding Qualcomm's anticompetitive practices).)
27

28

1   ¶¶ 87-100 (emphasis added).)[14]

2      Continental further alleges that each Defendant Licensor's deceptive SSO representations

3   included its failure to disclose its intent of refusing either to (i) license upstream suppliers at all, or

4   (ii) license them on terms that take into account the suppliers' overall licensing burdens, prices,

5   and margins, as FRAND requires.  (FAC, ¶¶ 9, 136-150.)  *See In re Innovatio IP Ventures*, 1:11–

6   cv–09308, 2013 WL 5593609, *9 (N.D. Ill. Oct. 3, 2013) ("RAND commitments should be

7   interpreted to grant licenses on terms that are objectively commercially reasonable"); *id.* at *38

8   ("Considering the profit of the chip manufacturer on the chip, rather than the profit margins of the

9   Manufacturers on the accused products, is appropriate because a RAND licensor such as Innovatio

10  cannot discriminate between licensees on the basis of their position in the market.").

11     Continental also alleges that "SSOs and users of the standards alike reasonably relied on

12  FRAND promises" when they "adopt[ed] and implement[e]d the standards at issue."  (FAC, ¶

13  101.)  Such promises are thus recognized as encumbrances, traveling with the patents so as to

14  ensure SEP owners do not undermine the goal of FRAND promises simply by transferring them to

15  another entity.  (*See id.*)  Continental further alleges that, pursuant to the cited IPR policies of the

16  relevant SSOs, "[w]hen SEPs are not available for FRAND licensing, the relevant SSOs have an

17  obligation to reassess, and then revise *or even abandon* the portions of their standards that rely on

18  such essential proprietary technologies."  (*Id.* ¶ 83 (emphasis added).)  Finally, the FAC alleges,

19  "Defendant Licensors' technologies became locked into the standards because their FRAND

20  licensing representations directly caused SSO participants to, at a minimum, forego the process by

21  which they were required to evaluate and select alternatives to any essential technology known to

22  be unavailable for FRAND licensing, *or to abandon those portions of the standards for which no*

23  *such alternative was available*."  (*Id.* ¶ 183 (emphasis added).)

24

25  [14] Conversant and Optis are also alleged to have made deceptive FRAND declarations (through material omission) directly to SSOs, which they do not deny.  (FAC, ¶¶ 89-91 (Conversant), 92-94

26  (Optis).)  *See Wi-LAN Inc. v. LG Electronics, Inc.*, 382 F. Supp. 3d 1012, 1022-23 (S.D. Cal. (2019) (rejecting Wi-LAN's arguments that "it cannot be liable under antitrust law for the alleged

27  actions of the prior owners of the patents-in-suit" given the complaint alleged "specific representations made by Wi-LAN to the SSOs, not just representations by the prior patent

28  owners.").

1   Defendants merely dispute the *accuracy* of these allegations, which they may not do on a

2   motion to dismiss.  *See RIM,* 644 F. Supp. 2d at 796 ("[T]his court must accept as true [on a

3   motion to dismiss] the allegation that Motorola obtained its position of power in the market not as

4   a consequence of a superior product, business acumen or historic accident, but by misrepresenting

5   its intentions.").  Indeed, Defendants are fully aware that the IPR Policies establish the form and

6   substance of FRAND declarations to which patentees must conform, and none provides for

7   selective exclusion of certain standards users, such as upstream suppliers; instead, all broadly

8   require licensing any standards user who seeks a FRAND license.  (*See* Holder Decl., Ex. 3 (TIA

9   IPR Policy) at 9, 11 (the Patent Holder "statement must be in the words of the TIA-approved form

10  . . . attached hereto as ANNEX A or . . . ANNEX B, with one of the paragraphs 1, 2a, or 2b

11  checked"); *id.* at 14, 18 (Annex A & B), §§ 2a & 2b (no selective exclusions); *id*., Ex. 4 (ETSI

12  Directives, Annex 6, at 46) (same); *id.*, Ex. 5 (ATIS Operating Procedures) at 10-11 (same); *id.*,

13  Ex. 6 (ATIS Patent Holder Statement) (same); *id.*, Ex. 7 (representative SSO declarations); *see*

14  *also* RJN, ¶¶ 3-7.)  Either Defendants affirmatively misrepresented that they would license any

15  user of the standards and then reneged on that promise by refusing to license upstream suppliers,

16  or materially omitted disclosing their intention to selectively withhold FRAND licenses from

17  certain standards users, as circumstances suit them.

18   Moreover, in light of the allegations of specific material omissions in Defendants'

19  declarations of their intent to boycott upstream suppliers, the FAC's general allegations that such

20  omissions were intentional is legally sufficient.  *See* F.R.C.P. 9(b) (allowing "[m]alice, intent,

21  knowledge, and other conditions of a person's mind" to be "alleged generally"); *Kel Lee Props. v.*

22  *Evanston Ins. Co.*, No. 17-cv-292, 2018 U.S. Dist. LEXIS 1418, *12 (S.D. Tex. Jan. 4, 2018)

23  (same); *Zenith*, 2015 WL 12765633, at *3 (falsity of FRAND promises may be alleged generally).

24   Finally, none of the cases Defendants cite involved analysis of the type of deception

25  alleged here, *i.e.*, the intentional concealment of a plan to boycott upstream suppliers, or withhold

26  FRAND licenses from standards users of their choice.  Nor did any of those cases involve an

27

28

1  actual and express boycott agreement that memorialized such an intention, as alleged here.[15]

2  **D.      The Complaint Adequately Alleges a Conspiracy to Monopolize.**

3  Courts have recognized conspiracy to monopolize as an actionable offense under Section

4  2.  *See American Tobacco Co. v. U.S.*, 328 U.S. 781, 809, 815 (1946) (affirming conviction of

5  horizontal competitors for conspiracy to monopolize); *Paladin Assocs., Inc. v. Montana Power*

6  *Co.*, 328 F.3d 1145, 1158 (9th Cir. 2003).  Defendants' three arguments as to why Continental has

7  not alleged a conspiracy to monopolize are meritless.  Defendants first argue that Continental has

8  not alleged certain elements of the offense.  The elements are "(1) the existence of specific intent

9  to monopolize; (2) the existence of a combination or conspiracy to achieve that end; (3) overt acts

10  in furtherance of the combination or conspiracy; and (4) an effect upon a substantial amount of

11  interstate commerce."  *N. Mississippi Commc'ns, Inc. v. Jones*, 792 F.2d 1330, 1335 (5th Cir.

12  1986).  As to the first two elements, Continental alleges Defendants entered into collusive

13  agreements, including the Multilateral Agreement, specifically to exert additional pressure and

14  bargaining power and to maintain and enhance their ability to exploit monopoly power.  (FAC ¶

15  192.)[16]  Otherwise, the Multilateral Agreement would not have incentivized any Avanci member

16  to pursue a group license that benefits all members when SEP infringement litigation is successful.

17  Instead, a member would pursue an individual license as to its own asserted SEPs.  (Papendick

18  Decl., Ex. A, §§ 4.8, 5.1.2 at 11.)  As to the third element, "the [overt] act may be no more than

19  the conspiracy itself."  *Hunt-Wesson Foods, Inc. v. Ragu Foods, Inc.*, 627 F.2d 919, 926 (9th Cir.

20  1980).  At any rate, Continental has alleged other overt acts.  (FAC, ¶¶ 108, 111, 112-14, 115-118,

21  145.)

22  Finally, Defendants argue the conspiracy to monopolize claim fails because it alleges only

23

24  ──────────────
   [15] Defendants' reliance on *Rambus*, 522 F.3d at 466, and *Huawei Techs., Co v. Samsung Elecs.*

25  *Co.*, 340 F. Supp. 3d 934, 955 (N.D. Cal. 2018), is unavailing.  In those cases, courts considered
   either the sufficiency of a plaintiff's *proof after trial*, or the existence of material disputed facts

26  based on a discovery record.  *See*, note 12, *supra* (distinguishing *Rambus*); *Huawei*, 340 F. Supp.
   3d at 956-57 (summary judgment).

27  [16] That Defendant Licensors purportedly cannot compete in any licensing market (because they
   have separate monopolies in each technology market) simply ignores the numerous allegations

28  that they ***do*** compete in the licensing market (FAC, ¶¶ 113-14, 127, 128).

1  an intent to create a "shared monopoly" where no single entity would gain monopoly power.  This

2  mischaracterizes the allegations as well as the case law.  For example, in *Zenith*, 2015 WL

3  12765633, the court upheld a conspiracy to monopolize claim against a patent pool and some of its

4  members, rejecting the shared monopoly argument.  *See id.* at *7-8 (finding allegations plausible

5  that the pooling agreement "was a mechanism to maintain . . . power by enhancing [the licensors']

6  ability to exploit the allegedly improperly obtained monopolies [in the standardized technology]");

7  *compare* FAC, ¶ 192.

8  **E.      The Complaint Adequately Alleges Relevant Markets.**

9       "Because market definition is a deeply fact-intensive inquiry, courts hesitate to grant

10  motions to dismiss for failure to adequately plead a relevant product market."  *Todd v. Exxon*

11  *Corp.*, 275 F.3d 191, 199-200 (2d Cir. 2001) (Sotomayor, J.) (reversing dismissal of antitrust

12  claim for failure to allege a plausible market).  Proper market definition can be determined only

13  after a factual inquiry into the "commercial realities" faced by consumers.  *See Eastman Kodak*

14  *Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 482 (1992), citing *Grinnell Corp.*, 384 U.S. at 572;

15  *Apani Sw., Inc. v. Coca-Cola Enters., Inc.*, 300 F.3d 620, 628 (5th Cir. 2002) (market definition is

16  "usually a question of fact").  Many courts find that market issues "are more appropriately

17  addressed at the summary judgment or trial stage."  1 ABA Section of Antitrust Law,

18  ANTITRUST LAW DEVELOPMENTS 628 (8th ed. 2017); *see also Newcal Indus., Inc. v. IKON*

19  *Office Solution*, 513 F.3d 1038, 1045 (9th Cir. 2008) (market definition is a fact issue).

20       Continental has alleged proper technology, licensing, and broadband processor markets.

21  Continental properly has alleged that the relevant technology markets and/or submarkets post-

22  standardization include only the specific patents and/or patent applications that each Defendant

23  Licensor claims are essential to the 2G, 3G, or 4G cellular standards.  (*See* FAC, ¶ 121.)  *See*

24  *Broadcom*, 501 F.3d at 315 (rejecting "Qualcomm['s] object[ion] to a relevant market definition

25  that is congruent with the scope of its WCDMA patents" and holding, "It is the incorporation of a

26  patent into a standard—not the mere issuance of a patent—that makes the scope of the relevant

27  market congruent with that of the patent."); *RIM*, 644 F.Supp. 2d at 793 ("A standard[,] by

28  definition, eliminates alternative technologies").  To the extent Defendants demand more

1  specificity, they seek to shift the blame for Defendants' conspiracy to conceal the actual SEPs at

2  issue onto its victims.  (*See* FAC, ¶¶ 115, 117.)  In short, "Avanci's lack of transparency has . . .

3  made it impossible for Continental or other[s] . . . to evaluate Avanci's claims as to the essentiality

4  of the patents it purports to license."  (*Id.*, ¶ 118.)

5      Defendants also argue the FAC fails for not alleging specific alternative technologies that

6  were excluded as a result of Defendant Licensors' false FRAND promises.  In doing so, they again

7  incorrectly rely on *Rambus*, 522 F.3d at 466-67, which was a patent ambush case decided after

8  trial on an extensive evidentiary record and addressing the sufficiency of the FTC's *proof* and not

9  allegations in a complaint.  Defendants' argument ignores Continental's allegations that when

10  SEPs are known to be unavailable for FRAND licensing, the policies of the relevant SSOs require

11  them to reassess and then revise or even abandon the portions of their standards for which

12  alternatives are not available on FRAND terms or at all.  (FAC, ¶ 83.)  As alleged, Defendants

13  intentionally displaced that process through misleading omissions about their licensing intentions,

14  such that the SSOs *at a minimum* lacked notice and opportunity to consider alternatives or modify

15  the standards.  (*Id.*, ¶¶ 84, 183.)  Defendants also gloss over the allegation that alternative

16  technologies were "regularly proposed to the SSOs by companies that are not members of

17  Avanci."  (*Id.*, ¶ 120.)  "Thus, ETSI could have adopted any of these alternatives (in whole or in

18  part) as part of the 3G UMTS and 4G LTE standards."  (*Id.*)  At this stage, these allegations

19  suffice to support the technology markets definition, and Continental should not be required to

20  amend to add detailed lists of alternative technology proposals for hundreds of SEPs Defendants

21  claim to own or license on a portfolio basis (although it could if it had to).  *See Apple*, 2012 WL

22  1672493, *6 (allegations of SEP lock-in, plus inability to switch to other technologies without

23  undue cost, suffice to support allegations of market power in technology markets).

24      Defendants next argue that the SEP licensing market allegations are deficient because the

25  theory that the SEP holders compete with each other does not make economic sense.  However,

26  this argument once again ignores case law establishing that SEP owners' licensing behavior

27  affects what other SEP owners can charge.  *Microsoft Corp. v. Motorola, Inc.*, 795 F.3d 1024,

28  1031 (9th Cir. 2015) ("royalty stacking" refers to risk that multiple SEP owners engaging in patent

1    hold-up will result in cumulative excessive royalties); *Georgia-Pacific Corp. v. United States*

2    *Plywood Corp.*, 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970) (in determining reasonable royalty,

3    courts will look to, *inter alia*, "rates paid by the licensee for the use of other patents comparable to

4    the patent in suit" though not necessarily substitutes), *mod. and aff'd*, 446 F.2d 295 (2d Cir. 1971);

5    *accord,* FAC, ¶¶ 127-28.  This argument also ignores other allegations, including that Defendants'

6    conspiracy was designed to allow them to extract supra-competitive, non-FRAND royalties

7    through royalty stacking that they could not otherwise achieve through individual licensing.  (*See*

8    *id.*)

9            Finally, Defendants claim that Continental's alleged baseband processor market fails

10   because none of the Defendants participate in that market.  However, the FAC alleges that

11   Qualcomm, a major baseband processor manufacturer, is a key Avanci member (indeed, a

12   founder).  (*See* FAC, ¶¶ 131-33, 172.)  Other Avanci Members (including Defendant Licensors)

13   have agreed to offer inducements to facilitate or encourage use of Qualcomm baseband processors

14   and limit competition in the baseband processor market.  (*See id*. ¶¶ 131-33.)  The fact that a

15   defendant was not itself engaged in a particular business "does not perforce exclude any claim that

16   it conspired with another company that was so engaged . . . ."  *Richter Concrete Corp. v. Hilltop*

17   *Basic Resources, Inc.*, 547 F. Supp. 893, 899 (S.D. Ohio 1981), *aff'd*, 691 F.2d 818 (6th Cir.

18   1982); *see also Klor's v. Broadway-Hale Stores*, 359 U.S. 207 (1959) (reversing defense summary

19   judgment where suppliers conspired with single competitor of retailer).

20   **IV.    DEFENDANTS' ATTACKS ON CONTINENTAL'S OTHER CLAIMS ALL FAIL.**

21        **A.    Continental Has Pled a Viable Promissory Estoppel Claim.**

22           Defendants argue Continental cannot state a promissory estoppel claim under French law,

23   but ignore that Continental's claim is also based on FRAND commitments to American SSOs like

24   ATIS and TIA, which are not governed by French law.  (FAC, ¶¶ 3, 71, 87, 91, 92, 94.)  They also

25   cite a New York decision in arguing that FRAND declarations are too vague to support a

26   promissory estoppel claim, *see Haier Am. Trading, LLC v. Samsung Elecs., Co.*, No. 1:17-cv-921

27   TJM, 2018 WL 4288617, *15-16 (N.D.N.Y. Sept. 7, 2018), but in addition to wrongly dismissing

28   that claim, the *Haier* court also held the FRAND promise did not even create a contractual

obligation.  That is an outlier view.  *Cf. Microsoft Corp.*, 696 F.3d at 884 ("Motorola's RAND

declarations to the ITU created a contract enforceable by Microsoft as a third-party beneficiary");

*RIM*, 644 F. Supp. 2d at 791, 797 (denying motion to dismiss FRAND promissory estoppel claim).

Further, numerous courts have refused to dismiss promissory estoppel claims in FRAND cases.

*See id.*; *Microsoft Corp. v. Motorola, Inc.*, No. 10-cv-1823-JLR, 2011 WL 11480223, *4 (W.D.

Wash. June 1, 2011); *Zenith*, 2015 WL 12765633, *4; *Realtek Semiconductor Corp. v. LSI Corp.

et al.*, No. 5:12-cv-03451-RMW, 2012 WL 4845628, *6 (N.D. Cal. Oct. 10, 2012); *TCL

Communications Technology Holdings, Ltd. v. Telefonaktiebolaget LM Ericsson*, Case No. 14-cv-

0341, 2016 WL 6562075, *2-3, n.3 (C.D. Cal. Aug. 9, 2016).  Thus, the Court should not follow

*Haier*, which renders the FRAND obligation almost meaningless and is not consistent with Ninth

Circuit law.[17]

### B.      Continental Is Entitled to Seek Declaratory Relief.

Defendants contend that Continental's declaratory judgment claim is duplicative of its

claim for breach of contract and otherwise serves no useful purpose.  This is not true, runs counter

to Defendants' other arguments, and is ultimately premature.

"The essential distinction between a declaratory judgment action and an action seeking

other relief is that in the former *no actual wrong need have been committed or loss have occurred*

in order to sustain the action."  *U.S. v. Fisher-Otis Co.*, 496 F.2d 1146, 1151 (10th Cir. 1974)

(emphasis added).  Indeed, "[t]he purpose of the Declaratory Judgment Act is to settle 'actual

controversies' *before* they ripen into violations of law or a breach of some contractual duty."

*Hardware Mut. Cas. Co. v. Schantz*, 178 F.2d 779, 780 (5th Cir. 1949) (emphasis added).  "[T]he

granting of a declaratory judgment lies considerably within the discretion of the court, after mature

consideration of all of the circumstances of the case."  *Lumbermens Mut. Cas. Co. v. McIver*, 27 F.

---

[17] Continental further notes that its promissory estoppel claim against Avanci is also based on
Avanci's public statements.  (FAC, ¶¶ 99, 160.)  Avanci should not be permitted to make repeated
FRAND promises to an entire industry, all for the purpose of earnings hundreds of millions of
dollars in royalties, while avoiding judicial scrutiny of its promises.  *See Kajima/Ray Wilson v.
L.A. Cnty. Metro. Transp. Auth.*, 23 Cal. 4th 305, 301 (2000) (explaining that "[a] promise which
the promisor should reasonably expect to induce action . . . and which does induce such action . . .
is binding if injustice can be avoided only by enforcement of the promise").

1   Supp. 702, 706 (S.D. Cal. 1939), *aff'd sub nom.* at 110 F.2d 323 (9th Cir. 1940).

2     Here, Continental's dispute with Defendants (and Avanci in particular) extends beyond the

3   contract claim.  For starters, Defendants are seeking to strike specific performance as a remedy.

4   Although without merit, that tactic alone means the declaratory judgment claim should stay.  *See*

5   *Funai Elec. Co.*, 2017 WL 1133513, *11 (declining to dismiss declaratory judgment claim re

6   FRAND on motion to dismiss where it was not yet clear whether all relief was available via the

7   contract claims).  Regarding Avanci, it says it is not a party to any contract on which Continental

8   can sue, even though it insists its rates are FRAND (MTD at 27, n.11), and wants to collect huge

9   sums of money by licensing cellular SEPs to the automotive industry.[18]  Continental has

10  demanded a FRAND license, but Avanci refuses (proving at the least that its licensing practice is

11  discriminatory) while demanding rates that are far higher than what would be fair and reasonable.

12  (FAC, ¶¶ 9-11, 98-102, 140, 141.)  In the meantime, Avanci members continue to sue Daimler for

13  patent infringement based on Continental's products (while threatening others), all while

14  Continental seeks (but cannot get) a FRAND license from Defendants.  Thus, there is an

15  unresolved dispute of great importance between the parties, *i.e.*, whether Continental is entitled to

16  an Avanci license, and the FRAND rates for such license.  (*Id.*, ¶¶ 168, 169.)  Absent relief, this

17  dispute will only continue, with lingering uncertainty, loss of business, and other ongoing harm to

18  Continental.  (*See supra* at pp. 2-6.)  Declaratory relief is needed to clarify the parties' relations.

19  At a minimum, it is far too early to decide that this claim has no utility separate from the breach of

20  contract claim.  That determination should only be made "after mature consideration of all of the

21  circumstances of the case," *i.e.*, at least once there has been discovery into the relations between

22  Avanci and its members, the basis for Avanci's rates and licensing practices, and so forth.

23  *Lumbermens Mut. Cas. Co.*, 27 F. Supp. at 706; *see also Funai Elec. Co.*, 2017 WL 1133513, *11.

24    **C.**  **Specific Performance Is an Obvious and Appropriate Remedy Here.**

25    Defendants' scattershot arguments about specific performance as a remedy for the breach

26

27  [18] *Xtria* does not apply because there, the court found plaintiff's declaratory judgment claim "essentially duplicates" its breach of contract claim.  Here, Avanci asserts that as a purported non-party to the contract, it cannot have committed any breach.  If Avanci prevails on this theory (it

28  should not), resolution of breach will not necessarily resolve Continental's dispute with Avanci.

1    of contract claim also lack merit, especially at this early stage of the case.

2         First, as addressed above at pages 2-6, it is false that Continental has not suffered any

3    harm.  Defendants failure and refusal to offer a FRAND license to Continental, consistent with the

4    contractual pledges made when the patents were declared to the SSOs (FAC, ¶¶ 86-102, 136-158),

5    has already caused substantial harm to Continental.  Moreover, Continental need not show

6    monetary damages to get specific performance.  *See Union Oil Co. of Calif. v. Greka Energy*

7    *Corp.*, 165 Cal. App. 4th 129, 136 (2008) ("[T]he fact [plaintiff] may have suffered no monetary

8    damage would not defeat [plaintiff's right to specific performance.");[19] *see also* Holder Decl., Ex.

9    26 (French Civil Code, Art. 1217, 1221, not requiring showing of harm to obtain specific

10   performance of contractual obligation under French law); *see also* RJN, ¶ 8.)  To the contrary, as

11   Defendants admit, the essence of a request for equitable relief is that there is no adequate remedy

12   at law.  (MTD at 5.)

13        Second, Continental has no adequate remedy at law for the harm it is suffering.  It seeks an

14   order imposing a FRAND license, consistent with Defendants' obligations.  (FAC, ¶¶ 14-16, 150,

15   158, Prayer.)  Absent such relief, Continental will continue suffering the same harms associated

16   with being unlicensed, including in ways that will materially impact Continental's involvement

17   and strategy in the telematics business.  A FRAND license—not money—is the only thing that can

18   rectify Continental's predicament.  *See Union Oil Co.*, 165 Cal. App. 4th at 136 ("[W]here a party,

19   as here, commits multiple breaches, specific performance is preferred over the adequate legal

20   remedy of repetitive future damage actions.") and 135 ("[A] party entitled to specific performance

21   of a continuing duty should receive it 'wherever it is practically feasible.'") (citations omitted).

22        Third, the fact Defendants subjectively argue there could be a "range" of FRAND rates is

23   premature, misdirected, and not a basis to strike a remedy.  The specific performance sought by

24   Continental includes, at a minimum, an order requiring Defendants to provide a full license to

25   Continental, regardless of whether rates are set.  The parties' positions regarding what rates are

26

27   [19] Where California law would have applied in the transferor court (*i.e.*, N.D. Cal.), California law

28   would apply here also.  *Van Dusen v. Barrack*, 376 U.S. 612, 639 (1964).

1   actually FRAND and should be imposed can and should be further addressed after discovery has

2   taken place.  In any event, numerous courts have already imposed specific FRAND terms where

3   the parties have an active and unresolvable dispute about those terms.[20]

4            Fourth, Defendants' argument regarding foreign patents is a red herring and specious.  At

5   issue in *Lotes* and *Voda* were requests for the courts to conduct infringement analyses regarding

6   individual foreign patents.  Continental is not requesting this, nor does the Court need to address

7   whether any specific foreign patents are infringed in order to resolve Continental's legal

8   entitlement to a license, and whether Defendants' royalty rates are FRAND.  In *Optis Wireless v.*

9   *Huawei*, the court declined jurisdiction over the declaratory judgment claim as to foreign patents,

10  but based on an incorrect understanding of *TCL*.  *Compare* 2018 WL 3375192 at *8 (stating *TCL*

11  court "did not really address the issue [of jurisdiction over FRAND declaratory judgment claim as

12  to foreign patents] because jurisdiction was not raised") *with TCL Communs. Tech. Holdings Ltd.*

13  *v. Telefonaktiebologet LM Ericsson*, No. 14-cv-00341, 2014 U.S. Dist. LEXIS 197319, at *12

14  (C.D. Cal. July 28, 2014) (finding federal question jurisdiction based on declaratory judgment

15  claim asserting "Defendants have not offered their [*global*] patent licenses on [FRAND] terms").[21]

16       **D.      Continental's UCL Claim Is Also Properly Pled and Supported.**

17           Defendants are wrong when they say Continental has not alleged any loss of money or

18  property.  Continental makes this *exact allegation* in support of the UCL claim (FAC, ¶ 203), and

19  throughout the FAC.  (*Id.*, ¶¶ 157, 177, 186, 195.)  The nature of Continental's harm is further

20  addressed above at pages 2-6.  These allegations easily demonstrate an "identifiable trifle" of

21

22  ─────────────────────
     [20] *See TCL Commc'n Tech. Holdings v. Telefonaktiebolaget LM Ericsson*, No. 15-cv-2370-JVS,
23  2018 WL 4488286, *50-52, *56 (C.D. Cal. Sept. 14, 2018); *In re Innovatio IP Ventures, LLC
     Patent Litig.*, No. 11-cv-9308-JFH, 2013 WL 5593609, *43-45 (N.D. Ill. Oct. 3, 2013); *Microsoft
24  Corp. v. Motorola, Inc.*, No. 10-cv-1823-JLR, 2013 WL 2111217, *98-101 (W.D. Wash. Apr. 25,
     2013); *RealTek Semiconductor v. LSI Corp.*, No. 12-cv-3451-RMW, 2014 WL 3736116 (N.D.
25  Cal. June 16, 2014).

26  [21] This Court need not, as Optis claims, have diversity jurisdiction to "reach issues of FRAND
     licensing of worldwide patent rights."  *See TCL*, 2014 U.S. Dist. LEXIS 197319 at *12 (finding
27  jurisdiction based solely on federal question, not diversity); *TCL Commc'n Tech. Holdings, Ltd. v.
     Telefonaktiebolaget LM Ericsson*, No. 15-cv-2370, 2017 WL 6611635, at *1 (C.D. Cal. Dec. 21,
28  2017) (deciding issues of FRAND licensing as to a worldwide patent portfolio).

1   economic injury, such that UCL standing exists.  *Kwikset Corp. v. Superior Ct.*, 51 Cal. 4th 310,

2   324 (2011); *see also Swain v. CACH, LLC*, 699 F. Supp. 2d 1117, 1122 (N.D. Cal. 2009)

3   (explaining that the plaintiff's loss need not be eligible for restitution to convey UCL standing).

4        Defendants are also wrong when they assert that there are not enough ties to California to

5   enable Continental to invoke the UCL.  To the contrary, the ample ties to California were fully

6   developed in Continental's opposition to the transfer motion (Dkt. 157, pp. 2-8, 19-22), including

7   the development of products which practice the cellular standards by Continental's affiliate (which

8   would be covered by the license at issue), and defendants' own activities in California.  *See*

9   *Clothesrigger, Inc. v. GTE Corp.*, 191 Cal. App. 3d 605, 613 (1987) (refusing to dismiss UCL

10  claim because "defendants do business in California . . .").

11       **E.      Continental Has Pled Facts to Support Its Contract Claim Against Avanci.**

12       Defendants cherry-pick from the allegations in the FAC in an attempt to characterize

13  Avanci as a traditional "licensing agent" against which a breach of contract claim cannot be

14  maintained "as a matter of basic California contract law."  (MTD at 26.)  However, the FAC paints

15  a far more nuanced picture, alleging facts showing that Avanci is an independent entity with its

16  own ownership and profit motivations, that its membership is made up of SEP holders that seek to

17  charge supra-FRAND rates through the market power of a "purported 'licensing platform,'" that it

18  expressly admits it operates subject to FRAND encumbrances, and that it will reap huge financial

19  gains from licensing SEPs.  (*See, e.g.*, FAC, ¶¶ 8-15, 23, 99-100, 107-135, 151-158.)

20       This description of Avanci is legally-significant at this stage of the litigation.  For one,

21  under Fifth Circuit law,[22] "the existence and scope of a principal-agent relationship is a question of

22  fact that is 'generally for the factfinder at trial to determine.'"  *Indus. Maritime Carriers, Inc. v.*

23  *Japan Heavy Lift*, No. 03-cv-1041, 2006 WL 860979, at *2 (E.D. La. Mar. 20, 2006) (quoting

24  *Wood v. Holiday Inns, Inc.*, 508 F.2d 167 (5th Cir. 1975)); *accord, Quest v. Bandera Cnty*, Case

25

26  _____

27  [22] Discovery may assist in determining which body of law should govern certain elements of
    Continental's breach of contract claim against Avanci.  (*See, e.g.*, Papendick Decl., Ex. A, § 9.7.1

28  (stating that the Avanci Agreement "will be governed by and construed and enforced in
    accordance with the laws of New York . . .").)

1   No. 13-cv-00506, 2013 WL 6835147, at *5 (W.D. Tex. Dec. 26, 2013); *Zimmerman v. Superior*

2   *Court of San Diego Cnty.*, 220 Cal. App. 4th 389, 401-02 (2013); *Impax Media, Inc v. Northeast*

3   *Adver. Corp.*, Case No. 17-cv-8272, 2018 WL 3962841, *8 (S.D.N.Y. Aug. 17, 2018); Rest.3d.

4   Agency § 1.02 (2006) ("whether a relationship is characterized as agency in an agreement between

5   parties . . . is not controlling").  In fact, in the *Bernsen* case cited by Defendants, the court refused

6   to dismiss even on summary judgment because a genuine issue of fact was raised as to the agency

7   relationship.

8        The law also provides that agents may be personally liable for the obligations of their

9   principals where there is evidence that the agent intends "to substitute or superadd his personal

10   liability for or to that of the principal."  *OTN v. Va. Hemotology Oncology*, Case No. C 05-3033

11   WDB, 2006 WL 334532, at *7-8 (N.D. Cal. Feb. 10, 2006); *Buckley v. Nat'l Football League*, 18-

12   cv-3009 (LGS), 2018 WL 6198367, *2 (S.D.N.Y. Nov. 16, 2018) (same); *Lake City Stevedores,*

13   *Inc. v. E. W. Shipping Agencies, Inc.*, 474 F.2d 1060, 1063 (5th Cir. 1973) ("agent may . . . bind

14   himself if he conducts himself in such a way as to indicate an intent to be bound").

15        Under these rules of law, Continental is entitled to conduct discovery into:  (1) Avanci's

16   origins and purpose (including its ownership structure and who profits from its activity); (2) the

17   nature of its relationship with its members; and (3) the transferability of the FRAND commitment

18   undertaken by the other Defendants.  All of this discovery relates to a constellation of facts

19   relevant to the Court's determination whether Continental may also maintain a breach of contract

20   claim against Avanci, in addition to the claims addressed above.[23]

21

22   ─────────────────────
     [23] For example, the Complaint alleges that the FRAND commitments undertaken by Avanci's

23   members "have been recognized as encumbrances that bind subsequent licensors and transferees
     of such patents."  (FAC, ¶ 101 (citing ETSI IPR Policy, § 6.1bis).)  Continental is entitled to

24   conduct discovery to explore the nature of Avanci's relationship to these FRAND commitments.
     In addition, exclusive licensees can be found to have an "ownership" interest in licensed patents.

25   *See Propat Int'l Corp. v. RPost, Inc.*, 473 F.3d 1187, 1189 (Fed. Cir. 2007).  Continental has pled
     sufficient facts to show that Avanci has an interest in the SEPs that is akin to an exclusive licensee

26   (and certainly more than a typical non-exclusive licensee).  (FAC, ¶ 129.)  Indeed, Continental
     presumes that Avanci has investors, as well as executives, who anticipate profiting very

27   handsomely from Avanci's wide-ranging and industry-encompassing licensing activities.
     Continental should be permitted to conduct discovery to explore this theory.

28

## V.   <u>PERSONAL JURISDICTION IS PROPER AS TO ALL "STATE LAW" CLAIMS.</u>

Certain Defendants challenge personal jurisdiction but only if the antitrust claims are dismissed.  (MTD, p. 26.)  Personal jurisdiction is thus admitted to be proper for the antitrust claims, and is also proper for all of the "state law" claims as they arise out of the same concerted refusal to license Continental and failure to adhere to Defendants' FRAND obligations.[24]  (FAC, ¶¶ 151-166.)  *See also Action Embroidery*, 368 F.3d at 1180-81 (where court has personal jurisdiction over defendants in connection with federal claims, court may exercise "pendent" personal jurisdiction over state law claims that arise out of a common nucleus of operative facts); *accord, Transource Int'l, Inc. v. Trinity Indus., Inc.*, 725 F.2d 274 (5th Cir. 1984); *Rolls-Royce Corp. v. Heros, Inc.*, 576 F. Supp. 2d 765, 784 (N.D. Tex. 2008).  The transferor court found that "all four state law claims arise out of a common nucleus of operative facts with the federal antitrust claims" and a "district court could therefore exercise pendent personal jurisdiction over the state law claims."  (Dkt. 204, pp. 15-16.).

## VI.   <u>OPTIS'S ADDITIONAL ARGUMENTS HAVE NO MERIT.</u>

Here, Continental addresses Optis's additional arguments, to the extent not already addressed (explicitly or implicitly) above.  First, Optis moves to dismiss for lack of venue, but it does not contest personal jurisdiction as to the antitrust claims.  (MTD at 26-27.)  The Clayton Act provides that for private lawsuits seeking injunctive relief (as here), venue is proper in any district having jurisdiction over the parties.  *See* 15 U.S.C. § 26 ("Any person, firm, corporation, or association shall be entitled to sue for and have injunctive relief, *in any court of the United States having jurisdiction over the parties*, against threatened loss or damage by a violation of the antitrust laws . . . .") (emphasis added).  Since Optis concedes personal jurisdiction as to the antitrust claims, and Continental seeks injunctive relief, venue is proper.

Second, Optis makes a variety of allegations regarding the parties' dealings in effort to

---

[24]  Even if the Court were to dismiss the antitrust claims (it should not), this Court still has personal jurisdiction over the state law claims.  All the Optis Defendants are incorporated or have principal places of business in Texas, so this Court has general personal jurisdiction.  Dkt. 102-6, ¶¶ 1-2, 9-11; *Daimler AG v. Bauman*, 571 U.S. 117, 137 (2014).  Nokia and Sharp participate in the Avanci licensing platform, which is based and operated in Texas.  Dkt. 110-3, ¶¶ 3-4, 7; Dkt. 110-2, ¶ 2; *McGee v. Int'l Life Ins. Co*., 355 U.S. 220, 223 (1957).

defeat standing and the other claims.  Continental vigorously disputes these allegations.  (*See* Djavaherian Decl., ¶¶ 2-8.)  In short, Continental sought to engage Optis because it was harassing Continental's customers for a license.  (*Id.*, ¶¶ 3-5.)  Continental asked Optis to stop, and specifically said it was willing to license any applicable SEPs.  (*See id.*)  Optis never responded until well after this lawsuit was filed.  (*Id.*, ¶ 6, 7.)  Although Optis misleadingly says it no longer seeks to directly license automotive OEMs, *it blatantly ignores the fact that Avanci, as its agent, continues to do exactly that, for Optis's express financial benefit*.  (*Id.*, ¶ 8.)  Optis cannot continue to participate in Avanci's unlawful cartel, and then argue here that it is an innocent actor with no role or blame.  It should further be noted that only *after* this lawsuit was filed did Optis finally say that it would directly license Continental on FRAND terms.  (*Id.*, ¶ 7.)  But Optis still—to this day—has made no offer.  (*Id.*)  Optis says it wants to arbitrate with Continental, but Continental filed this lawsuit to obtain a binding FRAND license (not an "advisory opinion") vis-à-vis all Defendants (including Optis and Avanci).  (*Id.*)  So long as Optis is still a member of Avanci, and fails to provide a FRAND offer to Continental, the parties' dispute is quite real and requires relief.

Optis's claim that Continental's in-house counsel "refused to deal" with it is contradicted by its own evidence.  (Dkt. 193-2.)  Optis also says Continental's outside counsel, Mr. Djavaherian, is "in the Northern District of California," suggesting contacts were being engineered with that District for jurisdiction or venue.  But he is in *southern* California.  (Dkt. 271, Ex. A (letterhead showing "San Clemente").)  Importantly, although his November 2019 letter (*id.*) reprised a request for a license, three months have gone by with no response, let alone a license offer.

## VII.   **CONCLUSION**

Continental respectfully requests that the motion be denied in its entirety.  Continental has sufficiently stated its claims for relief, and discovery is the proper vehicle for further inquiry.

1   Dated:  February 28, 2020

2                               SHEPPARD MULLIN RICHTER & HAMPTON, LLP

3

4                   By    _____
                                      /s/ *Matthew W. Holder*
5                               STEPHEN S. KORNICZKY
                                MARTIN R. BADER
6                               MATTHEW W. HOLDER
                                MICHAEL W. SCARBOROUGH
7                               LAI L. YIP

8                               Attorneys for Plaintiff
                   CONTINENTAL AUTOMOTIVE SYSTEMS, INC.
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28